JONES DAY
Bruce Bennett
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Tel: (213) 243-2533
Fax: (213) 243-2539

Counsel for the Litigation Trustee of the
MF Global Litigation Trust and for
MF Global Holdings Ltd.
as Plan Administrator


 - and -

JONES DAY
Jane Rue Wittstein
222 East 41st Street
New York, NY 10017
Tel: 212-326-3939
Fax: 212-755-7306

Counsel for MF Global Holdings Ltd.,
as Plan Administrator

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x
                                      :

In re                                          :

MF GLOBAL HOLDINGS LTD., et al.,       :

              Debtors.[1]             :

                                          :

                                          :

---------------------------------------------------------- x

Chapter 11

Case No. 11-15059 (MG)

(Jointly Administered)

---

[1]     The debtors in these chapter 11 cases (the "Chapter 11 Cases") are MF Global Holdings Ltd.; MF Global Finance USA Inc.; MF Global Capital LLC; MF Global Market Services LLC; MF Global FX Clear LLC; and MF Global Holdings USA Inc. (collectively, the "Debtors").

NAI-1500594322v6

|  |  |  |
|---|---|---|
| MF GLOBAL HOLDINGS LTD., as Plan Administrator; and NADER TAVAKOLI, as Trustee of the MF Global Litigation Trust, | : : : : : : | Adv. Proc. No. 15-____ (MG) |
| Plaintiffs, | : : : |  |
| vs. | : : : |  |
| JON S. CORZINE, J. RANDY MACDONALD, HENRI J. STEENKAMP, DAVID P. BOLGER, EILEEN S. FUSCO, DAVID GELBER, MARTIN J. GLYNN, EDWARD L. GOLDBERG, DAVID I. SCHAMIS, ROBERT S. SLOAN, U.S. SPECIALTY INSURANCE COMPANY, AXIS INSURANCE COMPANY, ACE AMERICAN INSURANCE COMPANY, ILLINOIS NATIONAL INSURANCE COMPANY, FEDERAL INSURANCE COMPANY, NEW HAMPSHIRE INSURANCE COMPANY, IRONSHORE INDEMNITY, INC., WESTCHESTER FIRE INSURANCE COMPANY, HARTFORD ACCIDENT & INDEMNITY COMPANY, ST. PAUL MERCURY INSURANCE COMPANY, IRONSHORE INSURANCE LTD., IRON-STARR EXCESS AGENCY LTD., and STARR INSURANCE & REINSURANCE LIMITED, | : : : : : : : : : : : : : : : : : : |  |
| Defendants. | : : : |  |

-----------------------------------------------------------  x

## ADVERSARY COMPLAINT FOR INJUNCTIVE RELIEF

MF Global Holdings Ltd., as Plan Administrator (the "Plan Administrator") in the above-captioned Chapter 11 Cases pursuant to the Debtors' confirmed plan of liquidation [Ch. 11 Docket No. 1382] (the "Plan"), and Nader Tavakoli in his capacity as the duly appointed trustee of the litigation trust created pursuant to the Plan (the "Litigation Trustee"; collectively with the Plan Administrator, the "Adversary Plaintiffs"), by and through their undersigned counsel, allege for their complaint as follows:

### PRELIMINARY STATEMENT

1.      As discussed more fully below, the Adversary Plaintiffs commence this action to enjoin the named defendants from continuing to take actions to obtain final approval of the current form of the *Stipulation and Agreement of Settlement with Individual Defendants* [MDL Docket No. 969-1] (the "Securities Settlement" or "Settlement Agreement"), a copy of which is annexed hereto as Exhibit A, between the Lead Plaintiffs[2] and the Individual Defendants[3] in the Securities Actions pending as part of the MDL before Judge Victor Marrero of the United States District Court for the Southern District of New York (the "District Court"), pending  resolution of the remaining estate-related claims asserted in the MDL (the "Estate MDL claims," as defined below).  This relief is necessary to prevent imminent harm to creditors of the Chapter 11 estates that will result if the Securities Settlement is approved in its current form, specifically the irremediable loss of $25 million in D&O coverage otherwise available to satisfy claims in the MDL, and the violation of the Plan Injunction by the Individual Defendants and Insurer Defendants named herein who have committed to pay out amounts under the Side ABC D&O policies that if permitted would invade the $13.06 million of Side B indemnification coverage (the "Side B Claims") which the Court previously ruled constitute property of the estate.  *See Memorandum Opinion And Order Lifting Automatic Stay To Permit Payments Of Defense Costs*

---

[2]     The "Lead Plaintiffs" are the lead plaintiffs in the securities actions (the "Securities Actions") consolidated under the cases captioned *In re MF Global Holdings Limited Securities Litigation*, No. 1:11-cv-07866-VM (S.D.N.Y.) (the "MDL").  The Lead  Plaintiffs are not named herein as defendants since the Plan Administrator and Litigation Trustee do not oppose the amount of the Securities Settlement, but only the sources of funding and timing separately agreed to by Individual Defendants and Insurer Defendants named herein, and therefore only seek to prevent the Securities Settlement from becoming final until the provision regarding funding are addressed to prevent the loss of $25 million in D&O policy proceeds.

[3]     The "Director Defendants" who are named only in the securities-related actions and not in the Estate MDL claims, are  David P. Bolger, Eileen S. Fusco, David Gelber, Martin J. Glynn, Edward L. Goldberg, David I. Schamis, and Robert S. Sloan.  The Director Defendants, collectively with Jon S. Corzine, J. Randy MacDonald, and Henri J. Steenkamp (the "Officer Defendants"), are the "Individual Defendants".

*Under Certain Insurance Policies* dated September 4, 2014 [Ch. 11 Docket No. 1988 at 22]

("Lift Stay Ruling").  The District Court's *Order Preliminarily Approving Proposed Settlement*

*with Individual Defendants and Providing for Notice* (MDL Docket No. 975 at 5 ¶ 6) expressly

provided that adjournments of the settlement hearing and modifications to the Securities

Settlement  could be agreed to by the parties without requiring further notice to the Individual

Defendant Settlement Class; as such, the relief sought herein does not unduly harm any party and

should be granted in the interests of justice.

**JURISDICTION AND VENUE**

2.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§  1334(b) and (e), and 157(b)(1).  This adversary proceeding is a core proceeding pursuant to 28

U.S.C. §§ 157(b)(2)(A) and (O).  The Court also expressly retained broad jurisdiction under

Article XII of the Plan [Chapter 11 Docket No. 1382 at 73-74] and in the *Order Confirming*

*Amended and Restated Joint Plan of Liquidation* [Ch. 11 Docket No. 1288 at 42 ¶ 89] (the

"Confirmation Order").

3.      Venue of this action in this District is proper pursuant to 28 U.S.C. §§ 1408 and

1409.

4.      This adversary proceeding has been brought in accordance with §§ 105(a) and

1142 of the Bankruptcy Code and Bankruptcy Rules 7001(7) and 7065.

5.      This adversary proceeding also seeks relief against the Individual Defendants and

Insurer Defendants under the Plan Injunction which, *inter alia,* enjoins "any actions to interfere

with the implementation or consummation of the Plan."  *See* Plan at Article XI, Section D

[Chapter 11 Docket No. 1382 at 72-73]; Confirmation Order at ¶ 37 [Ch. 11 Docket No. 1288 at

22].

**THE PARTIES**

6.       The Plan Administrator, on behalf of the Debtors' estates and on behalf of MF Global Assigned Assets LLC ("MFGAA"), and the Litigation Trustee are the named plaintiffs in this action ("Adversary Plaintiffs").  The Plan Administrator is responsible under the Plan for liquidating all property under the Plan and making distributions to creditors of the Debtors' estates, except for the prosecution of certain claims on behalf of the creditors expressly vested in the Litigation Trustee under the Plan.  As relevant here, the Litigation Trustee is prosecuting claims in the MDL proceeding, *Tavakoli v. Corzine, et al.* (the "Litigation Trust claims") against certain of the same defendants as named in the Securities Actions, with the recoveries on such claims flowing back to the creditors of the Debtors' estates.  Also pending in the MDL are certain claims on behalf of former customers of MF Global Inc. ("MFGI") for Net Equity claims brought by class representatives, the *Commodity Customer Class Action* (the "Customer Class Action claims"), which through a series of assignments approved by this Court are held by MFGAA[4] (the "MFGAA claims"; and together with Litigation Trust claims, the "Estates' MDL claims").  The Estate MDL claims are one of the major remaining sources of expected recoveries for creditors in the Chapter 11 cases.

7.       The "Individual Defendants" named herein are the same parties as the Individual Defendants in the Securities Action who are seeking final approval of the Securities Settlement:

A.       Defendant Jon S. Corzine ("Corzine") was Chairman of the Board of Directors and Chief Executive Officer of MF Global Holdings Ltd. from March 23, 2010 to November 4, 2011.

---

[4]       The MFGAA claims include any recoveries by the Customer Representatives for the Net Equity claims, which were assigned by MFGI  through a series of agreements approved by this Court to MFGAA; any such recoveries will be distributed to the Debtors' estates in proportion to their *pro rata*  claims against MFGI.  *See* Letter to the Honorable Victor Marrero from Jane Rue Wittstein dated September 11, 2015, with Exhibits (MDL Docket No. 996), attached hereto as Exhibit D.

B.  Defendant J. Randy MacDonald ("MacDonald") was Chief Financial Officer of MF Global Holdings Ltd. from April 2008 through March 2011.

C.  Defendant Henri J. Steenkamp ("Steenkamp") was Chief Financial Officer of MF Global Holdings Ltd. beginning in April, 2011.  Defendants Corzine, MacDonald, and Steenkamp are the "Officer Defendants".

D.  Defendants David P. Bolger, Eileen S. Fusco, David Gelber, Martin J. Glynn, Edward L. Goldberg, David I. Schamis, and Robert S. Sloan served on the Board of Directors of MF Global Holdings Ltd., and are all named as the "Director Defendants" in the Securities Actions (collectively with the Officer Defendants, the "Individual Defendants").

8.  The "Insurer Defendants" named herein are certain of the insurers under directors and officers insurance policies (the "D&O Policies" or "D&O Coverage") issued to the Debtors whose policies are implicated in the Securities Settlement and/or in providing coverage for the Side B Claims:

A.  Defendant U.S. Specialty Insurance Company ("U.S. Specialty") is the primary D&O insurer; on information and belief, while U. S. Specialty's coverage limits on the primary policy have been paid out, U.S. Specialty remains involved in its role as the lead D&O insurer and is also one of the three D&O insurers issuing excess Side A Independent Director Liability policies at the top of the D&O tower, as discussed below.

B.  Defendants AXIS Insurance Company, ACE American Insurance Company, Illinois National Insurance Company, Federal Insurance Company, New Hampshire Insurance Company, Ironshore Indemnity, Inc., Westchester Fire Insurance Company, Hartford Accident & Indemnity Company are the eight insurers who, on information and belief, have reached an undisclosed agreement with the Individual Defendants to fund the Securities

6

Settlement from the 2nd through part of the 7th Excess Side ABC insurance layers (the "Funding
Insurers").

C.      Defendants St. Paul Mercury Insurance Company, Starr Insurance &
Reinsurance Limited, and Ironshore Insurance Ltd., are the three insurers providing excess Side
ABC coverage from $135 million to $150 million that are subject to the Debtors' Side B Claims
(the "Side ABC Cushion Insurers," and collectively with U.S. Specialty and the Funding
Insurers, the "Insurer Defendants").  Defendant Iron-Star Excess Agency Ltd. is the company
that issued the policy for and on behalf of Starr Insurance & Reinsurance Limited and Ironshore
Insurance Ltd. as the co-insurers subscribing to a shared layer of coverage.

## BACKGROUND

9.      The parties to this proceeding are key players in the efforts of the Plan
Administrator and Litigation Trustee to prosecute claims and marshal assets for the benefit of the
creditors of the MF Global estates.  The Individual Defendants are among the officers and
directors named in the Securities Actions and/or the Estates' MDL claims for their roles in
bringing about the demise of the Debtors, and the D&O insurers and Individual Defendants have
previously appeared in this Court to lift the automatic stay and Plan Injunction with respect to
payments by certain of the D&O insurers for the Individual Defendants' defense costs.

10.     The facts relevant to the instant proceeding are limited and believed to be largely,
if not entirely, undisputed.  The proceeds of the Debtors' insurance policies remain critical to
creditor recoveries in the Chapter 11 Cases, through claims being pursued by the Litigation Trust
established pursuant to the Plan and through the Customer Representatives' Net Equity claims in
the MDL which flow through a series of assignments (approved by the Court) into the Debtors'
estates.  While the Plan Administrator expects to also recover funds from other sources

(including, for example, claims against MF Global UK Ltd. and affiliated entities), among the Plan Administrator's best opportunities to materially increase creditor recoveries are the Estates' MDL claims against certain of the Individual Defendants and others in the MDL, and those recoveries are expected to come largely from the Debtors' insurance policies under which the Individual Defendants are named insureds.

11.     The D&O Policies are part of an insurance "tower," as is typical of such policies. The total D&O tower purchased by the Debtors and in place for the 2011-12 policy year relevant to the MDL proceedings was $225 million in primary and excess policies.

12.     The issuers and coverage under the D&O tower is as follows:

| Coverage | Limits | Attachment | Insurer |
|---|---|---|---|
| **$150 Million Combined Side A, B, and C**[5] | | | |
| Primary | $25 million | | U.S. Specialty Insurance Co. |
| 1st Excess | $25 million | $25 million | XL Speciality Insurance Co. |
| 2nd Excess | $15 million | $50 million | AXIS Insurance Co. |
| 3rd Excess | $10 million | $65 million | ACE American Insurance Co. |
| 4th Excess | $10 million | $75 million | Illinois National Insurance Co. |
| 5th Excess | $5 million | $85 million | Federal Insurance Co. |
| 6th Excess | $15 million p/o $35 million | $90 million | New Hampshire Insurance Co. |
| 6th Excess | $10 million p/o $35 million | $90 million | Ironshore Indemnity, Inc. |
| 6th Excess | $10 million p/o $35 million | $90 million | Westchester Fire Insurance Co. |
| 7th Excess | $10 million | $125 million | Hartford Accident & Indemnity Co. |
| 8th Excess | $5 million | $135 million | St. Paul Mercury Insurance Company |
| 9th Excess | $7 million p/o $10 million | $140 million | Ironshore Insurance Ltd. |
| 9th Excess | $3 million p/o $10 million | $140 million | Starr Insurance & Reinsurance Ltd. |
| **$50 Million Side A Only**[6] | | | |

---

[5] The $150 million combined Side A, B, and C policies are referred to herein as the "Side ABC Policies" or the "Side ABC Coverage."

[6] The $50 million Side A only policies are referred to herein as the "Side A Excess D&O Policies" or the "Side A Excess D&O Coverage."

| 10th Excess | $10 million | $150 million | Allied World Assurance Co. Ltd. |
| 11th Excess | $15 million | $160 million | AXIS Specialty Ltd. Bermuda |
| 12th Excess | $10 million | $175 million | Catlin Insurance Co. Inc. |
| 13th Excess | $5 million p/o $15 million | $185 million | Federal Insurance Co. |
| 13th Excess | $5 million p/o $15 million | $185 million | Continental Casualty Co. |
| 13th Excess | $5 million p/o $15 million | $185 million | Everest National Insurance Co. |
| **$25 Million Side A – Independent Director Liability[7]** | | | |
| 14th Excess | $10 million p/o $15 million | $200 million | Scottsdale Indemnity Co. |
| 14th Excess | $5 million p/o $15 million | $200 million | New Hampshire Insurance Co. |
| 15th Excess | $10 million | $215 million | U.S. Specialty Insurance Co. |

13.     Side A of the Side ABC Policies provides coverage for non-indemnifiable losses of individual insured, including a requirement that the applicable insurers pay losses that the insured entity cannot pay on behalf of the individual insureds because of insolvency.  Side B of the Side ABC Policies reimburses the company for indemnifiable losses incurred by it, and Side C provides coverage for securities claims only and reimburses loss to the company.  The $50 million Side A Excess D&O Policies cover all officers and directors of MF Global, whereas the $25 million Excess Director Policies provide Side A coverage only for the directors who were not officers or employees of the Company (*i.e.*, the Director Defendants).

14.     As such, while a total tower of $225 million in D&O coverage had been put in place by the Debtors for 2011-2012, only the first $150 million offers combined Side ABC coverage (including coverage for the Debtors' Side B Claims).  The next $50 million provides Side A coverage for all claims against the Individual Defendants in the MDL, and the top $25

---

[7]     The $25 million Side A independent director liability policies at the top of the D&O tower are referred to herein as the "Excess Director Policies."

million in Excess Director Policies provides coverage only for the Director Defendants, who are currently named only in the Securities Actions in the MDL.

15.     The Debtors' D&O policies are rapidly wasting assets.  In September 2014, this Court granted the Individual Defendants' motion to lift the automatic stay to remove the "Soft Cap" previously imposed on the D&O insurers' reimbursement of defense costs.  At the same time, the Court explicitly put in place a restriction "on $13.06 million of the D&O proceeds [that] should not be spent absent further relief from the Court" for the Debtors' Side B Claims. Lift Stay Ruling, Ch. 11 Docket No. 1988, at 4 (emphasis added).

16.     The Lift Stay Ruling was ambiguous about whether the stay was lifted only for payment of defense costs—the title of the Lift Stay Ruling lifted the stay "To Permit Payments Of Defense Costs" (emphasis added), and similarly narrow language was used in the order: "The Court concludes the Individual Insureds are entitled to access the full amount of the D&O Proceeds for defense costs, except for $13.06 million."  Lift Stay Ruling, Ch. 11 Docket No. 1988, at 22 (emphasis added).  Notwithstanding this language, the Individual Defendants and Insurer Defendants have viewed the Lift Stay Ruling as providing them with *carte blanche* to use (or waste) the D&O policies without any further oversight—even to the point, it appears, of exercising control over the last $13.06 million of Side ABC Coverage which the Court explicitly determined was still "property of the estate."

17.     At the time of the Lift Stay Ruling in September 2008—just a little over a year ago—the total amounts disbursed to reimburse for defense costs under both the D&O and Errors & Omissions ("E&O") policies had reached just over $48 million.  *See* Lift Stay Ruling at 3.  Yet remarkably, in a letter dated July 22, 2015 (the "July 2015 D&O Letter"), a copy of which is

annexed hereto as Exhibit C,[8] the D&O Insurers represented to the Plan Administrator that *at most $68 million of the original $225 million in D&O policy limits would be available to satisfy all remaining claims under those policies if the Securities Settlement becomes final*. July 2015 D&O Letter, Ex. C, at 2. The basis for this calculation is not fully disclosed by the insurers, begging the question: how can only $68 million (and diminishing by the day) be left from a $225 million D&O tower, even with a $64.5 million Securities Settlement?

18.     From the July 2015 D&O Letter and from public filings in the MDL proceedings, the picture becomes clear. The primary and 1st excess layers have already been exhausted and the 2nd excess layer has been partially exhausted by the payment of defense costs. *See* July 2015 D&O Letter, Ex. C, at 2. The insurers further represented that, if consummated, the Securities Settlement (taken together with other undisclosed settlements)[9] would exhaust the 2nd through 6th excess layers in their entirety and the 7th excess layer in part. *Id.* Based on this, the insurers estimated that the remaining coverage under the D&O tower was approximately $68 million as of July 22. *Id.*

19.     Basic math shows that this $68 million is comprised of the $50 million in Side A D&O Coverage, the $10 million 9th excess policies, the $5 million 8th excess policy, and approximately $3 million out of the $10 million 7th excess policy. The July 2015 D&O Letter

---

[8]     The July 2015 D&O Letter was sent in response to a letter dated July 13, 2015, by which David W. Steuber of Jones Day wrote to the D&O insurer representatives to inquire about the Securities Settlement, a copy of which is annexed hereto as Exhibit B.

[9]     In fact, it appears that the Individual Defendants and Insurer Defendants entered into settlements of undisclosed amounts funded by the D&O policies of the *AG Oncon Action* and with another opt-out, Cadian Capital Management, using the Side ABC coverage in July 2015. *See* Securities Settlement [MDL Docket No. 969-1], Ex. A at 9 ¶ 22; Judgment of Dismissal Against Individual Defendants dated July 10, 2015 [MDL Docket No. 980]. As such, on information and belief, the only claims still pending against the Director Defendants appear to be opt outs from the Securities Settlement, if any—which are unlikely to be material since the Lead Plaintiffs and Individual Defendants reached an undisclosed side agreement, as is typical in class settlements, providing the terms on which the parties may terminate the settlement based on opt-outs. *See* Securities Settlement [MDL Docket No. 969-1], Ex. A at 40, ¶ 41.

makes no mention of the $25 million Excess Director Policies at the top of the D&O tower in stating what is left under the D&O program.

20.     From the July 2015 D&O Letter,  it also can be pieced together how these policies have been eroded since the Lift Stay Ruling.  Subtracting the $64.5 million earmarked for the Securities Settlement plus the $68 million remaining for other claims as of July 22nd (*i.e.,* $132.5 million) from the $200 million in Side ABC and Side A Excess coverage confirms that $67.5 million has *already been spent by the D&O insurers alone in defense costs and to fund settlements other than the $64.5 million currently in escrow for the Securities Settlement*.  In other words, since the Court entered the Lift Stay Ruling—at which time approximately $48 million in combined E&O and D&O spending had been court-authorized, of which $33.75 was accrued or paid in defense costs under the D&O policies only ( *see* Transcript of 8/22/2014 Hearing dated 9/12/14 [Ch. 11 Docket No. 1991] at 45)—the D&O insurers alone have spent an additional $33.75 million on defense costs or settlements through July 2015 (excluding the $64.5 million for the Securities Settlement at issue here).[10]

21.     From this record, it is clear that in the year since the Lift Stay Ruling, the Individual Defendants and Insurer Defendants chose to focus on settling the Securities Actions ahead of the Estates' MDL claims (and other MDL claims) against the Individual Defendants, and also agreed to "fix" which layers of insurance would fund settlements of the Securities Actions *based on the dates they elected to enter into settlements of those claims*—even though the Securities Settlement is conditioned on final approval of the District Court in the MDL (which is not scheduled for hearing until November 20, 2015) and even though payments will

---

[10]     On information and belief, these undisclosed settlements include combined amounts totaling $10.75 million, which would mean that $23 million has been spent on defense costs in D&O alone in the eleven-month period from August 2014 to July 2015 (for a burn rate on just the D&O policies of over $2 million per month in defense spending since the Soft Cap was removed).

not be made to the class members (even assuming, *arguendo*, the Securities Settlement is approved in its current form), until months later.[11]

22.     The Insurer Defendants and Individual Defendants earmarked funds from Side ABC coverage to cover the entirety of these claims instead of having these claims be satisfied, in part, by the $25 million in Excess Director Policies, apparently without any agreement to require contribution from the Excess Director Policies if exhaustion of the underlying policies was met by competing demands on the policies (even if it occurred prior to the effective date of the settlement).  This agreement to effectively throw away $25 million in D&O proceeds should not be countenanced.  The Excess Director Policies were purchased by the Debtors to provide up to $225 million of protection based on total claims against policies.  It would cause the estates irreparable harm to allow $25 million in D&O proceeds to be wasted when total claims well exceeding the D&O policies limits will clearly be reached,[12] but have not at this time simply because the Insurer Defendants and Individual Defendants have *stipulated* to have the Securities Settlement be funded prior to resolving other MDL claims and months prior even to the Securities Settlement becoming final.

23.     To avoid this harm to creditor recoveries, the Plan Administrator and Litigation Trustee initiate this adversary proceeding to object not to the *amount* of the Securities Settlement

---

[11]     According to the limited information provided in the Securities Settlement, the Funding Insurers were required to escrow the funds for the Securities Settlement within 30 days of the preliminary approval, but all funds except those to cover the notice expenses are held in escrow until the settlement becomes effective, which is no earlier than after the final hearing, currently scheduled for November 20, 2015. *See* Securities Settlement [MDL Docket No. 969-1], Ex. A at 22, ¶ 9.  Payments to class members will not follow until after a claims submission process followed by a separate application for a Class Distribution Order. *Id.* at 32-36, ¶¶ 27-32.

[12]     Damages for the Litigation Trust claims exceed $1.8 billion and the Shortfall Amounts for the Customer Representative claims assigned to MFGAA exceed $484 million.  While this is not the place to detail efforts to resolve the Estates' MDL claims, suffice it to say that demands meeting the underlying exhaustion requirements to trigger the Excess Director Policies could easily be met.

NAI-1500594322v6                                    13

agreed to by the Individual Defendants and Lead Plaintiffs, but only to take issue with the timing and sources of proposed funding agreed to by the Individual Defendants and Insurer Defendants.

24.     In addition, the Plan Administrator brings this action to protect the $13.06 million in Side B Claims which the Court's Lift Stay Ruling deemed property of the estate. The July 2015 D&O Letter makes no mention of any reserve being held for these claims, and as discussed above, Side B coverage terminates at $150 million. To ensure that $13.06 million is available for the Side B Claims, *the insurers cannot pay out sums within the last Side ABC layers from $136.94 to $150 million* "absent further relief from the Court" by the express terms of the Lift Stay Ruling. *See* Lift Stay Ruling [Ch. 11 Docket No. 1988] at 4.

25.     Notwithstanding the restrictions placed by the Lift Stay Ruling, it appears Insurer Defendants and Individual Defendants have completely disregarded this Court's directive to seek relief before spending the last $13.06 million of Side ABC coverage. Specifically, by (i) acknowledging that the Securities Settlement would require funding well into the 7th excess layer (i.e., $132.5 million); and (ii) providing information on defense costs paid since the Lift Stay Ruling that reflect a burn rate of in excess of $2 million per month, it is almost certain that approval of the Securities Settlement in its current form (scheduled for the final hearing on November 20, 2015) would cause the Funding Insurers and Side ABC Cushion Insurers to invade the 8th and 9th Excess Layers that are protected as property of the estate on account of the Side B Claims, all without seeking leave of this Court. Therefore, the Securities Settlement in its current form should not be approved on the independent grounds that it provides for spending that, combined with defense costs and amounts already committed under the Side ABC coverage, would violate the Plan injunction and Lift Stay Ruling.

**COUNT I**
**INJUNCTIVE RELIEF UNDER**
**SECTION 105(A) OF THE BANKRUPTCY CODE**

26.    The Adversary Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 25 as if fully set forth herein.

27.    Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

28.    If the Securities Settlement in its current form is permitted to become final prior to the resolution of other claims in the MDL, $25 million in D&O proceeds will be rendered unavailable to satisfy the MDL Estates' claims, reducing recoveries to the creditors of the Chapter 11 Debtors' estates and benefitting no one but the issuers of the Excess Director Policies.

29.    The Adversary Plaintiffs are entitled to an injunction under Section 105(a) of the Bankruptcy Code enjoining the final approval of the Securities Settlement pending either the resolution of the Estates' MDL claims or modifications to the Securities Settlement to prevent this waste of the D&O policies and consequent harm to the creditors of the Chapter 11 estates.

**COUNT II**
**DECLARATORY AND INJUNCTIVE RELIEF UNDER THE**
**THE PLAN INJUNCTION AND THE COURT'S**
**LIFT STAY RULING**

30.    The Adversary Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 29 as if fully set forth herein.

31.    $13.06M of proceeds from Side ABC coverage was found to be property of the Chapter 11 Debtors' bankruptcy estates pursuant to the Court's Lift Stay Ruling.

32.    Section XI.D of the Chapter 11 Debtors' Second Amended and Restated Joint Plan of Liquidation (the "Plan Injunction"), Docket No. 1382, enjoins, among other things,

"acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan" and "taking any actions to interfere with the implementation or consummation of this Plan."

33. Consummation of the Securities Settlement, combined with defense spending and other commitments by the Funding D&O Insurers and Side ABC Cushion Insurers, are at imminent risk of dissipating the D&O Policies' Side ABC coverage such that less than $13.06M of proceeds would remain available as a reserve for the Side B Claims, in violation of the Plan Injunction and this Court's Lift Stay Ruling.

34. Accordingly, the Adversary Plaintiffs are entitled to declaratory and injunctive relief preventing the defendants from accessing D&O proceeds in the Side ABC 8th and 9th excess layers.

**COUNT III**
**DECLARATORY AND INJUNCTIVE RELIEF UNDER THE**
**THE PLAN INJUNCTION AND THE COURT'S**
**LIFT STAY RULING**

35. The Adversary Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 34 as if fully set forth herein.

36. The Court's Lift Stay Ruling by its express terms only permitted the use of D&O proceeds for reimbursement of defense costs.

37. Accordingly, the Adversary Plaintiffs are entitled to declaratory and injunctive relief preventing the defendants from entering into or consummating settlements which deplete the D&O policies without seeking leave of this Court to ensure that the policies are used in an equitable manner.

38. The Adversary Plaintiffs also are entitled to reimbursement for the costs of this proceeding to enforce the Court's Lift Stay Ruling.

16

WHEREFORE, for all the foregoing reasons, the Plan Administrator and Litigation Trustee respectfully requests entry of:

1. An order enjoining final approval of the Securities Settlement either (i) until the Estates' MDL claims are resolved, or (ii) until the Individual Defendants and Insurer Defendants modify the timing or sources of funding the Securities Settlement to prevent the waste of the Excess Director policies and consequent harm to the creditors of the Chapter 11 estates; and

2. An order declaring that approval of the Securities Settlement violates the Plan Injunction and the Court's Lift Stay Ruling to the extent that less than $13.06M of Side ABC D&O proceeds would remain available as a reserve for the Side B Claims if the Securities Settlement is consummated;

3. An order enjoining the defendants from permitting dissipation of the Side ABC policies without leaving a reserve for the Side B Claims;

4. An order preventing the defendants from entering into or consummating settlements which deplete the D&O policies without seeking leave of this Court to ensure that the policies are used in an equitable manner;

5. An order reimbursing Adversary Plaintiffs for the costs of this proceeding; and

6. An order granting Adversary Plaintiffs such other and further relief as is just.

Dated:  October 19, 2015
      New York, New York

Respectfully submitted,

 /s/ *Jane Rue Wittstein*

**JONES DAY**
Bruce Bennett
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Tel: (213) 243-2533
Fax: (213) 243-2539

Jane Rue Wittstein
222 East 41st Street
New York, NY 10017
Tel: 212-326-3939
Fax: 212-755-7306

*Counsel for MF Global Holdings Ltd.,*
    *as Plan Administrator*

 /s/ *Bruce Bennett*

**JONES DAY**
Bruce Bennett
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Tel: (213) 243-2533
Fax: (213) 243-2539

*Counsel for the Litigation Trustee of the MF*
    *Global Litigation Trust*

NAI-1500594322v6

# Exhibit A

EXECUTION COPY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| IN RE MF GLOBAL HOLDINGS LIMITED SECURITIES LITIGATION | : : : : | Civil Action No. 1:11-CV-07866-VM |
| THIS DOCUMENT RELATES TO: | : : : | |
| All Securities Actions (*DeAngelis v. Corzine*) | : : : : | ECF CASE |

## STIPULATION AND AGREEMENT OF SETTLEMENT
## <u>WITH INDIVIDUAL DEFENDANTS</u>

This Stipulation and Agreement of Settlement, dated as of July 2, 2015 (the "Stipulation" or "Individual Defendant Stipulation") is entered into between (a) the Virginia Retirement System and Her Majesty The Queen In Right Of Alberta (collectively "Lead Plaintiffs"), on behalf of themselves, the other named plaintiffs in the Action (defined below), and the other members of the Settlement Class (defined below); (b) defendants Jon S. Corzine, J. Randy MacDonald, and Henri J. Steenkamp (collectively, the "Officer Defendants"), and (c) defendants David P. Bolger, Eileen S. Fusco, David Gelber, Martin J.G. Glynn, Edward L. Goldberg, David I. Schamis, and Robert S. Sloan (collectively, the "Director Defendants," and together with the Officer Defendants, the "Individual Defendants"; the Individual Defendants together with Lead Plaintiffs, on behalf of themselves, the other named plaintiffs in the Action, and the other members of the Settlement Class, the "Settling Parties"), by and through their respective undersigned counsel, and embodies the terms and conditions of the settlement between the Settling Parties.[1]  Subject to the approval of the Court and the terms and conditions expressly provided herein, this Stipulation is intended

---

[1]  Unless otherwise defined in ¶ 1 herein, all terms with initial capitalization shall have the meanings ascribed to them.

to fully, finally and forever compromise, settle, release, resolve, and dismiss with prejudice all claims asserted in the Action against the Individual Defendants.

WHEREAS:

A. Beginning on November 3, 2011, multiple putative securities class action complaints were filed in the United States District Court for the Southern District of New York (the "Court").  Pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77z-1 and 78u-4, as amended (the "PSLRA"), notice to the public was issued setting forth the deadline by which putative class members could move the Court to be appointed to act as lead plaintiff.

B. By Order dated January 20, 2012, the Court consolidated the related actions in the Action, appointed the Virginia Retirement System and Her Majesty The Queen In Right Of Alberta as Lead Plaintiffs for the Action, and approved Lead Plaintiffs' selection of Bernstein Litowitz Berger & Grossmann LLP and Labaton Sucharow LLP as Co-Lead Counsel.

C. On August 20, 2012, Lead Plaintiffs filed and served their Consolidated Amended Securities Class Action Complaint (the "Amended Complaint"), which included the Government of Guam Retirement Fund, the West Virginia Laborers' Pension Trust Fund, LRI Invest S.A., Monica Rodriguez, and Jerome Vrabel as additional named plaintiffs.  The Amended Complaint asserted claims under § 11 of the Securities Act of 1933 (the "Securities Act") against the Underwriter Defendants and the Individual Defendants, claims under § 12(a)(2) of the Securities Act against the Underwriter Defendants, and claims under § 15 of the Securities Act and §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against some or all of the Individual Defendants.

D. On October 19, 2012, the Individual Defendants and Underwriter Defendants filed and served their motions to dismiss the Amended Complaint.  On December 18, 2012, Lead

Case 1:11-cv-07866-VM-JCF   Document 969-1   Filed 07/07/15   Page 4 of 160

Plaintiffs filed and served their papers in opposition to the motions and, on February 1, 2013, the Individual Defendants and Underwriter Defendants filed and served their reply papers.

E.     On February 6, 2013, the Court stayed all proceedings in the Action to permit the parties to pursue a global mediation of plaintiffs' claims (as well as claims asserted by MF Global's commodities futures customers).  The initial mediation with respect to the Action included three in-person sessions before Judge Daniel Weinstein (Ret.) and multiple telephonic conferences.  The mediation was unsuccessful in resolving the Action, and the stay of the Action expired on August 2, 2013.

F.     On November 12, 2013, the Court entered its Memorandum and Order denying the Individual Defendants' and the Underwriter Defendants' motions to dismiss.

G.     On December 27, 2013, the Individual Defendants and the Underwriter Defendants filed their answers and affirmative defenses to the Amended Complaint.

H.     Discovery in the Action commenced in December 2013.   The Individual Defendants, Underwriter Defendants and third-parties – including James W. Giddens, as Trustee for the liquidation of MF Global Inc. pursuant to the Securities Investor Protection Act of 1970, and Nader Tavakoli, the Litigation Trustee presiding over the entity formerly known as MF Global Holdings Limited – have produced millions of documents.

I.     By Order dated August 13, 2014, the Court approved the substitution of Bleichmar Fonti Tountas & Auld LLP for Labaton Sucharow LLP as Co-Lead Counsel.

J.     On October 3, 2014, Lead Plaintiffs filed the Consolidated Second Amended Securities Class Action Complaint (the "Complaint"), which added MF Global's auditor, PricewaterhouseCoopers LLP ("PwC"), as a named defendant and asserted claims against PwC for violation of § 10(b) of the Exchange Act and § 11 of the Securities Act.

Case 1:11-cv-07866-VM-JCF    Document 969-1    Filed 07/07/15    Page 5 of 160

K.      On February 3, 2015, the Court entered a stipulated order dismissing with prejudice Plaintiff Monica Rodriguez's claims asserted in the Complaint.

L.      Following additional extensive arm's-length negotiations, including significant mediation efforts conducted by Magistrate Judge James C. Francis, the Settling Parties reached an agreement to settle the Action as against the Individual Defendants as set forth herein.

M.      This Stipulation (together with the exhibits hereto) has been duly executed by the undersigned signatories on behalf of their respective clients and reflects the final and binding agreement between the Settling Parties.

N.      Based upon their investigation, prosecution and mediation of the case, Lead Plaintiffs and Co-Lead Counsel have concluded that the terms and conditions of this Stipulation are fair, reasonable and adequate to Lead Plaintiffs and the other members of the Settlement Class, and in their best interests.  Based on Lead Plaintiffs' direct oversight of the prosecution of this matter and with the advice of their counsel, each of the Lead Plaintiffs has agreed to settle and release the claims raised in the Action against the Individual Defendants pursuant to the terms and provisions of this Stipulation, after considering (i) the substantial financial benefit that Lead Plaintiffs and the other members of the Settlement Class will receive from resolution of the Action as against the Individual Defendants; (ii) the significant risks of continued litigation and trial against the Individual Defendants; and (iii) the desirability of permitting the Settlement to be consummated as provided by the terms of this Stipulation.

O.      The Settling Parties agree that certification of a class, for settlement purposes only, is appropriate in the Action.  For purposes of this Settlement only, the Settlement Class is defined in ¶ 1 below.  Nothing in this Stipulation shall serve in any fashion, either directly or indirectly, as evidence or support for certification of a litigation class, and the Settling Parties intend that the

4

Case 1:11-cv-07866-VM-JCF    Document 969-1    Filed 07/07/15    Page 6 of 160

provisions herein concerning certification of the Settlement Class shall have no effect whatsoever in the event this Settlement does not become Final.

P.      This Stipulation constitutes a compromise of matters that are in dispute between the Settling Parties. The Individual Defendants are entering into this Stipulation solely to eliminate the uncertainty, burden and expense of further protracted litigation. Each of the Individual Defendants has denied and continues to deny any wrongdoing, and this Stipulation shall in no event be construed or deemed to be evidence of or an admission or concession on the part of any of the Individual Defendants, or any other of the Individual Defendants' Releasees (defined below), with respect to any claim or allegation of any fault or liability or wrongdoing or damage whatsoever, or any infirmity in the defenses that the Individual Defendants have, or could have, asserted. The Individual Defendants expressly deny that Lead Plaintiffs have asserted any valid claims as to them, and expressly deny any and all allegations of fault, liability, wrongdoing or damages whatsoever. Similarly, this Stipulation shall in no event be construed or deemed to be evidence of or an admission or concession on the part of any Lead Plaintiff of any infirmity in any of the claims asserted in the Action, or an admission or concession that any of the Individual Defendants' defenses to liability had any merit. Each of the Settling Parties recognizes and acknowledges, however, that the Action has been initiated, filed and prosecuted by Lead Plaintiffs in good faith and defended by the Individual Defendants in good faith, and that the Action as to the Individual Defendants is being voluntarily settled with the advice of counsel.

NOW THEREFORE, without any admission or concession on the part of Lead Plaintiffs of any lack of merit of the Action whatsoever, and without any admission or concession on the part of the Individual Defendants of any liability or wrongdoing or lack of merit in the defenses whatsoever, it is hereby STIPULATED AND AGREED, by and among Lead Plaintiffs

5

Case 1:11-cv-07866-VM-JCF    Document 969-1    Filed 07/07/15    Page 7 of 160

(individually and on behalf of the Settlement Class) and the Individual Defendants, by and through their respective undersigned attorneys, and subject to the approval of the Court pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, that, in consideration of the benefits flowing to the Settling Parties from the Settlement, all Released Plaintiffs' Claims as against the Individual Defendants' Releasees and all Released Individual Defendants' Claims as against the Plaintiffs' Releasees shall be fully, finally and forever compromised, settled, released, discharged and dismissed with prejudice, upon and subject to the terms and conditions set forth below.

## DEFINITIONS

1.    As used in this Stipulation and any exhibits attached hereto and made a part hereof, the following capitalized terms shall have the following meanings:

(a)    "Action" means the consolidated securities class action styled *In re MF Global Holdings Limited Securities Litigation*, Civil Action No. 1:11-CV-07866-VM that has been consolidated with other actions under the master case *DeAngelis v. Corzine*, 11-CV-07866-VM.

(b)    "Authorized Claimant" means a Claimant who or which submits a Proof of Claim Form to the Claims Administrator that is approved by the Court for payment.

(c)    "Barred Claims" means (i) claims and claims over for contribution or indemnity (or any other claim or claim over for contribution or indemnity however denominated on whatsoever theory), arising from or related to the claims or allegations asserted by Lead Plaintiffs in the Action, or (ii) any other claim of any type, whether arising under state, federal, common, or foreign law, for which the injury claimed is that person's or entity's actual or threatened liability to Lead Plaintiffs, Settlement Class Members and/or persons and entities who or which, but for their exclusion from the Settlement Class pursuant to request, would be

6

Settlement Class Members arising from or related to the claims or allegations asserted by Lead Plaintiffs in the Action.

(d)    "Claim" means a Proof of Claim Form submitted to the Claims Administrator.

(e)    "Claim Form" or "Proof of Claim Form" means the form, substantially in the form attached hereto as Exhibit 3 to Exhibit A, that a Claimant must complete and submit to the Claims Administrator in order to be eligible to share in a distribution of the net proceeds of the recoveries obtained on behalf of the classes in the Action.

(f)    "Claimant" means a person or entity who or which submits a Claim Form to the Claims Administrator seeking to be eligible to share in the net proceeds of the recoveries obtained on behalf of the classes in the Action.

(g)    "Claims Administrator" or "Notice Administrator" means the firm retained by Lead Plaintiffs and Co-Lead Counsel, subject to approval of the Court, to provide all notices approved by the Court to potential class members in the Action and to administer settlements achieved in the Action.

(h)    "Class Distribution Order" means an order entered by the Court authorizing and directing that the net proceeds of the recoveries obtained on behalf of the classes in the Action, including but not limited to the Individual Defendant Settlement Class and the Other Class(es), be distributed, in whole or in part, to Authorized Claimants.

(i)    "Co-Lead Counsel" means the law firms of Bernstein Litowitz Berger & Grossmann LLP and Bleichmar Fonti Tountas & Auld LLP.

(j)    "Complaint" means the Consolidated Second Amended Securities Class Action Complaint filed by Lead Plaintiffs in the Action on October 3, 2014.

7

(k)    "Court" means the United States District Court for the Southern District of New York.

(l)    "Defendants" means the Individual Defendants, the Underwriter Defendants, and PwC.

(m)    "Effective Date" with respect to the Settlement means the first date by which all of the events and conditions specified in ¶ 36 of this Stipulation have been met and have occurred or have been waived.

(n)    "Escrow Account" means an account maintained at Citibank, N.A. wherein the Settlement Amount shall be deposited and held in escrow under the control of Co-Lead Counsel.

(o)    "Escrow Agent" means Citibank, N.A.

(p)    "Escrow Agreement" means the agreement between Co-Lead Counsel and the Escrow Agent setting forth the terms under which the Escrow Agent shall maintain the Escrow Account.

(q)    "Excluded Individual Defendants' Claims" means any claims asserted, or which may be asserted by the Individual Defendants' Releasees against: (i) MF Global or any of its past or present parents, subsidiaries, affiliates, successors, predecessors, and/or estate(s) thereof; (ii) any person or entity who or which is a named plaintiff in the action styled *AG Oncon, LLC, et al. v. Jon S. Corzine, et al.*, Civil Action No. 14 Civ. 0396 (S.D.N.Y.) ("*AG Oncon* Action") or on whose behalf the *AG Oncon* Action was brought (the "*AG Oncon* Plaintiffs"); (iii) Cadian Capital Management LP (f/k/a Cadian Capital Management, LLC) ("Cadian"); (iv) any person or entity who or which submits a request for exclusion from the Individual Defendant Settlement Class or any Other Class(es) (to the extent such persons or entities are also Individual

8

Defendant Settlement Class Members) that is accepted by the Court; (v) any of the Individual

Defendants' Insurance Carriers, and any affiliates or subsidiaries thereof, and their respective

insurance policies, to the extent that the full coverage limits of any applicable insurance policies

have not been contributed towards the defense of the Action and/or the Settlement Amount; and

(vi) any person or entity relating to the enforcement of the Individual Defendant Settlement.

(r)      "Excluded Plaintiffs' Claims" means: (i) any claims asserted, or which may

be asserted, in the Action against any of the Non-Settling Defendants; (ii) any claims asserted, or

which may be asserted, in the *AG Oncon* Action; (iii) any claims which could have been or may

be asserted by Cadian; (iv) any claims of any person or entity who or which submits a request for

exclusion from the Individual Defendant Settlement Class or any Other Class(es) (to the extent

such persons or entities are also Individual Defendant Settlement Class Members) that is accepted

by the Court; and (v) any claims relating to the enforcement of the Individual Defendant

Settlement.

(s)      "Final", with respect to the Judgment or any other court order, means the

later of: (i) if there is an appeal from the Judgment or order, the date of final affirmance on appeal

or dismissal of all such appeals, and the expiration of the time for any further judicial review,

whether by appeal, reconsideration or a petition for a writ of certiorari, and, if a writ of certiorari

is granted, the date of final affirmance of the Judgment or order following review pursuant to the

grant; or (ii) the expiration of the time provided for the filing or noticing of any appeal from the

Judgment or order under the Federal Rules of Civil Procedure, *i.e.*, thirty (30) days after the

Judgment or order is entered on the Court's docket.  Any appeal or proceeding seeking subsequent

judicial review pertaining solely to an order issued with respect to (i) attorneys' fees, costs or

9

expenses, or (ii) any plan of allocation of Settlement proceeds (as submitted or subsequently modified), shall not in any way delay or preclude the Judgment from becoming Final.

(t)     "Immediate Family" means children, stepchildren, parents, stepparents, spouses, siblings, mothers-in-law, fathers-in-law, sons-in-law, daughters-in-law, brothers-in-law, and sisters-in-law.  As used in this paragraph, "spouse" shall mean a husband, a wife, or a partner in a state-recognized domestic relationship or civil union.

(u)     "Individual Defendants" means Jon S. Corzine, J. Randy MacDonald, and Henri J. Steenkamp (collectively, the "Officer Defendants"), and David P. Bolger, Eileen S. Fusco, David Gelber, Martin J.G. Glynn, Edward L. Goldberg, David I. Schamis, and Robert S. Sloan (collectively, the "Director Defendants").

(v)     "Individual Defendants' Counsel" means the law firms of Dechert, LLP; Akin Gump Strauss Hauer & Feld LLP; Binder & Schwartz LLP; and Davis Polk & Wardwell LLP.

(w)     "Individual Defendants' Insurance Carriers" means the Individual Defendants' liability insurance carriers that have made payments or are making payments in connection with the defense of the Action and/or are making payments towards the Settlement Amount from their respective policies, *i.e.*,: U.S. Specialty Insurance Company, Policy No. 14-MGU-11-A23947; XL Specialty Insurance Company, Policy No. ELU121502-11; AXIS Insurance Company, Policy No. MNN 732350/01/2011; ACE American Insurance Company, Policy No. DOX G23655901 005; Illinois National Insurance Company, Policy No. 01-880-23-08; Federal Insurance Company, Policy No. 8208-3225; New Hampshire Insurance Company, Policy No. 15927114; Ironshore Indemnity, Inc., Policy No. 000425002; Westchester Fire

10

Insurance Company, Policy No. DOX G23822684 005; and Hartford Accident & Indemnity Company, Policy No. DA 250858-11.

(x)    "Individual Defendants' Releasees" means (i) the Individual Defendants; (ii) members of the Immediate Families of the Individual Defendants; (iii) the respective past, present, or future heirs, executors, administrators, agents, employees, attorneys, advisors, investment advisors, auditors, accountants and assigns, of the foregoing in (i) and (ii), in their capacities as such; (iv) any entity controlled by any of the Individual Defendants; and (v) the Individual Defendants' Insurance Carriers and their respective insurance policies to the extent of payments made toward the defense of the Action and/or the Settlement Amount.  Notwithstanding the foregoing, Individual Defendants' Releasees does not include any Non-Settling Defendants.

(y)    "Investment Vehicle" means any investment company or pooled investment fund, including but not limited to mutual fund families, exchange-traded funds, fund of funds and hedge funds, in which any Underwriter Defendant has or may have a direct or indirect interest or as to which its affiliates may act as an investment advisor but in which the Underwriter Defendant or any of its respective affiliates is not a majority owner or does not hold a majority beneficial interest.  This definition ¶ 1(y) does not bring into the Individual Defendant Settlement Class any of the Underwriter Defendants or any other person or entity who or which is excluded from the Individual Defendant Settlement Class by definition.

(z)    "Judgment" or "Individual Defendant Judgment" means a final order of judgment and dismissal approving the Settlement, substantially in the form attached hereto as Exhibit B, to be entered by the Court pursuant to Federal Rule of Civil Procedure 54(b).

(aa)   "Lead Plaintiffs" means the Virginia Retirement System and Her Majesty The Queen In Right Of Alberta.

11

(bb)   "Litigation Expenses" means the reasonable costs and expenses incurred in connection with commencing, prosecuting and settling the Action (which may include the costs and expenses of Plaintiffs directly related to their representation of the Settlement Class), for which Co-Lead Counsel intend to apply to the Court for reimbursement from the Settlement Fund.

(cc)   "MF Global" means MF Global Holdings Limited and its estate in bankruptcy.

(dd)   "MF Global Securities" means MF Global common stock (including shares acquired through the MF Global Ltd. Amended and Restated 2007 Long Term Incentive Plan ("LTIP") or the MF Global Ltd. Employee Stock Purchase Plan); MF Global's 9% Convertible Senior Notes due June 20, 2038 issued on or about June 25, 2008; MF Global's 1.875% Convertible Senior Notes due February 1, 2016 issued on or about February 7, 2011; MF Global's 3.375% Convertible Senior Notes due August 1, 2018 issued on or about July 28, 2011; and MF Global's 6.25% Senior Notes due August 8, 2016 issued on or about August 1, 2011.

(ee)   "Net Settlement Fund" or "Individual Defendant Net Settlement Fund" means the Settlement Fund less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; and (iv) any attorneys' fees awarded by the Court.

(ff)   "Non-Settling Defendants" means the Underwriter Defendants and PwC.

(gg)   "Notice" or "PwC/Individual Defendant Notice" means the Notice of (I) Certification of Settlement Classes; (II) Proposed Settlements with PricewaterhouseCoopers LLP and the Individual Defendants; (III) Motion for an Award of Attorneys' Fees and Reimbursement of Expenses; and (IV) Settlement Fairness Hearing, substantially in the form attached hereto as Exhibit 1 to Exhibit A, which is to be mailed to Settlement Class Members.

Case 1:11-cv-07866-VM-JCF Document 965-1 Filed 07/07/15 Page 14 of 100

(hh)    "Notice and Administration Costs" means the reasonable and appropriate costs, fees and expenses that are incurred by the Claims Administrator and/or Co-Lead Counsel in connection with (i) providing notices to the Settlement Class; and (ii) administering the Settlement, including but not limited to the Claims process, as well as the costs, fees and expenses incurred in connection with the Escrow Account.

(ii)    "Other Class(es)" means the settlement classes certified by the Court in connection with the settlements set forth in the Stipulation and Agreement of Settlement with Certain Underwriter Defendants dated November 25, 2014 (the "Underwriter Settlement Class"), the Stipulation and Agreement of Settlement with Defendant Commerz Markets LLC dated March 17, 2015 (the "Commerz Settlement Class"), and the Stipulation and Agreement of Settlement with Defendant PricewaterhouseCoopers LLP dated April 3, 2015 (the "PwC Settlement Class"), as well as any other class(es) covered by any other settlement(s) presented to the Court for consideration of final approval concurrently with consideration of the Individual Defendant Settlement for final approval.

(jj)    "Plaintiffs' Counsel" means Co-Lead Counsel and all other legal counsel who, at the direction and under the supervision of Co-Lead Counsel, performed services on behalf of the Settlement Class in the Action.

(kk)    "Plaintiffs' Releasees" means (i) Lead Plaintiffs, all other plaintiffs in the Action, and all other Settlement Class Members; (ii) each of the respective past, present and future parents, subsidiaries, affiliates, successors and predecessors of the foregoing in (i); and (iii) the respective heirs, executors, administrators, officers, directors, agents, employees, attorneys, advisors, investment advisors, auditors, accountants, insurers, and assigns of the foregoing in (i) and (ii), in their capacities as such.

(ll)    "Plan of Allocation" means the plan of allocation that Lead Plaintiffs are submitting to the Court for approval upon notice to the Settlement Class to be utilized for determining the allocation of the Net Settlement Fund as well as the other recoveries obtained on behalf of the classes in the Action, substantially in the form attached hereto as Exhibit 2 to Exhibit A.

(mm)    "Preliminary Approval Order" or "Individual Defendant Preliminary Approval Order" means the order, substantially in the form attached hereto as Exhibit A, to be entered by the Court preliminarily approving the Settlement and directing that notice of the Settlement be provided to the Settlement Class.

(nn)    "Released Claims" means all Released Plaintiffs' Claims and all Released Individual Defendants' Claims.

(oo)    "Released Individual Defendants' Claims" means any and all claims and causes of action, rights, actions, suits, obligations, debts, demands, judgments, agreements, promises, liabilities, damages, losses, controversies, costs, expenses or attorney fees, of every nature and description, whether direct or indirect, whether known claims or Unknown Claims, suspected or unsuspected, accrued or unaccrued, in law or in equity, whether based on contract, tort, or other legal or equitable theory of recovery, and whether having arisen or yet to arise, including without limitation, any claims arising under any federal, state, local, statutory, common or foreign law, or any other law, rule or regulation, that the Individual Defendants could have asserted in any forum that arise out of, relate to or are in any way based upon the institution, prosecution, or settlement of the claims against the Individual Defendants.  Released Individual Defendants' Claims do not include any Excluded Individual Defendants' Claims.

14

Case 1:11-cv-07866-VM-JCF Document 969-1 Filed 07/07/15 Page 16 of 160

(pp)  "Released Plaintiffs' Claims" means any and all past, present, or future claims and causes of action, rights, actions, suits, obligations, debts, demands, judgments, agreements, promises, liabilities, damages, losses, controversies, costs, penalties, expenses or attorney fees, of every nature and description whatsoever, whether direct or indirect, whether known claims or Unknown Claims, suspected or unsuspected, accrued or unaccrued, in law or in equity, whether based on contract, tort, or other legal or equitable theory of recovery, and whether having arisen or arising in the future, including, without limitation, any claims of violations of federal or state securities laws, any federal, state, or foreign law, statute, rule or regulation, or other legal or equitable claims of fraud, intentional misrepresentation, negligent misrepresentation, negligence, gross negligence, breach of duty of care and/or breach of duty of loyalty, breach of fiduciary duty or breach of contract, that Lead Plaintiffs or any other member of the Settlement Class (i) asserted in the Complaint, or (ii) could have asserted in the Complaint or in any other court action or before any administrative body, tribunal, arbitration panel, or other adjudicatory body, arising out of, relating to or based upon, in whole or in part, the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or referred to in the Complaint and that relate to the purchase, sale or trading of MF Global Securities during the Settlement Class Period.  Released Plaintiffs' Claims do not cover or include any Excluded Plaintiffs' Claims.

(qq)  "Releasee(s)" means each and any of the Individual Defendants' Releasees and each and any of the Plaintiffs' Releasees.

(rr)  "Releases" means the releases set forth in ¶¶ 5-7 of this Stipulation.

15

(ss)    "Settlement" or "Individual Defendant Settlement" means the resolution of the Action as against the Individual Defendants in accordance with the terms and provisions of this Stipulation.

(tt)    "Settlement Amount" or "Individual Defendant Settlement Amount" means $64,500,000 in cash.

(uu)    "Settlement Class" or "Individual Defendant Settlement Class" means all persons and entities who or which purchased or otherwise acquired any of the MF Global Securities during the Settlement Class Period, and were damaged thereby.  Excluded from the Settlement Class are: (i) Defendants and MF Global; (ii) members of the Immediate Families of the Individual Defendants; (iii) the subsidiaries and affiliates of Defendants and MF Global; (iv) any person or entity who or which was at any time during the Settlement Class Period and/or is a partner, executive officer, director, or controlling person of MF Global, or any of its subsidiaries or affiliates, or of any Defendant; (v) any entity in which any Defendant or MF Global had at any time during the Settlement Class Period and/or has a controlling interest (including but not limited to any trust established by an Individual Defendant for the benefit of (a) himself/herself or any member of his/her family, or (b) any entity in which he/she has had or has a beneficial interest; or any trust over which an Individual Defendant has had and/or currently has any form of direct or indirect control); (vi) Defendants' Insurance Carriers, and any affiliates or subsidiaries thereof; (vii) the *AG Oncon* Plaintiffs; (viii) Cadian and its principals, members, officers, directors and controlling persons; and (ix) the legal representatives, heirs, successors and assigns of any such excluded person or entity; provided, however, that any Investment Vehicle (as defined herein) shall not be deemed an excluded person or entity by definition.  Also excluded from the Settlement Class are any persons and entities who or which exclude themselves from the Individual Defendant

16

Case 1:11-cv-07866-VM-JCF    Document 969-1    Filed 07/07/15    Page 18 of 160

Settlement Class or any Other Class(es) (to the extent such persons or entities are also Individual

Defendant Settlement Class Members) by submitting a request for exclusion that is accepted by

the Court.

(vv)    "Settlement Class Member" or "Individual Defendant Settlement Class

Member" means each person and entity who or which is a member of the Settlement Class.

(ww)    "Settlement Class Period" or "Individual Defendant Settlement Class

Period" means the period beginning on May 20, 2010 through and including November 21, 2011.

(xx)    "Settlement Fund" or "Individual Defendant Settlement Fund" means the

Settlement Amount plus any and all interest earned thereon.

(yy)    "Settlement Hearing" means the hearing set by the Court under

Rule 23(e)(2) of the Federal Rules of Civil Procedure to consider final approval of the Settlement.

(zz)    "Settling Parties" means the Individual Defendants and Lead Plaintiffs, on

behalf of themselves, the other named plaintiffs in the Action, and the other members of the

Settlement Class.

(aaa)    "Summary Notice" or "PwC/Individual Defendant Summary Notice"

means the Summary Notice of (I) Certification of Settlement Classes; (II) Proposed Settlements

with PricewaterhouseCoopersLLP and the Individual Defendants; (III) Motion for an Award of

Attorneys' Fees and Reimbursement of Expenses; and (IV) Settlement Fairness Hearing,

substantially in the form attached hereto as Exhibit 4 to Exhibit A, to be published as set forth in

the Preliminary Approval Order.

(bbb)    "Taxes" means (i) all federal, state and/or local taxes of any kind (including

any interest or penalties thereon) on any income earned by the Settlement Fund; (ii) the reasonable

expenses and costs incurred by Co-Lead Counsel in connection with determining the amount of,

and paying, any taxes owed by the Settlement Fund (including, without limitation, reasonable expenses of tax attorneys and accountants); and (iii) all taxes imposed on payments by the Settlement Fund, including withholding taxes.

(ccc) "Underwriter Defendants" means BMO Capital Markets Corp.; Citigroup Global Markets Inc.; Commerz Markets LLC; Deutsche Bank Securities Inc.; Goldman, Sachs & Co.; Jefferies LLC (formerly, Jefferies & Company, Inc.); J.P. Morgan Securities LLC; Lebenthal & Co., LLC; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Natixis Securities Americas LLC (formerly Natixis Securities North America Inc.); RBS Securities Inc.; Sandler O'Neill + Partners, L.P.; and U.S. Bancorp Investments, Inc.

(ddd) "Unknown Claims" means any Released Plaintiffs' Claims which any Lead Plaintiff or any other Settlement Class Member does not know or suspect to exist in his, her or its favor at the time of the release of such claims, and any Released Individual Defendants' Claims which any Individual Defendant does not know or suspect to exist in his or her favor at the time of the release of such claims, which, if known by him, her or it, might have affected his, her or its decision(s) with respect to this Settlement, or might have affected his, her, or its decision(s) not to object to this Settlement or not to exclude himself, herself, or itself from the Settlement Class.

## CLASS CERTIFICATION

2. Solely for purposes of the Settlement and for no other purpose, the Individual Defendants stipulate and agree to: (a) certification of the Action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Settlement Class; (b) certification of Lead Plaintiffs as class representatives for the Settlement Class; and (c) appointment of Co-Lead Counsel as class counsel for the Settlement Class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.

18

## PRELIMINARY APPROVAL OF SETTLEMENT

3.      Within ten (10) business days of the execution of this Stipulation, Lead Plaintiffs will move for preliminary approval of the Settlement, certification of the Settlement Class for settlement purposes only, and the scheduling of a hearing for consideration of final approval of the Settlement, which motion shall be unopposed by the Individual Defendants.  Concurrently with the motion for preliminary Court approval, Lead Plaintiffs shall apply to the Court for, and the Individual Defendants shall agree to, entry of the Preliminary Approval Order, substantially in the form attached hereto as Exhibit A.  If the Settlement is terminated for any reason or not approved by the Court, the conditional approval of the Action as a class action shall be vacated immediately without further application or motion by any person or entity, and the Action shall proceed as if the Settlement Class had never been certified, and the stipulation and appointments in ¶ 2 had not been made.

## RELEASE OF CLAIMS

4.      The obligations incurred pursuant to this Stipulation are in consideration of the full and final disposition of the Action as against the Individual Defendants and the Releases provided for herein.

5.      Pursuant to the Judgment, without further action by anyone, upon the Effective Date of the Settlement, Lead Plaintiffs and each of the other Settlement Class Members, on behalf of themselves and all of their respective past, present or future parents, subsidiaries, divisions, affiliates, shareholders, general or limited partners, attorneys, spouses, insurers, beneficiaries, employees, officers, directors, legal and equitable owners, members, predecessors in interest, successors in interest, legal representatives, trustees, associates, heirs, executors, administrators, and/or assigns, in their capacities as such, release and forever discharge, to the fullest extent

19

permitted by law, and shall be deemed to have, and by operation of law and of the Judgment shall have, fully, finally and forever compromised, settled, released, resolved, relinquished, waived and discharged, each and every Released Plaintiffs' Claim against the Individual Defendants and the other Individual Defendants' Releasees, and shall forever be enjoined from prosecuting any or all of the Released Plaintiffs' Claims against any of the Individual Defendants' Releasees. Notwithstanding any of the provisions of the Judgment or any provisions of this Stipulation, this Release shall not apply to, and Lead Plaintiffs and each of the other Settlement Class Members do not release and shall not release any Excluded Plaintiffs' Claim.

6.      Pursuant to the Judgment, without further action by anyone, upon the Effective Date of the Settlement, the Individual Defendants, on behalf of themselves and all of their respective past, present or future attorneys, spouses, insurers, beneficiaries, employees, predecessors in interest, successors in interest, legal representatives, trustees, associates, heirs, executors, administrators, affiliates and/or assigns, in their capacities as such, release and forever discharge to the fullest extent permitted by law, and shall be deemed to have, and by operation of law and of the Judgment shall have, fully, finally and forever compromised, settled, released, resolved, relinquished, waived and discharged each and every Released Individual Defendants' Claim against Lead Plaintiffs and the other Plaintiffs' Releasees as well as the Individual Defendants' Insurance Carriers but only to the extent of their payments made towards the defense of the Action and/or the Settlement Amount under their respective insurance policies, and shall forever be enjoined from prosecuting any or all of the Released Individual Defendants' Claims against any of those Releasees. Notwithstanding any of the provisions of the Judgment or any provisions of this Stipulation, this Release shall not apply to, and the Individual Defendants do not release and shall not release, any Excluded Individual Defendants' Claim.

20

7.      In addition, with respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the Effective Date of the Settlement, Lead Plaintiffs and the Individual Defendants shall be deemed to have expressly waived, and each of the other Settlement Class Members shall be deemed to have waived, and by operation of the Judgment shall have expressly waived, to the fullest extent permitted by law, any and all provisions, rights, and benefits conferred by California Civil Code § 1542 and any law of any state or territory of the United States, or principle of common law or foreign law, which is similar, comparable, or equivalent to California Civil Code § 1542, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Lead Plaintiffs, Settlement Class Members and the Individual Defendants may hereafter discover facts in addition to or different from those which he, she or it now knows or believes to be true with respect to the subject matter of the Released Plaintiffs' Claims or the Released Individual Defendants' Claims as applicable, but each Lead Plaintiff and each Individual Defendant shall expressly have—and each Settlement Class Member by operation of the Judgment shall be deemed to have—upon the Effective Date, fully, finally and forever settled and released any and all Released Plaintiffs' Claims or any and all Released Individual Defendants' Claims as applicable, whether known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. Lead Plaintiffs and the Individual Defendants acknowledge, and each of the other Settlement Class

Members shall be deemed by operation of law to have acknowledged, that the foregoing waiver was separately bargained for and a material element of the Settlement.

8.      Notwithstanding ¶¶ 5-7 above, nothing in the Judgment shall bar any action by any of the Settling Parties to enforce or effectuate the terms of this Stipulation or the Judgment.

<div align="center">

**THE SETTLEMENT CONSIDERATION**

</div>

9.      In consideration of the settlement of the Released Plaintiffs' Claims against the Individual Defendants and the other Individual Defendants' Releasees, the Individual Defendants shall cause the Individual Defendants' Insurance Carriers to deposit their respective contributions to the Settlement Amount into the Escrow Account—severally and not jointly, in accordance with their several interests, in accordance with Defendants' agreements with those carriers—within thirty (30) calendar days after all the following are satisfied: (a) entry of an order preliminarily approving the Settlement; (b) stipulations of settlement in the *AG Oncon Action* and with Cadian are executed by all necessary parties; and (c) receipt by the Individual Defendants' Insurance Carriers from Co-Lead Counsel of the information necessary to effectuate a transfer of funds, including wiring instructions to include the bank name and ABA routing number, account name and number, and a signed W-9 reflecting a valid taxpayer identification number for the qualified settlement fund in which the Settlement Amount is to be deposited.  The Settlement Amount is the total and exclusive amount that will be paid under this Stipulation.

10.      Other than the obligation of the Individual Defendants to cause the Individual Defendants' Insurance Carriers to pay the Settlement Amount into the Escrow Account, the Individual Defendants shall have no obligation whatsoever with respect to payment of the Settlement Amount pursuant to this Stipulation.

<div align="center">

22

</div>

11.     The Settlement is expressly conditioned on Lead Plaintiffs receiving satisfactory confirmation of the representations made to Co-Lead Counsel as to the Officer Defendants' net worth.  With respect to Defendant Corzine, there shall be a confirmation process conducted by Judge Daniel Weinstein (Ret.) (the "Neutral") which shall be completed no later than thirty (30) days after the execution of this Stipulation.  The information and documents to be provided in this process will be reviewed only by the Neutral and his agents, not by any Plaintiffs' Counsel or other person or party, and may not be disclosed by the Neutral or his or her agents, except as set forth in subparagraph 11(e) below.  Specifically, Defendant Corzine:

(a)     shall complete a "Net Worth Questionnaire", substantially in the form attached hereto as Exhibit C, listing:

(i)     All of his current assets, whether owned individually or jointly and/or over which he does or can exercise control, regardless of where they are located– including, but not limited to, cash, bank accounts, brokerage, money market or other accounts, personal property, real property, loans, trusts, and insurance policies – in excess of $100,000, and

(ii)     All of his current liabilities.

(b)     shall provide to the Neutral:

(i)     Copies of annual bank and brokerage account statements for the years 2010 – 2014 for all accounts listed in the Net Worth Questionnaire, and

(ii)     Copies of his tax returns (whether individual or joint) for the years 2010 – 2014.

23

(c)    shall respond in writing or in person (as requested by the Neutral) to any questions posed by the Neutral with respect to the information and/or documentation provided and shall provide any additional information and/or documentation that the Neutral deems necessary.

(d)    shall execute a sworn affidavit or declaration for the Neutral averring:

(i)    That he has provided to the Neutral annual account statements for all bank, brokerage, money market or other accounts that he has or had (whether individually or jointly or over which he did or could exercise control) at any time between May 30, 2010 and the date of his submission to the Neutral, regardless whether those accounts may have been closed before the date of the submission.

(ii)    That he has provided a listing of all of his current assets in excess of $100,000, wherever located in the world; and

(iii)    That he has provided a listing of all insurance coverage available to satisfy a settlement or judgment in the Securities Action.

(e)    In connection with the retention of the Neutral:

(i)    The protocol for the Neutral's review will be determined by the Neutral;

(ii)    The Neutral may disclose the fact that the Neutral is performing a net worth examination of Defendant Corzine as well as the determination reached, *i.e.*, whether the representation made to Co-Lead Counsel as to his net worth has been confirmed by the examination or not; and

24

(iii)   In connection with Lead Plaintiffs' seeking Court approval of this Settlement, the Neutral may disclose the review process and protocol utilized by the Neutral to reach his conclusions as well as his conclusions.  However, under no circumstances will the Neutral be authorized or permitted to disclose any documents or information collected by the Neutral about Defendant Corzine pursuant to subparagraphs 11(a), (b) and (c) above, absent the consent of Defendant Corzine, unless otherwise ordered by the Court.

(f)   The fees for the Neutral's services, which shall be deemed an extension of the mediation process, will be borne by the Settling Parties with each party responsible for one-half of the total.

With respect to Defendants MacDonald and Steenkamp, they shall provide, no later than thirty (30) days after the execution of this Stipulation, confirmation of their respective net worths in a form that is satisfactory to Co-Lead Counsel.  If Lead Plaintiffs do not obtain the confirmation of net worth as provided for herein within the specified time period they have the absolute right to terminate the Settlement in which case the provisions of ¶ 39 below shall apply.

<div align="center">**USE OF SETTLEMENT FUND**</div>

12.   The Settlement Fund shall be used to pay: (a) any Taxes; (b) any Notice and Administration Costs pursuant to ¶ 17 below and as otherwise approved by the Court; (c) any Litigation Expenses awarded by the Court; and (d) any attorneys' fees awarded by the Court to Co-Lead Counsel on behalf of Plaintiffs' Counsel (collectively, "Settlement Costs").  The balance remaining in the Settlement Fund, that is, the Net Settlement Fund, shall be distributed to Authorized Claimants who are eligible to receive a distribution from the Net Settlement Fund as

provided in ¶¶ 21-32 below.  The Settlement Fund shall be the sole source of Settlement Costs, and Lead Plaintiffs, Co-Lead Counsel and Settlement Class Members shall have no recourse against the Individual Defendants' Releasees for Settlement Costs.

13.  Except as provided herein or pursuant to orders of the Court, the Net Settlement Fund shall remain in the Escrow Account prior to the Effective Date.  All funds held by the Escrow Agent shall be deemed to be in the custody of the Court and shall remain subject to the jurisdiction of the Court until such time as the funds shall be distributed or returned pursuant to the terms of this Stipulation and/or further order of the Court.  The Escrow Agent shall invest any funds in the Escrow Account exclusively in United States Treasury Bills (or a mutual fund invested solely in such instruments) and shall collect and reinvest all interest accrued thereon, except that any residual cash balances up to the amount that is insured by the FDIC may be deposited in any account that is fully insured by the FDIC.  In the event that the yield on United States Treasury Bills is negative, in lieu of purchasing such Treasury Bills, all or any portion of the funds held by the Escrow Agent may be deposited in any account that is fully insured by the FDIC or backed by the full faith and credit of the United States.  All risks related to the investment of the Settlement Fund shall be borne by the Settlement Fund.

14.  The Settling Parties agree that the Settlement Fund is intended to be a Qualified Settlement Fund within the meaning of Treasury Regulation § 1.468B-1 and that Co-Lead Counsel, as administrators of the Settlement Fund within the meaning of Treasury Regulation § 1.468B-2(k)(3), shall be solely responsible for filing or causing to be filed all informational and other tax returns as may be necessary or appropriate (including, without limitation, the returns described in Treasury Regulation § 1.468B-2(k)) for the Settlement Fund.  Such returns shall be consistent with this paragraph and in all events shall reflect that all taxes on the income earned on the Settlement

Fund shall be paid out of the Settlement Fund as provided by ¶ 15. Co-Lead Counsel shall also be solely responsible for causing payment to be made from the Settlement Fund of any Taxes owed with respect to the Settlement Fund. The Individual Defendants' Releasees shall not have any liability or responsibility for any such Taxes. Upon written request, the Individual Defendants shall cause the transferors of the Settlement Amount to provide the statement described in Treasury Regulation § 1.468B-3(e) to Co-Lead Counsel. Co-Lead Counsel, as administrators of the Settlement Fund within the meaning of Treasury Regulation § 1.468B-2(k)(3), shall timely make such elections as are necessary or advisable to carry out this paragraph, including, as necessary, making a "relation back election," as described in Treasury Regulation § 1.468B-1(j), to cause the Qualified Settlement Fund to come into existence at the earliest allowable date, and shall take or cause to be taken all actions as may be necessary or appropriate in connection therewith.

15. All Taxes shall be paid out of the Settlement Fund, and shall be timely paid by the Escrow Agent pursuant to the disbursement instructions to be set forth in the Escrow Agreement, and without further order of the Court. Any tax returns prepared for the Settlement Fund (as well as the election set forth therein) shall be consistent with the previous paragraph and in all events shall reflect that all Taxes (including any interest or penalties) on the income earned by the Settlement Fund shall be paid out of the Settlement Fund as provided herein. The Individual Defendants' Releasees shall have no responsibility or liability for the acts or omissions of Co-Lead Counsel or their agents with respect to the payment of Taxes, as described herein. The Settlement Fund shall indemnify and hold all Releasees harmless for any Taxes (including without limitation, taxes payable by reason of any such indemnification). The Individual Defendants shall notify Co-Lead Counsel if they receive any notice of any claim for Taxes.

27

16.     The Settlement is not a claims-made settlement.  Upon the occurrence of the Effective Date, no Individual Defendant, Individual Defendants' Releasee, nor any other person or entity who or which paid any portion of the Settlement Amount shall have any right to the return of the Settlement Fund or any portion thereof for any reason whatsoever, including without limitation, the number of Claim Forms submitted, the collective amount of Fund Recognized Claims (as will be defined in the Plan of Allocation to be proposed by Lead Plaintiffs) of Authorized Claimants who or which are eligible to receive a distribution from the Individual Defendant Net Settlement Fund, the percentage of recovery of losses, or the amounts to be paid to persons and entities who or which are eligible to receive a distribution from the Individual Defendant Net Settlement Fund.

17.     Following entry of the Preliminary Approval Order, Co-Lead Counsel may pay from the Settlement Fund, without further approval from the Individual Defendants or further order of the Court, all Notice and Administration Costs actually incurred.  Such costs and expenses shall include, without limitation, the actual costs of printing and mailing the Notice, publishing the Summary Notice, reimbursements to nominee owners for forwarding the Notice to their beneficial owners, the administrative expenses actually incurred and fees reasonably charged by the Claims Administrator in connection with providing Notice, administering the Settlement (including processing the submitted Claims), and the fees, if any, of the Escrow Agent.  In the event that the Settlement is terminated pursuant to the terms of this Stipulation, all Notice and Administration Costs paid or incurred, including any related fees, shall not be returned or repaid to the Individual Defendants, any of the other Individual Defendants' Releasees, or any other person or entity who or which paid any portion of the Settlement Amount.

**ATTORNEYS' FEES AND LITIGATION EXPENSES**

18.     Co-Lead Counsel will apply to the Court for a collective award of attorneys' fees to Plaintiffs' Counsel to be paid from (and out of) the Settlement Fund.  Co-Lead Counsel also will apply to the Court for reimbursement of Litigation Expenses, which may include a request for reimbursement of Plaintiffs' costs and expenses directly related to their representation of the Settlement Class, to be paid from (and out of) the Settlement Fund.  Co-Lead Counsel's application for an award of attorneys' fees and/or Litigation Expenses is not the subject of any agreement between the Individual Defendants and Lead Plaintiffs other than what is set forth in this Stipulation.

19.     Any attorneys' fees and Litigation Expenses that are awarded by the Court shall be paid from the Settlement Fund to Co-Lead Counsel immediately upon award, notwithstanding the existence of any timely filed objections thereto, or potential for appeal therefrom, or collateral attack on the Settlement or any part thereof, subject to Co-Lead Counsel's obligation to make appropriate refunds or repayments to the Settlement Fund, plus accrued interest at the same net rate as is earned by the Settlement Fund, if the Settlement is terminated pursuant to the terms of this Stipulation or if, as a result of any appeal or further proceedings on remand, or successful collateral attack, the award of attorneys' fees and/or Litigation Expenses is reduced or reversed and such order reducing or reversing the award has become Final.  Co-Lead Counsel shall make the appropriate refund or repayment in full no later than fifteen (15) days after (a) receiving from Individual Defendants' Counsel notice of the termination of the Settlement; or (b) any order reducing or reversing the award of attorneys' fees and/or Litigation Expenses has become Final. An award of attorneys' fees and/or Litigation Expenses is not a necessary term of this Stipulation and is not a condition of the Settlement embodied herein.  Neither Lead Plaintiffs nor Co-Lead

29

Counsel may cancel or terminate the Settlement based on the Court's or any appellate court's ruling with respect to attorneys' fees and/or Litigation Expenses.

20.     Co-Lead Counsel shall allocate the attorneys' fees awarded amongst Plaintiffs' Counsel in a manner which they, in good faith, believe reflects the contributions of such counsel to the institution, prosecution and settlement of the Action.  The Individual Defendants' Releasees shall have no responsibility for or liability whatsoever with respect to the allocation or award of attorneys' fees or Litigation Expenses.  The attorneys' fees and Litigation Expenses that are awarded to Plaintiffs' Counsel shall be payable solely from the Escrow Account.

## NOTICE AND SETTLEMENT ADMINISTRATION

21.     As part of the Preliminary Approval Order, Lead Plaintiffs shall seek appointment of a Claims Administrator.  The Claims Administrator shall administer the Settlement, including but not limited to disseminating the Notice to potential Settlement Class Members and the process of receiving, reviewing and approving or denying Claims, under Co-Lead Counsel's supervision and subject to the jurisdiction of the Court.  None of the Individual Defendants, nor any other Individual Defendants' Releasees, shall have any interest or involvement in, or any responsibility, authority or liability whatsoever for: (a) the selection of the Claims Administrator; (b) the establishment or maintenance of the Escrow Account; (c) the development or application of any plan of allocation; (d) any issue pertaining to the administration of the Settlement, including but not limited to, processing or payment of Claims, or nonperformance of the Claims Administrator; (e) the maintenance, investment or distribution of the Settlement Fund or the Net Settlement Fund; (f) the payment or withholding of Taxes (including interest and penalties) owed by the Settlement Fund; or (g) any losses incurred in connection with the foregoing, and shall have no liability

whatsoever to any person or entity, including, but not limited to, Lead Plaintiffs, any other Settlement Class Members or Co-Lead Counsel in connection with the foregoing.

22.      In accordance with the terms of the Preliminary Approval Order to be entered by the Court, Co-Lead Counsel shall cause the Claims Administrator to mail the Notice to those members of the Settlement Class as may be identified through reasonable effort.  Co-Lead Counsel shall also cause the Claims Administrator to have the Summary Notice published in accordance with the terms of the Preliminary Approval Order to be entered by the Court.

23.      After a plan of allocation is approved by the Court, the Claims Administrator shall receive Claims and determine first, whether the Claim is a valid Claim, in whole or part, and second, each Authorized Claimant's share of the Individual Defendant Net Settlement Fund and any other net settlement funds created by any other recoveries that may be achieved in the Action as calculated pursuant to the Plan of Allocation to be proposed by Lead Plaintiffs or such other plan of allocation as the Court approves.

24.      The Plan of Allocation to be proposed by Lead Plaintiffs is not a necessary term of the Settlement or of this Stipulation, and it is not a condition of the Settlement or of this Stipulation that any particular plan of allocation be approved by the Court.  Lead Plaintiffs and Co-Lead Counsel may not cancel or terminate the Settlement (or this Stipulation) based on the Court's or any appellate court's ruling with respect to the Plan of Allocation or any other plan of allocation in this Action, and, as set forth in ¶ 37 below, it is not a condition to the Effective Date occurring that a plan of allocation shall have been approved by the Court.  The Individual Defendants and the other Individual Defendants' Releasees shall not object in any way to the Plan of Allocation that will be proposed by Lead Plaintiffs or to any other plan of allocation in this Action.

31

25.     Any Individual Defendant Settlement Class Member who or which does not submit a valid Claim Form will not be entitled to receive any distribution from the Individual Defendant Net Settlement Fund but will otherwise be bound by all of the terms of this Stipulation and Settlement, including the terms of the Judgment to be entered in the Action and the Releases provided for herein and therein, and will be permanently barred and enjoined from bringing any action, claim, or other proceeding of any kind against the Individual Defendants' Releasees with respect to the Released Plaintiffs' Claims in the event that the Effective Date occurs with respect to the Settlement.

26.     Co-Lead Counsel shall be responsible for supervising the administration of the Settlement and the disbursement of the Net Settlement Fund subject to Court approval. No Individual Defendant, nor any other Individual Defendants' Releasee, shall be permitted to review, contest or object to any Claim Form or any decision of the Claims Administrator or Co-Lead Counsel with respect to accepting or rejecting any claim for payment by a Settlement Class Member, except as provided in ¶ 28. Co-Lead Counsel shall have the right, but not the obligation, to waive what they deem to be formal or technical defects in any Claim Forms submitted in the interests of achieving substantial justice.

27.     For purposes of determining the extent, if any, to which an Individual Defendant Settlement Class Member shall be entitled to be treated as an Authorized Claimant, the following conditions shall apply:

(a)     Each Individual Defendant Settlement Class Member shall be required to submit a Claim Form supported by such documents as are designated therein, including proof of the Claimant's loss, or such other documents or proof as the Claims Administrator or Co-Lead Counsel, in their discretion, may deem acceptable;

32

(b)      All Claim Forms must be submitted by the date to be set by the Court.  Any Individual Defendant Settlement Class Member who fails to submit a Claim Form by such date shall be forever barred from receiving any distribution from the Individual Defendant Net Settlement Fund or payment pursuant to this Stipulation (unless by Order of the Court such Individual Defendant Settlement Class Member's Claim Form is accepted and approved for payment), but shall in all other respects be bound by all of the terms of this Stipulation and the Settlement, including the terms of the Judgment and the Releases provided for herein and therein, and will be permanently barred and enjoined from bringing any action, claim or other proceeding of any kind against any and all Individual Defendants' Releasees with respect to any and all of the Released Plaintiffs' Claims.  Provided that it is mailed by the claim-submission deadline, a Claim Form shall be deemed to be submitted when postmarked, if received with a postmark indicated on the envelope and if mailed by first-class mail and addressed in accordance with the instructions thereon.  In all other cases, the Claim Form shall be deemed to have been submitted on the date when actually received by the Claims Administrator;

(c)      Each Claim Form submitted to the Claims Administrator by an Individual Defendant Settlement Class Member shall be reviewed by the Claims Administrator who shall determine in accordance with this Stipulation and the plan of allocation approved by the Court the extent, if any, to which each Claim shall be allowed, subject to review by the Court pursuant to subparagraph (e) below as necessary;

(d)      Claim Forms submitted by Individual Defendant Settlement Class Members that do not meet the submission requirements may be rejected.  Prior to rejecting a Claim in whole or in part, the Claims Administrator shall communicate in writing with the Individual Defendant Settlement Class Member who or which submitted the deficient Claim to give that person or entity

33

the chance to remedy any curable deficiencies in the Claim Form submitted. The Claims Administrator shall notify, in a timely fashion and in writing, all Individual Defendant Settlement Class Members whose Claims the Claims Administrator proposes to reject in whole or in part, setting forth the reasons therefor, and shall indicate in such notice that the person or entity whose Claim is to be rejected has the right to a review by the Court if he, she or it so desires and complies with the requirements of subparagraph (e) below; and

(e)     If any Individual Defendant Settlement Class Member whose Claim has been rejected in whole or in part desires to contest such rejection, that person or entity must, within twenty (20) days after the date of mailing of the notice required in subparagraph (d) above, serve upon the Claims Administrator a notice and statement of reasons indicating his, her or its grounds for contesting the rejection along with any supporting documentation, and requesting a review thereof by the Court. If a dispute concerning a Claim cannot be otherwise resolved, Co-Lead Counsel shall thereafter present the request for review to the Court.

28.     Each Claimant seeking to share in the distribution of the Individual Defendant Net Settlement Fund shall be deemed to have submitted to the jurisdiction of the Court with respect to his, her or its Claim, including, but not limited to, the releases provided in the Judgment, and the Claim will be subject to investigation and discovery under the Federal Rules of Civil Procedure, provided that such investigation and discovery shall be limited to that Claimant's status as a Settlement Class Member and the validity and amount of the Claimant's Claim. No discovery shall be allowed on the merits of this Action or of the Settlement in connection with the processing of Claim Forms; provided, however, that the Individual Defendants may verify through Co-Lead Counsel whether specific persons or entities that opt out of the Settlement Class have submitted Claim Forms.

29.    Co-Lead Counsel will apply to the Court, on notice to the Individual Defendants' Counsel, for a Class Distribution Order that: (a) approves the Claims Administrator's administrative determinations concerning the acceptance and rejection of the Claims submitted by or on behalf of persons and entities seeking to share in the distribution of the Individual Defendant Net Settlement Fund; (b) approves payment of any outstanding Notice and Administration Costs; and (c) if the Effective Date has occurred, directs payment of the Individual Defendant Net Settlement Fund to Authorized Claimants who are eligible to receive a distribution from that fund from the Escrow Account.

30.    Payment pursuant to the Class Distribution Order shall be final and conclusive against all Individual Defendant Settlement Class Members.  All Individual Defendant Settlement Class Members whose Claims are not approved by the Court for payment out of the Individual Defendant Net Settlement Fund shall be barred from participating in distributions from the Individual Defendant Net Settlement Fund, but otherwise shall be bound by all of the terms of this Stipulation and the Settlement, including the terms of the Judgment to be entered in this Action and the Releases provided for therein and herein, and will be permanently barred and enjoined from bringing any action against any and all Individual Defendants' Releasees with respect to any and all of the Released Plaintiffs' Claims.

31.    No person or entity shall have any claim against Lead Plaintiffs, Co-Lead Counsel, the Claims Administrator, or any other agent designated by Co-Lead Counsel, based on the administration of the Settlement, including, without limitation, arising from the processing of Claims, distributions made substantially in accordance with the Stipulation, the Settlement, the plan of allocation approved by the Court, or any order of the Court.  Lead Plaintiffs and their counsel, and Lead Plaintiffs' damages expert and all other Plaintiffs' Releasees shall have no

35

liability whatsoever for the investment or distribution of the Settlement Fund or the Net Settlement Fund, the plan of allocation, or the determination, administration, calculation, or payment of any Claim or nonperformance of the Claims Administrator, the payment or withholding of taxes (including interest and penalties) owed by the Settlement Fund, or any losses incurred in connection therewith.

32.     All proceedings with respect to the administration, processing and determination of Claims and the determination of all controversies relating thereto, including disputed questions of law and fact with respect to the validity of Claims submitted by or on behalf of persons and entities seeking to share in the distribution of the Individual Defendant Net Settlement Fund, shall be subject to the jurisdiction of the Court. All Settlement Class Members, other Claimants, and parties to this Settlement expressly waive trial by jury (to the extent any such right may exist) and any right of appeal or review with respect to such determinations.

## TERMS OF THE JUDGMENT

33.     If the Settlement contemplated by this Stipulation is approved by the Court, Co-Lead Counsel and the Individual Defendants' Counsel shall request that the Court enter a Judgment, substantially in the form attached hereto as Exhibit B, including among other things, the Releases, bar order, and judgment reduction provisions provided for therein, and an express determination pursuant to Federal Rule of Civil Procedure 54(b) that there is no just reason for delay of its entry.

34.     The Judgment shall contain a Bar Order substantially in the form set forth in Exhibit B that: (a) permanently bars, enjoins and restrains any person or entity from commencing, prosecuting, or asserting any Barred Claims against any of the Individual Defendants' Releasees, whether as claims, cross-claims, counterclaims, third-party claims, or otherwise, and whether

36

asserted in the Action or any other proceeding, in the Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere; and (b) permanently bars, enjoins, and restrains the Individual Defendants' Releasees from commencing, prosecuting, or asserting any Barred Claims against any person or entity, whether as claims, cross-claims, counterclaims, third-party claims or otherwise, and whether asserted in the Action or any other proceeding, in the Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere.

35. The Judgment also shall contain a provision substantially in the form set forth in Exhibit B, providing that: any final verdict or judgment obtained by or on behalf of the Settlement Class or a Settlement Class Member against any person or entity subject to the Bar Order arising out of or relating to any Released Plaintiffs' Claim shall be reduced by the greater of: (a) an amount that corresponds to the percentage of responsibility of the Individual Defendants for the loss to the Settlement Class or the Settlement Class Member for common damages in connection with any such final verdict or judgment; or (b) the amount paid by or on behalf of the Individual Defendants to the Settlement Class or the Settlement Class Member for common damages.

## CONDITIONS OF SETTLEMENT AND EFFECT OF DISAPPROVAL, CANCELLATION OR TERMINATION

36. The Effective Date of the Settlement shall be deemed to occur on the occurrence or waiver of all of the following events:

(a) the Court has entered the Preliminary Approval Order, substantially in the form set forth in Exhibit A attached hereto, as required by ¶ 3 above;

(b) the Settlement Amount has been deposited into the Escrow Account in accordance with the provisions of ¶ 9 above;

(c)      the Individual Defendants have not exercised their option to terminate the Settlement pursuant to the provisions of this Stipulation (including the Supplemental Agreement described in ¶ 41 below);

(d)      Lead Plaintiffs have not exercised their option to terminate the Settlement pursuant to the provisions of this Stipulation; and

(e)      the Court has approved the Settlement as described herein, following notice to the Settlement Class and a hearing, as prescribed by Rule 23 of the Federal Rules of Civil Procedure, and entered the Judgment and the Judgment has become Final.

37.      The occurrence of the Effective Date is not conditioned on the Court having approved a plan of allocation for the Settlement proceeds or a claims process having begun.  It is expressly understood and agreed that the determination of when the Plan of Allocation for the proceeds of the Settlement should be presented to the Court for approval is to be made solely by Lead Plaintiffs.

38.      Upon the occurrence of all of the events referenced in ¶ 36 above, any and all remaining interest or right of the Individual Defendants and/or the Individual Defendants' Insurance Carriers in or to the Settlement Fund, if any, shall be absolutely and forever extinguished and the Releases herein shall be effective.

39.      If (i) the Individual Defendants exercise their right to terminate the Settlement as provided in this Stipulation; (ii) Lead Plaintiffs exercise their right to terminate this Settlement as provided in this Stipulation; (iii) the Court disapproves the Settlement; or (iv) the Effective Date as to the Settlement otherwise fails to occur, then:

(a)    The Settlement and the relevant portions of this Stipulation shall be canceled and terminated without prejudice and this Stipulation shall be null and void and shall have no further force or effect;

(b)    Lead Plaintiffs and the Individual Defendants shall revert to their respective positions in the Action as of May 8, 2015;

(c)    The terms and provisions of this Stipulation and the fact of this Settlement, with the exception of this ¶ 39 and ¶¶ 15, 17, 19, 42, 61, and 63 herein, shall have no further force and effect with respect to the Settling Parties and shall not be enforceable, or used in the Action or in any other proceeding for any purpose, and any Judgment or order entered by the Court in accordance with the terms of this Stipulation shall be treated as vacated, *nunc pro tunc*; and

(d)    Within five (5) business days after joint written notification to the Escrow Agent by the Individual Defendants' Counsel and Co-Lead Counsel, the Settlement Fund (including, but not limited to, any funds received by Co-Lead Counsel consistent with ¶ 19 above), less any expenses and any costs which have either been disbursed or incurred and chargeable to Notice and Administration Costs and less any Taxes paid or due or owing shall be refunded by the Escrow Agent to the Individual Defendants' Insurance Carriers (or such other persons or entities as the Individual Defendants' Insurance Carriers may direct), as per their respective payments towards the Settlement Amount, pursuant to written instructions to be provided by the Individual Defendants' Counsel to Co-Lead Counsel. Co-Lead Counsel or their designee shall apply for any tax refund owed to the Settlement Fund and pay the proceeds to the Individual Defendants' Insurance Carriers (or such other persons or entities as the Individual Defendants' Insurance Carriers may direct), after deduction of any fees or expenses incurred in connection with such

39

application(s) for refund(s), pursuant to written instructions provided by the Individual Defendants' Counsel to Co-Lead Counsel.

40.     It is further stipulated and agreed that Lead Plaintiffs, provided they agree, and the Individual Defendants, provided they agree, shall have the right to terminate the Settlement and this Stipulation, by providing written notice of their election to do so to the other parties to this Stipulation within thirty (30) days of: (a) the Court's declining to enter the Preliminary Approval Order in any material respect; (b) the Court's refusal to approve the Settlement or any material part thereof; (c) the Court's declining to enter the Judgment in any material respect; or (d) the date upon which the Judgment is modified or reversed in any material respect by an Order that is a Final decision on the matter, and the provisions of ¶ 39 above shall apply.  However, any decision or proceeding, whether in the Court or any appellate court, with respect to an application for attorneys' fees or reimbursement of Litigation Expenses or with respect to any plan of allocation shall not be considered material to the Settlement, shall not affect the finality of any Judgment and shall not be grounds for termination of the Settlement.

41.     In addition to the grounds set forth in ¶ 39 above, the Individual Defendants, provided they agree, shall have the unilateral right to terminate the Settlement in the event that the conditions for termination set forth in the Individual Defendants' confidential supplemental agreement with Lead Plaintiffs (the "Supplemental Agreement"), which conditions relate to requests for exclusion by Individual Defendant Settlement Class Members, are met.  The Supplemental Agreement, which is being executed concurrently herewith, shall not be filed with the Court and its terms shall not be disclosed in any other manner (other than the statements herein and in the Notice, to the extent necessary, or as otherwise provided in the Supplemental Agreement) unless and until the Court otherwise directs or a dispute arises between Lead Plaintiffs

40

and the Individual Defendants concerning its interpretation or application. If submission of the Supplemental Agreement is required for resolution of a dispute or is otherwise ordered by the Court, Lead Plaintiffs and the Individual Defendants will undertake to have the Supplemental Agreement submitted to the Court *in camera*.

## NO ADMISSION OF WRONGDOING

42. Neither this Stipulation (whether or not consummated), including the exhibits hereto, the Plan of Allocation to be proposed by Lead Plaintiffs (or any other plan of allocation that may be approved by the Court), the negotiations leading to the execution of this Stipulation, nor any proceedings taken pursuant to or in connection with this Stipulation and/or approval of the Settlement (including any arguments proffered in connection therewith):

(a) shall be offered against any of the Individual Defendants' Releasees as evidence of, or construed as, or deemed to be evidence of (i) any presumption, concession, or admission by any of the Individual Defendants' Releasees with respect to the truth of any fact alleged by Lead Plaintiffs, the validity of any claim that was or could have been asserted by Lead Plaintiffs or any member of the Settlement Class, the deficiency of any defense that has been or could have been asserted by the Individual Defendants in this Action or in any other litigation, or coverage under the Individual Defendants' Insurance Carriers' respective insurance policies, or (ii) any liability, negligence, fault, or other wrongdoing of any kind of any of the Individual Defendants' Releasees or in any way referred to for any other reason as against any of the Individual Defendants' Releasees, in any civil, criminal or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of this Stipulation;

41

(b)      shall be offered against any of the Plaintiffs' Releasees, as evidence of, or construed as, or deemed to be evidence of (i) any presumption, concession or admission by any of the Plaintiffs' Releasees that any of their claims are without merit, that any of the Individual Defendants' Releasees had meritorious defenses, or that damages recoverable against the Individual Defendants under the Complaint would not have exceeded the Settlement Amount, or (ii) any liability, negligence, fault or wrongdoing of any kind, or in any way referred to for any other reason as against any of the Plaintiffs' Releasees, in any civil, criminal or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of this Stipulation; or

(c)      shall be construed against any of the Releasees as an admission, concession, or presumption that the consideration to be given hereunder represents the amount which could be or would have been recovered against the Individual Defendants after trial;

provided, however, that if this Stipulation is approved by the Court, the Settling Parties and the Releasees and their respective counsel may refer to it to effectuate the protections from liability granted hereunder or otherwise to enforce the terms of the Settlement.

## MISCELLANEOUS PROVISIONS

43.      All of the exhibits attached hereto are hereby incorporated by reference as though fully set forth herein.  Notwithstanding the foregoing, in the event that there exists a conflict or inconsistency between the terms of this Stipulation and the terms of any exhibit attached hereto, the terms of the Stipulation shall prevail.

44.      In the event of the entry of a final order of a court of competent jurisdiction determining the transfer of money to the Settlement Fund or any portion thereof by or on behalf of any Individual Defendant to be a preference, voidable transfer, fraudulent transfer or similar

transaction and any portion thereof is required to be returned, and such amount is not promptly deposited into the Settlement Fund by others, then, at the sole election of Lead Plaintiffs, the Settling Parties shall jointly move the Court to vacate and set aside the Releases given and the Judgment entered pursuant to this Stipulation, in which event the Releases and Judgment shall be null and void, and the Settling Parties shall be restored to their respective positions in the litigation as of May 8, 2015 and any cash amounts in the Settlement Fund shall be returned as provided in ¶ 39 above.

45. Nothing in this Stipulation or the Settlement shall in any way limit Plaintiffs' right or ability to prosecute claims in the Action against any Non-Settling Defendant(s), and, neither Plaintiffs nor the Individual Defendants waive any of their rights with respect to any requests or efforts to obtain deposition and/or trial testimony from any of the Individual Defendants in connection with the ongoing prosecution of the Action.

46. The Settling Parties intend this Stipulation and the Settlement to be a final and complete resolution of all disputes asserted or which could be asserted by Lead Plaintiffs and any other Settlement Class Members against the Individual Defendants' Releasees with respect to the Released Plaintiffs' Claims. Accordingly, Lead Plaintiffs and their counsel and the Individual Defendants and their counsel agree not to assert in any forum or in any statement made to any media representative (whether or not for attribution) that this Action was brought by Lead Plaintiffs or defended by the Individual Defendants in bad faith or without a reasonable basis, nor will they deny that the Action was commenced, prosecuted and defended in good faith and is being settled voluntarily after consultation with competent legal counsel. No Settling Party shall assert any claims of any violation of Rule 11 of the Federal Rules of Civil Procedure relating to the institution or prosecution of the Action by Lead Plaintiffs against the Individual Defendants, the

defense of the Action by the Individual Defendants, or the settlement of the claims against the Individual Defendants by the Settling Parties. The Settling Parties agree that the amount paid and the other terms of the Settlement were negotiated at arm's-length and in good faith by the Settling Parties, including through a mediation process, and reflect the Settlement that was reached voluntarily after extensive negotiations and consultation with experienced legal counsel, who were fully competent to assess the strengths and weaknesses of their respective clients' claims or defenses. In all events, Lead Plaintiffs and their counsel and the Individual Defendants and their counsel shall not make any accusations of wrongful or actionable conduct by any Settling Party concerning the prosecution, defense, and resolution of the Action as against the Individual Defendants, and shall not otherwise suggest that the Settlement constitutes an admission of any claim or defense alleged.

47.    The terms of the Settlement, as reflected in this Stipulation, may not be modified or amended, nor may any of its provisions be waived except by a writing signed on behalf of both Lead Plaintiffs and the Individual Defendants (or their successors-in-interest).

48.    The headings herein are used for the purpose of convenience only and are not meant to have legal effect.

49.    The administration and consummation of the Settlement as embodied in this Stipulation shall be under the authority of the Court, and the Court shall retain jurisdiction for the purpose of entering orders providing for awards of attorneys' fees and Litigation Expenses to Plaintiffs' Counsel and enforcing the terms of this Stipulation, the Plan of Allocation (or such other plan of allocation as may be approved by the Court) and the distribution of the Individual Defendant Net Settlement Fund to Authorized Claimants eligible to receive a distribution from the fund.

44

50.     Any condition in this Stipulation may be waived by the party entitled to enforce the condition in a writing signed by that party or its counsel. The waiver by one Settling Party of any breach of this Stipulation by any other Settling Party shall not be deemed a waiver of such breach by any other Settling Party, or a waiver of any prior or subsequent breach of this Stipulation by that party or any other party. Without further order of the Court, the parties may agree to reasonable extensions of time to carry out any of the provisions of this Stipulation.

51.     This Stipulation and its exhibits and the Supplemental Agreement constitute the entire agreement between Lead Plaintiffs and the Individual Defendants concerning the Settlement and this Stipulation and its exhibits. All Settling Parties acknowledge that no other agreements, representations, warranties, or inducements have been made by any Settling Party hereto concerning this Stipulation, its exhibits or the Supplemental Agreement other than those contained and memorialized in such documents.

52.     This Stipulation may be executed in one or more counterparts, including by signature transmitted via facsimile, or by a .pdf/.tif image of the signature transmitted via email. All executed counterparts and each of them shall be deemed to be one and the same instrument.

53.     This Stipulation shall be binding upon and inure to the benefit of the successors and assigns of the Settling Parties, including any and all Releasees and any corporation, partnership, or other entity into or with which any Settling Party hereto may merge, consolidate or reorganize.

54.     The construction, interpretation, operation, effect and validity of this Stipulation, the Supplemental Agreement and all documents necessary to effectuate it shall be governed by the internal laws of the State of New York without regard to conflicts of laws, except to the extent that federal law requires that federal law govern.

45

55.     Any action arising under or to enforce this Stipulation or any portion thereof, shall be commenced only in the Court.

56.     This Stipulation shall not be construed more strictly against one Settling Party than another merely by virtue of the fact that it, or any part of it, may have been prepared by counsel for one of the Settling Parties.

57.     All counsel and any other person executing this Stipulation and any of the exhibits hereto, or any related Settlement documents, warrant and represent that they have the full authority to do so and that they have the authority to take appropriate action required or permitted to be taken pursuant to the Stipulation to effectuate its terms.

58.     Co-Lead Counsel and the Individual Defendants' Counsel agree to cooperate reasonably with one another in seeking Court approval of the Preliminary Approval Order and the Settlement, as embodied in this Stipulation, and to use reasonable efforts to promptly agree upon and execute all such other documentation as may be reasonably required to obtain final approval by the Court of the Settlement.

59.     If any Settling Party is required to give notice to another Settling Party under this Stipulation, such notice shall be in writing and shall be deemed to have been duly given upon receipt of hand delivery or facsimile or email transmission, with confirmation of receipt.  Notice shall be provided as follows:

| | |
|---|---|
| If to Lead Plaintiffs or Co-Lead Counsel: | Bernstein Litowitz Berger & Grossmann LLP<br>Attn:  Salvatore J. Graziano<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Telephone:  (212) 554-1400<br>Facsimile:  (212) 554-1444<br>Email: Salvatore@blbglaw.com |

and

46

Case 1:11-cv-07866-VM-JCF    Document 969-1    Filed 07/07/15    Page 48 of 100

|  |  |
|---|---|
|  | Bleichmar Fonti Tountas & Auld LLP<br>Attn:  Javier Bleichmar<br>7 Times Square, 27th Floor<br>New York, New York 10036<br>Telephone:  (212) 789-1340<br>Facsimile:  (212) 205-3960<br>Email: jbleichmar@bftalaw.com |
| If to Defendant Jon S. Corzine: | Dechert, LLP<br>Attn:  Andrew J. Levander<br>1095 Avenue of the Americas<br>New York, NY 10036<br>Telephone:  (212) 698-3500<br>Facsimile:  (212) 698-3599<br>Email: andrew.levander@dechert.com |
| If to Defendant J. Randy MacDonald: | Akin Gump Strauss Hauer & Feld LLP<br>Attn: Robert H. Hotz, Jr.<br>One Bryant Park<br>New York, New York 10036<br>Telephone:  (212) 872-1028<br>Facsimile:  (212) 872-1002<br>Email: rhotz@akingump.com |
| If to Defendant Henri J. Steenkamp: | Binder & Schwartz LLP<br>Attn:  Neil S. Binder<br>28 W. 44th Street, Suite 700<br>New York, NY 10036<br>Telephone:  (212) 510-7008<br>Facsimile:  (212) 510-7299<br>Email: nbinder@binderschwartz.com |
| If to Defendants David P. Bolger, Eileen S. Fusco, David Gelber, Martin J.G. Glynn, Edward L. Goldberg, David I. Schamis and/or Robert S. Sloan: | Davis Polk & Wardwell LLP<br>Attn: Edmund Polubinski III<br>450 Lexington Avenue<br>New York, NY 10017<br>Telephone:  (212) 450-4000<br>Facsimile:  (212) 701-5800<br>Email: edmund.polubinski@davispolk.com |

60.    Except as otherwise provided herein, each Settling Party shall bear its own costs.

61.    Whether or not the Stipulation is approved by the Court and whether or not the Stipulation is consummated, or the Effective Date occurs, the Settling Parties and their counsel

47

shall use their best efforts to keep all negotiations, discussions, acts performed, agreements, drafts, documents signed and proceedings in connection with this Stipulation and the Settlement confidential, except to the extent required by law, provided that written notice to the other Settling Parties shall be given at least three (3) business days prior to any proposed disclosure. Notwithstanding anything in this paragraph, the Supplemental Agreement may not be disclosed without prior order of the Court.

62.    The Settling Parties agree that, prior to final approval by the appropriate court(s) of the Settlement, Magistrate Judge James C. Francis will continue to serve as a mediator for any disputes or issues that may arise between the Settling Parties relating to the Settlement.

63.    All agreements made and orders entered during the course of this Action relating to the confidentiality of information shall survive this Settlement.

64.    No opinion or advice concerning the tax consequences of the proposed Settlement to individual Settlement Class Members is being given or will be given by the Settling Parties or their counsel; nor is any representation or warranty in this regard made by virtue of this Stipulation. Each Settlement Class Member's tax obligations, and the determination thereof, are the sole responsibility of the Settlement Class Member, and it is understood that the tax consequences may vary depending on the particular circumstances of each individual Settlement Class Member.

65.    The Settling Parties stipulate and agree that all litigation activity in the Action against the Individual Defendants, except proceedings relating to the approval of the Settlement (including those contemplated herein and in the Preliminary Approval Order, the Notice, and the Judgment) shall be stayed, and all hearings, deadlines, and other proceedings in this Action against the Individual Defendants, except a preliminary approval hearing (if any) and the Settlement Hearing, shall be taken off the calendar.

48

**IN WITNESS WHEREOF,** the parties hereto have caused this Stipulation to be executed,

by their duly authorized attorneys, as of July 2, 2015.

<div style="margin-left:50%;">

**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**

By: _____

    Salvatore J. Graziano
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

          and

**BLEICHMAR FONTI
  TOUNTAS & AULD LLP**


By: _____

    Javier Bleichmar *by RH with permission*
7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960

*Co-Lead Counsel for Lead Plaintiffs
and the Settlement Class*


**DECHERT, LLP**


By: _____

    Andrew J. Levander
Jonathan R. Streeter
Matthew L. Mazur
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel for Defendant Jon S. Corzine*

</div>

49

Case 1:11-cv-07866-VM-JCF    Document 969-1    Filed 07/07/15    Page 51 of 100

**IN WITNESS WHEREOF,** the parties hereto have caused this Stipulation to be executed, by their duly authorized attorneys, as of July 2, 2015.

**BERNSTEIN LITOWITZ BERGER &**
**GROSSMANN LLP**

By: _____
    Salvatore J. Graziano
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444

and

**BLEICHMAR FONTI**
**TOUNTAS & AULD LLP**

By: _____
    Javier Bleichmar
7 Times Square, 27th Floor
New York, New York 10036
Telephone:  (212) 789-1340
Facsimile:  (212) 205-3960

*Co-Lead Counsel for Lead Plaintiffs*
*and the Settlement Class*

**DECHERT, LLP**

By: _____
    Andrew J. Levander
Jonathan R. Streeter
Matthew L. Mazur
1095 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 698-3500
Facsimile:  (212) 698-3599

*Counsel for Defendant Jon S. Corzine*

49

AKIN GUMP STRAUSS HAUER
& FELD LLP

By: _____
        Robert H. Hotz, Jr.
Estela Diaz
Dean L. Chapman
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1028
Facsimile:  (212) 872-1002

*Counsel for Defendant J. Randy MacDonald*


BINDER & SCHWARTZ LLP


By: _____
        Neil S. Binder
Danielle J. Levine
28 W. 44th Street, Suite 700
New York, NY 10036
Telephone: (212) 510-7008
Facsimile:  (212) 510-7299

*Counsel for Defendant Henri J. Steenkamp*


DAVIS POLK & WARDWELL LLP


By: _____
        Edmund Polubinski III
David B. Toscano
Daniel A. Spitzer
450 Lexington Avenue
New York, NY 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5800

*Counsel for Defendants David P. Bolger,
Eileen S. Fusco, David Gelber, Martin J.G.
Glynn, Edward L. Goldberg, David I.
Schamis and Robert S. Sloan*

Doc # 900744

50

AKIN GUMP STRAUSS HAUER
& FELD LLP


By: _____
         Robert H. Hotz, Jr.
Estela Diaz
Dean L. Chapman
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1028
Facsimile:  (212) 872-1002

*Counsel for Defendant J. Randy MacDonald*


**BINDER & SCHWARTZ LLP**

By: _____
         Neil S. Binder
Danielle J. Levine
28 W. 44th Street, Suite 700
New York, NY 10036
Telephone: (212) 510-7008
Facsimile:  (212) 510-7299

*Counsel for Defendant Henri J. Steenkamp*


**DAVIS POLK & WARDWELL LLP**


By: _____
         Edmund Polubinski III
David B. Toscano
Daniel A. Spitzer
450 Lexington Avenue
New York, NY 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5800

*Counsel for Defendants David P. Bolger,*
*Eileen S. Fusco, David Gelber, Martin J.G.*
*Glynn, Edward L. Goldberg, David I.*
*Schamis and Robert S. Sloan*

Doc # 900744

50

AKIN GUMP STRAUSS HAUER
& FELD LLP

By: _____
        Robert H. Hotz, Jr.
Estela Diaz
Dean L. Chapman
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1028
Facsimile: (212) 872-1002

*Counsel for Defendant J. Randy MacDonald*

BINDER & SCHWARTZ LLP

By: _____
        Neil S. Binder
Danielle J. Levine
28 W. 44th Street, Suite 700
New York, NY 10036
Telephone: (212) 510-7008
Facsimile: (212) 510-7299

*Counsel for Defendant Henri J. Steenkamp*

DAVIS POLK & WARDWELL LLP

By: *Edmund Polubinski/dbt*
        Edmund Polubinski III
David B. Toscano
Daniel A. Spitzer
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

*Counsel for Defendants David P. Bolger,*
*Eileen S. Fusco, David Gelber, Martin J.G.*
*Glynn, Edward L. Goldberg, David I.*
*Schamis and Robert S. Sloan*

Doc # 900744

50

# Exhibit B

# JONES DAY

555 SOUTH FLOWER STREET  •  FIFTIETH FLOOR  •  LOS ANGELES, CALIFORNIA 90071-2300
TELEPHONE: 213-489-3939  •  FACSIMILE: 213-243-2539

Direct Number: (213) 243-2457
dsteuber@jonesday.com

JP014928                                    July 13, 2015

VIA E-MAIL TO THE DISTRIBUTION LIST PROVIDED BELOW

**[All D&O Insurers Provided in Distribution List Below]**

Re:   Insured:      MF Global Holdings Ltd.
        Insurers:     **[See Distribution List Below]**
        Policy Nos.:  **[See Distribution List Below]**
        Matter:       Proposed Settlement of Securities Actions in *In re MF
                        Global Holdings Ltd. Securities Litigation,*
                        Civ. Action. No. 1:11-CV-07866-VM (S.D.N.Y.)

To All D&O Insurer Representatives:

        We represent MF Global Holdings Ltd. ("MFGH") in connection with its interests under
the primary and excess policies participating in the directors and officers ("D&O") coverage
program led by U.S. Specialty Insurance Company ("USSIC") Directors, Officers and Corporate
Liability Insurance Policy Number 14-MGU-11-A23947 (the "Primary Policy"). We have
reviewed the Stipulation and Agreement of Settlement with Individual Defendants dated July 2,
2015 (the "Proposed Settlement"), as well as the Memorandum of Law in Support of the Lead
Plaintiffs' Motion for Preliminary Approval of the Proposed Settlement filed on July 7 with
respect to all securities actions in the above-referenced matter. It is not clear from the Proposed
Settlement how the D&O insurers agreed to fund the $64.5 million settlement amount through
the D&O coverage program and how much of a coverage obligation was allocated to each
respective insurer and each respective policy. It is also not clear which D&O insurers have
advanced defense costs to the Individual Defendants to date and how all of these defense and
settlement payments will impact the remaining available coverage and total aggregate limits of
the D&O coverage program.

        The provisions of the Proposed Settlement appear to indicate that only the following
insurers and policies advanced defense costs in the past and/or agreed to fund a portion of the
$64.5 million settlement amount: (1) USSIC under the Primary Policy; (2) XL Specialty
Insurance Company under policy number ELU121502-11; (3) AXIS Insurance Company under
policy number MNN 732350/01/2011; (4) ACE American Insurance Company under policy
number DOX G23655902 005; (5) Illinois National Insurance Company under policy number
01-880-23- 08; (6) Federal Insurance Company under policy number 8208-3225; (7) New
Hampshire Insurance Company under policy number 15927114; (8) Ironshore Indemnity, Inc.
under policy number 000425002; (9) Westchester Fire Insurance Company under policy number

NAI-1500433645v1

All D&O Insurer Representatives
July 13, 2015
Page 2

DOX G23822684 005; and (10) Hartford Accident & Indemnity Company under policy number DA 250858-11 (collectively the "Participating Insurers"). It does not appear that the policies providing $90 million in potential coverage in excess of $135 million of underlying insurance *(i.e.,* above policy number DA 250858-11 issued by Hartford) were implicated by the Proposed Settlement or have otherwise made any defense or indemnity coverage payment to or on behalf of the Individual Defendants thus far. The Proposed Settlement indicates to us that the Individual Defendants also reserved their rights to seek the full remaining limits of the D&O coverage program, including the untapped policy limits from excess insurers not participating in the Proposed Settlement (or who have not participated in defense cost funding) and the unpaid limits of certain Participating Insurers' partially eroded policies that may have been implicated by prior advancements of defense costs or the Proposed Settlement if approved.

MFGH, as the D&O coverage program's policyholder, an "Insured" and the "Named Corporation" pursuant to Item 1 of the Primary Policy's Declarations, and pursuant to its authority as the Plan Administrator under the Second Amended and Joint Plan of Chapter 11 Liquidation, seeks to confirm that the D&O coverage program's remaining policy limits have been adequately protected for the Individual Defendants' future covered losses (whether that loss involves further defense costs, settlements or judgments) resulting from the MDL actions. The Litigation Trustee, in his capacity as a claimant pursuing claims against the Individual Defendants covered under the D&O coverage program, joins in this request.

As you know, the debtors and creditors involved in the MF Global bankruptcy proceedings have a financial stake in the outcome of the MDL actions and the ability of the Individual Defendants to pay any settlement or judgment (through personal wealth contributions or available insurance coverage or both). We therefore request the following information regarding the D&O coverage program's remaining aggregate limit, the D&O insurers' advancement of defense costs to the Individual Defendants to date, and the coverage amounts committed to the Proposed Settlement and/or other potentially pending or previously consummated settlements:

- Identify each insurer and each policy that advanced defense costs to the Individual Defendants in responding to any MDL action prior to the Proposed Settlement, and the amounts advanced by each insurer and under each policy respectively.

- Identify each insurer that agreed to fund a portion of the Proposed Settlement amount and the respective amount committed by each insurer under each policy.

- Confirm that the excess insurers in the D&O coverage program who are not Participating Insurers paid no coverage to the Individual Defendants to date and their policies' respective limits remain fully available for future defense costs

NAI-1500433645v1

**JONES DAY**

All D&O Insurer Representatives
July 13, 2015
Page 3

payments, settlements or judgments. To the extent those limits do not remain fully available, please explain how and by what prior (or pending) payments, if at all, those limits have been impaired.

- Confirm that any remaining limits on the Participating Insurers' policies which will not be completely exhausted by either prior advancements of the defense costs or any commitment to fund the Proposed Settlement, or a combination of both, remain available for future defense costs payments, settlements or judgments.[1]

- Identify all coverage payments made by any insurer participating in the D&O coverage program in response to any claim or proceeding not resolved by the Proposed Settlement or defined as an "Excluded Plaintiffs' Claim" under Definition 1(r) of the Proposed Settlement agreement.

- Confirm the total amount of coverage now available under the D&O program to pay future losses incurred by the Individual Defendants if the Proposed Settlement is approved (assuming maximum coverage exists up to the $225 million ceiling of the program).

We ask for your response to this correspondence and the information requested herein no later than Friday, July 17, at Noon EDT. MGFH reserves all rights under the D&O coverage program it purchased at law or in equity. Likewise, the Litigation Trustee reserves all rights at law or in equity.

We look forward to your response.

---

[1] We note certain Participating Insurers also issued higher excess layer policies which do not appear to have been implicated by defense costs payments or an agreement to fund the Proposed Settlement. For example, as a Participating Insurer, Federal Insurance Company appears to have committed funds to the Proposed Settlement under policy number 8208-3225, which provides $5 million in coverage in excess of $85 million of underlying insurance. Federal also issued an excess policy providing $5 million in coverage (in a shared $15 million layer) in excess of $185 million of underlying insurance. We seek confirmation that Federal's higher limit excess policy remains untapped and that any remaining coverage under policy number 8208-3225 after the defense costs payments or the agreement to fund the Proposed Settlement will remain available to the Individual Defendants for future losses. Other Participating Insurers similarly issued higher level excess policies and we seek the same confirmation.

**JONES DAY**

All D&O Insurer Representatives
July 13, 2015
Page 4

Very truly yours,
JONES DAY

David W. Steuber

cc:      [Distribution List – Contact/Policy Information for All Excess Insurers]

## MF GLOBAL D&O COVERAGE PROGRAM DISTRIBUTION LIST

| Carrier/Policy No. | Limits | Attachment | Counsel |
|---|---|---|---|
| U.S. Specialty Insurance Company<br><br>Policy No. 14-MGU-11-A23947 | $25 million | | Gary Dixon<br>Leslie Ahari<br>Meredith Werner<br>Troutman Sanders LLP<br>202-662-2003<br>703-734-4322<br>202-662-2053<br>Gary.dixon@troutmansanders.com<br>Leslie.ahari@troutmansanders.com<br>Meredith.werner@troutmansanders.com<br><br>Dennis McGoldrick |
| XL Specialty Insurance Company<br><br>Policy No. ELU121502-11 | $25 million | $25 million | Gary Dixon<br>Leslie Ahari<br>Meredith Werner<br>Troutman Sanders LLP<br>202-662-2003<br>703-734-4322<br>202-662-2053<br>Gary.dixon@troutmansanders.com<br>Leslie.ahari@troutmansanders.com<br>Meredith.werner@troutmansanders.com<br><br>Patricia Melly |
| AXIS Insurance Company<br><br>Policy No. MNN 732350/01/2011 | $15 million | $50 million | Scott Schaffer<br>Jonathan Meer<br>Alicia Santocki<br>Wilson Elser Moskowitz Edelman & Dicker LLP<br>212-915-5771<br>914-872-7503<br>scott.schaffer@wilsonelser.com<br>jonathan.meer@wilsonelser.com<br>alicia.santocki@wilsonelser.com<br><br>Harold Neher |
| ACE American Insurance Company<br><br>Policy No. DOX G23655901 005 | $10 million | $65 million | Ned Kirk<br>Allison Calkins<br>Clyde & Co.<br>212-710-3900<br>edward.kirk@clydeco.us |

| Carrier/Policy No. | Limits | Attachment | Counsel |
|---|---|---|---|
| | | | allison.calkins@clydeco.us<br><br>Victor Corbo |
| Illinois National Insurance Company<br><br>Policy No. 01-880-23-08 | $10 million | $75 million | James DeSilva<br>James.DeSilva@chartisinsurance.com |
| Federal Insurance Company<br><br>Policy No. 8208-3225 | $5 million | $85 million | Tracy Tkac<br>Assistant Vice-President<br>Chubb & Son, Inc.<br>908-903-5468<br>ttkac@chubb.com |
| New Hampshire Insurance Company<br><br>Policy No. 15927114 | $15 million p/o $35 million | $90 million | Robert Benjamin<br>Kaufman Borgeest & Ryan LLP<br>914-449-1059<br>rbenjamin@kbrlaw.com |
| Ironshore Indemnity, Inc.<br><br>Policy No. 000425002 | $10 million p/o $35 million | $90 million | Mary Jo Barry<br>Gavin Curley<br>D'Amato & Lynch<br>212-909-2188<br>MJBarry@damato-lynch.com<br>GCURLEY@damato-lynch.com |
| Westchester Fire Insurance Company<br><br>Policy No. DOX G23822684 005 | $10 million p/o $35 million | $90 million | Ned Kirk<br>Allison Calkins<br>Clyde & Co.<br>212-710-3900<br>edward.kirk@clydeco.us<br>allison.calkins@clydeco.us |
| Hartford Accident & Indemnity Company<br><br>DA 250858-11 | $10 million | $125 million | Anthony Fowler<br>anthony.fowler@thehartford.com |
| St. Paul Mercury Insurance Company<br><br>Policy No. EC09004078 | $5 million | $135 million | Thomas A. Forker, Esq.<br>Claim Counsel<br>Travelers<br>TFORKER@travelers.com |
| Ironshore Insurance Ltd. | $7 million p/o $10 million | $140 million | Mary Jo Barry<br>Gavin Curley |

2

| Carrier/Policy No. | Limits | Attachment | Counsel |
|---|---|---|---|
| Policy No. ISF0000507 | | | D'Amato & Lynch 212-909-2188 MJBarry@damato-lynch.com GCURLEY@damato-lynch.com |
| Starr Insurance & Reinsurance Limited  Policy No. ISF0000507 | $3 million p/o $10 million | $147 million | Mary Jo Barry Gavin Curley D'Amato & Lynch 212-909-2188 MJBarry@damato-lynch.com GCURLEY@damato-lynch.com |
| Allied World Assurance Company Ltd.  Policy No. C007490/005 | $10 million | $150 million | John McCarrick Maurice Pesso Daniel Simnowitz White and Williams LLP 914-487-7342 212-631-4405 212-714-3061 mccarrickj@whiteandwilliams.com pessom@whiteandwilliams.com simnowitzd@whiteandwilliams.com  Jan Haylett Charmain Smith |
| AXIS Specialty Limited Bermuda  Policy No. 1132770111QA | $15 million | $160 million | Scott Schaffer Jonathan Meer Alicia Santocki Wilson Elser Moskowitz Edelman & Dicker LLP 212-915-5771 914-872-7503 scott.schaffer@wilsonelser.com jonathan.meer@wilsonelser.com alicia.santocki@wilsonelser.com  Harold Neher |
| Catlin Insurance Company, Inc.  Policy No. XSP-100903-0511 | $10 million | $175 million | Jim Skarzynski Jennifer Dowd Boundas, Skarzynski, Walsh & Black, LLC 212- 820-7720 212-820-7734 jskarzynski@bswb.com |

3

| Carrier/Policy No. | Limits | Attachment | Counsel |
|---|---|---|---|
| | | | |
| Federal Insurance Company<br><br>Policy No. 8208-3266 | $5 million p/o $10 million | $185 million | Tracy Tkac<br>Assistant Vice-President<br>Chubb & Son, Inc.<br>908-903-5468<br>ttkac@chubb.com |
| Continental Casualty Company<br><br>Policy No. 425151372 | $5 million p/o $10 million | $185 million | Mary Anne Mullin<br>*CNA* Pro Claim<br>125 Broad Street  8th Floor<br>New York, New York 10004<br>(212) 440-7408<br>mary.mullin@cna.com |
| Everest National Insurance Company<br><br>Policy No. FL5SA00006-11 | $5 million | $195 million | Ned Kirk<br>Allison Calkins<br>Clyde & Co.<br>212-710-3900<br>edward.kirk@clydeco.us<br>allison.calkins@clydeco.us<br><br>Bernadette Dono |
| Scottsdale Indemnity Company<br><br>Policy No. XMI1100056 | $10 million | $200 million | Dan Bailey<br>Keith Little<br>Bailey Cavalieri<br>dan.bailey@baileycavalieri.com<br>keith.little@baileycavalieri.com<br><br>Isatu Kanu<br>Freedom Specialty, a Nationwide Company<br>212-329-6951<br>KANUI@freedomspecialtyins.com |
| New Hampshire Insurance Company<br><br>Policy No. 15927115 | $5 million | $210 million | Robert Benjamin<br>Kaufman Borgeest & Ryan LLP<br>914-449-1059<br>rbenjamin@kbrlaw.com |
| U.S. Specialty Insurance Company<br><br>Policy No. 14-MGU-11-A23952 | $10 million | $215 million | Gary Dixon<br>Leslie Ahari<br>Meredith Werner<br>Troutman Sanders LLP<br>202-662-2003 |

4

5

| Carrier/Policy No. | Limits | Attachment | Counsel |
|---|---|---|---|
| | | | 703-734-4322<br>202-662-2053<br>Gary.dixon@troutmansanders.com<br>Leslie.ahari@troutmansanders.com<br>Meredith.werner@troutmansanders.com<br><br>Dennis McGoldrick |

# Exhibit C

**Representatives of**
**MF Global 2011-12 D&O Insurers**

July 22, 2015

**VIA ELECTRONIC MAIL**

David W. Steuber, Esq.
Jones Day
555 South Flower Street, 15th Floor
Los Angeles, CA 90071-2300
via e-mail dsteuber@jonesday.com

<div style="margin-left:2em">

Re:    Insured:    MF Global Holdings, Ltd.

         Matter:    Proposed Settlement of Securities Actions in *In re MF Global Holdings Ltd. Securities Litigation*, Civ Action. No. 1:11-CV-07866-VM (S.D.N.Y.)

</div>

Dear Mr. Steuber:

The D&O insurers listed on the distribution list attached to your July 13, 2015 letter acknowledge receipt of, and herewith respond to, said letter.

The primary D&O insurer, U.S. Specialty Insurance Company, whose policy has $25 million limits, and the first excess D&O insurer, XL Specialty Insurance Company, which has $25 million limits, have been fully exhausted through the payment of Insured Persons' Loss including Defense Costs, as such terms are defined in the U.S. Specialty policy. Payment of additional Defense Costs are currently being processed by the second excess D&O insurer, AXIS Insurance Company, whose limits are $15 million. The AXIS policy shall be fully exhausted by payments of these Defense Costs and the Insured Persons' settlements of the securities claims including the Securities Class Action mentioned in your letter.

Based upon the prior full exhaustion of the U.S. Specialty and XL D&O policies, and partial exhaustion of the AXIS D&O policy by Defense Costs as referenced above, the following D&O policies will soon be exhausted or partially exhausted based upon limits to be paid for the Insured Persons' settlements of the securities claims: AXIS Insurance Company Policy No. MNN 732350/01/2011; ACE American Insurance Company Policy No. DOX G23655901 005; Illinois National Insurance Company Policy No. 01-880-23-08; Federal Insurance Company Policy No. 8208-3225; New Hampshire Insurance Company Policy No. 15927114; Ironshore Indemnity, Inc. Policy No. 000425002; Westchester Fire Insurance Company Policy No. DOX G23822684 005; and Hartford Accident & Indemnity Company Policy No. 00 DA 0250858-11. The balance of the Hartford policy limits of $10 million not paid toward settlements shall become the next "working layer" for payment of additional Loss including Defense Costs. Various of the settlements that have been paid or will be paid by the policies are confidential, and further details therefore may not be disclosed by the D&O insurers.

6888398v.1

The full respective limits of all the excess D&O policies including the Hartford policy and the D&O policies above the Hartford are available for the Insured Persons' additional Loss including Defense Costs subject to the respective terms of those policies and the respective D&O insurers' continuing reservations of rights.

Based upon the Loss including Defense Costs paid, committed to be paid, or incurred and presently being considered for payment by the D&O tower through the Hartford policy, we estimate that approximately $68 million in limits remain available to defendant Insured Persons in the actions brought by the Litigation Trustee, customers and the CFTC for additional Loss on the claims against them. This again is subject to the respective terms of the D&O policies and the respective D&O insurers' continuing reservations of rights. This is only an estimate as forthcoming Defense Costs payments by AXIS have not as yet been finalized, and additional defense invoices are continuing to be submitted to AXIS and the Hartford.

The D&O insurers reserve the right to supplement this letter as additional information becomes available or as developments may warrant. In the interim, the D&O insurers continue to reserve all rights, privileges and coverage defenses under the D&O policies with respect to all of the various pending MF Global related matters that have not as yet been resolved.

Very Truly Yours,

The Representatives of the MF Global 2011-12 D&O Insurers:

Leslie Ahari, Esq.
Gary Dixon, Esq.
Meredith Werner, Esq.
Troutman Sanders LLP
(Counsel for U.S. Specialty Insurance Company,
XL Specialty Insurance Company)
1850 Towers Crescent Plaza, Suite 500
Tysons Corner, VA 22182
leslie.ahari@troutmansanders.com
Gary.dixon@troutmansanders.com
Meredith.werner@troutmansanders.com

Scott R. Schaffer, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
(Counsel for AXIS Insurance Company,
AXIS Specialty Limited Bermuda)
150 E. 42nd Street
New York, NY 10017-5639
scott.schaffer@wilsonelser.com

6888398v.1

Edward J. Kirk, Esq.
Clyde & Co.
(Counsel for ACE American Insurance Company,
Westchester Fire Insurance Company,
Everest National Insurance Company)
The Chrysler Building
405 Lexington Avenue, 16th Floor
New York, NY 10017
Edward.Kirk@clydeco.us

Robert A. Benjamin, Esq.
Kaufman Borgeest & Ryan LLP
(Counsel for Illinois National Insurance Company,
New Hampshire Insurance Company)
120 Broadway, 14th Floor
New York, NY 10271
rbenjamin@kbrlaw.com

Tracy S. Tkac
Chubb & Son, a division of Federal Insurance Company
15 Mountain View Road
Warren, New Jersey 07059
ttkac@chubb.com

Mary Jo Barry, Esq.
D'Amato & Lynch, LLP
(Counsel for Ironshore Indemnity Inc.,
and Iron-Starr Excess Agency Ltd.)
Two World Financial Center
New York, NY 10281
MJBarry@Damato-Lynch.com

Anthony J. Fowler, Esq.
Harford Accident & Indemnity Company
277 Park Avenue, 15th Floor
New York, NY 10172
Anthony.Fowler@thehartford.com

Thomas A. Forker, Esq.
St. Paul Mercury Insurance Company
385 Washington St.
St. Paul, MN 55102
TFORKER@travelers.com

6888398v.1

John McCarrick, Esq.
White and Williams
(Counsel for Allied World Assurance Company Ltd.)
250 West 34th Street
New York, NY 10119
mccarrickj@whiteandwilliams.com

Jim Skarzynski, Esq.
Skarzynski Black LLC
(Counsel for XL Catlin, Inc. with respect to the D&O policy issued by Catlin Insurance
Company (UK) Ltd.)
One Battery Park Plaza
32nd Floor
New York, NY 10004
jskarzynski@skarzynski.com

David Philips
CNA Specialty Lines
125 Broad Street, 8th Floor
New York, NY 10004
David.philips@cna.com

Keith Little, Esq.
Bailey Cavalieri
(Counsel for Scottsdale Indemnity Company)
10 West Broad Street, Suite 2100
Columbus, OH  43215-3422
Keith.little@baileycavalieri.com

# Exhibit D

# JONES DAY

222 EAST 41ST STREET • NEW YORK, NEW YORK 10017.6702

TELEPHONE: +1.212.326.3939 • FACSIMILE: +1.212.755.7306

Direct Number: (212) 326-3415
JRUEWITTSTEIN@JONESDAY.COM

September 11, 2015

VIA EMAIL AND HAND DELIVERY

The Honorable Victor Marrero
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

> Re:  Deangelis v. Corzine
> In re MF Global Holdings Ltd. Investment Litigation
> In re MF Global Holdings Ltd. Securities Litigation
> Consolidated Under Case Number 11-cv-07866-VM

Dear Judge Marrero,

Jones Day represents MF Global Holdings Ltd., as Plan Administrator, and MF Global Assigned Assets LLC, as assignee under a July 27, 2015 Sale and Assumption Agreement between MF Global Holdings Ltd., as Plan Administrator, and James W. Giddens, as trustee for the SIPA liquidation of MF Global Inc. (the "Trustee").[1] The Sale and Assumption Agreement was approved by Judge Glenn in both the chapter 11 cases of MF Global Holdings Ltd. and its affiliates and the SIPA liquidation of MF Global Inc.[2]

Pursuant to the agreement, the Trustee has assigned to MF Global Assigned Assets LLC ("MFGAA") all of his rights, remedies, title, and interests in, arising out of, or related to any and all claims asserted in the above-identified cases (collectively, the "MDL") arising from the shortfall in customer property available to satisfy allowed commodity customer net equity claims. The Trustee has also assigned to MFGAA all of his rights, remedies, title, and interests set forth in certain agreements and orders identified in the Sale Assumption Agreement. *See* Sale and Assumption Agreement § 1.2 (providing for the assignment of the Common Interest Agreement, CCAA, NES Assigned Agreement, Allocation Motion, Allocation Order, and

---

[1] A copy of the Sale and Assumption Agreement is attached to this letter as Exhibit A. The Sale and Assumption Agreement closed on September 8, 2015. A copy of the executed Closing Sale and Assumption Agreement is attached hereto as Exhibit B.

[2] A copy of the order approving the Sale and Assumption Agreement is attached to this letter as Exhibit C.

NAI-1500528213v1

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID
MEXICO CITY • MIAMI • MILAN • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • RIYADH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

**JONES DAY**

The Honorable Victor Marrero
September 11, 2015
Page 2

District Court Order).  In addition, MFGAA has assumed, among other obligations, all obligations of the Trustee regarding responding to discovery requests arising out of the MDL.

Accordingly, we respectfully request that the Court deem that MFGAA is the relevant party in interest in place of the Trustee with respect to all matters regarding the MDL, and any and all correspondences or inquiries that might otherwise be directed to the Trustee regarding the MDL should be directed to MFGAA, as assignee under the Sale and Assumption Agreement.[3]

The Trustee has authorized Jones Day to submit this letter jointly on behalf of MFGAA and the Trustee.

Respectfully submitted,

*Jane Rue Wittstein*

Jane Rue Wittstein

cc:    Bruce Bennett (bbennett@jonesday.com)
       Dustin P. Smith (dustin.smith@hugheshubbard.com)
       Hon. James C. Francis (james_c_francis@nysd.uscourts.gov)
       All Counsel of Record in the MDL

---

[3] Jones Day will file a notice of appearance of counsel for MFGAA substantially in the form attached hereto as Exhibit D.

NAI-1500528213v1

# EXHIBIT A

**SALE AND ASSUMPTION AGREEMENT**

**by and between**

**THE TRUSTEE FOR THE LIQUIDATION OF MF GLOBAL INC.**

**and**

**MF GLOBAL HOLDINGS LTD., AS THE PLAN ADMINISTRATOR UNDER THE
CONFIRMED PLAN FOR THE CHAPTER 11 DEBTORS**

**Dated as of July 24, 2015**

66065567_19

# TABLE OF CONTENTS

Page

ARTICLE I AGREEMENT OF SALE AND ASSUMPTION .......................................................2

    Section 1.1    Sale of the Assigned Rights .................................................................2
    Section 1.2    Assumption of Liabilities and Obligations ..........................................5
    Section 1.3    Consideration .......................................................................................6
    Section 1.4    Reserve Funds .....................................................................................7
    Section 1.5    Qualifying Alternative Transaction .....................................................7

ARTICLE II COURT APPROVAL .............................................................................................8

    Section 2.1    Bankruptcy Court Filings....................................................................8

ARTICLE III REPRESENTATIONS AND WARRANTIES.........................................................9

    Section 3.1    Representations and Warranties of Assignor.......................................9
    Section 3.2    Representations and Warranties of Assignee........................................9
    Section 3.3    Limitations on Representations and Warranties ................................10
    Section 3.4    No Survival of Representations and Warranties.................................11

ARTICLE IV COVENANTS ......................................................................................................11

    Section 4.1    Claims ...............................................................................................11
    Section 4.2    Preservation of Privilege...................................................................11
    Section 4.3    Required Approvals ...........................................................................12
    Section 4.4    Failure to Assign ..............................................................................12
    Section 4.5    Cooperation.......................................................................................13
    Section 4.6    Taxes.............................................................**Error! Bookmark not defined.**
    Section 4.7    Publicity ...........................................................................................13
    Section 4.8    Indemnification.................................................................................14

ARTICLE V CLOSING ............................................................................................................15

    Section 5.1    Closing Arrangements .......................................................................15
    Section 5.2    Closing Deliveries.............................................................................15
    Section 5.3    Closing Cash Prerequisites ...............................................................15
    Section 5.4    Closing Transfer................................................................................15

ARTICLE VI TERMINATION OF AGREEMENT .....................................................................16

    Section 6.1    Termination.......................................................................................16
    Section 6.2    Effect of Termination........................................................................16

ARTICLE VII MISCELLANEOUS............................................................................................17

    Section 7.1    Relationship of the Parties .................................................................17
    Section 7.2    Amendment of Agreement.................................................................17
    Section 7.3    Notices ..............................................................................................17
    Section 7.4    Fees and Expenses ............................................................................18

66065567_19

Section 7.5      Governing Law; Jurisdiction; Service of Process; WAIVER OF
                RIGHT TO TRIAL BY JURY ................................................................18
Section 7.6      Further Assurances................................................................................19
Section 7.7      Entire Agreement .................................................................................19
Section 7.8      Waiver...................................................................................................19
Section 7.9      Designation of Assignee .......................................................................19
Section 7.10     Assignment ...........................................................................................20
Section 7.11     Successors and Assigns.........................................................................21
Section 7.12     No Third Party Beneficiaries ................................................................21
Section 7.13     Severability of Provisions ....................................................................21
Section 7.14     Counterparts..........................................................................................21
Section 7.15     Certain Terms.......................................................................................21
Section 7.16     Interpretation........................................................................................22
Section 7.17     Time ......................................................................................................22

Exhibits

Exhibit A      Definitions
Exhibit B      Assigned Data and Contracts
Exhibit C      Assumed Preservation Liabilities and Obligations
Exhibit D      Disputed Unsecured Claims
Exhibit E      Form of Sale and Assumption Order
Exhibit F      Form of Closing Sale and Assumption Agreement

66065567_19

## SALE AND ASSUMPTION AGREEMENT

This SALE AND ASSUMPTION AGREEMENT, dated as of July 24, 2015 (this "Agreement"), is by and between James W. Giddens, solely in his capacity as trustee for the liquidation of MFGI (the "Trustee" or the "Assignor"), and  MF Global Holdings Ltd. as Plan Administrator ("Holdings" or the "Plan Administrator") under the Second Amended and Restated Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code (the "Second Amended and Restated Plan") for MF Global Holdings Ltd., MF Global Finance USA Inc., MF Global Capital LLC, MF Global FX Clear LLC, MF Global Market Services LLC, and MF Global Holdings USA Inc. (collectively, the "Chapter 11 Debtors").  Assignor and the Plan Administrator are referred to individually herein as a "Party" and collectively as the "Parties". Certain capitalized terms used in this Agreement are defined in Exhibit A.

## RECITALS

WHEREAS, on October 31, 2011 (the "Filing Date"), the Honorable Paul A. Engelmayer, District Judge of the United States District Court for the Southern District of New York (the "District Court"), entered an order commencing the liquidation of MFGI which, among other things, (i) appointed Assignor as trustee for the liquidation of MFGI pursuant to Section 78eee(b)(3) of SIPA and (ii) removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court" (Case No. 11-2790 (MG) SIPA)) (the "MFGI Proceeding").

WHEREAS, the Trustee has completed 100 percent distributions to all categories of allowed commodities and securities customer claims, commenced 100 percent distribution on all allowed secured, administrative, and priority claims, and substantially completed a 74 percent interim distribution on allowed unsecured general creditor claims.

WHEREAS, the Trustee has substantially completed the process of marshalling the assets of the MFGI estate and any further substantial distributions to general creditors will depend on resolution of the MDL, as defined below,  and the related issues of insurance coverage and the realization of other definite and contingent future recoveries.

WHEREAS, the Parties seek to maximize the recovery for the general creditors of the MFGI estate while minimizing the risk, expense and delay related to the resolution of the multidistrict litigation and other definite and contingent future recoveries.

WHEREAS, to accomplish these goals, the Parties have entered into this Agreement, which provides (as described in detail below) that:

A.      the Plan Administrator, on behalf of the MFGH Entities, forgoes further distributions on account of the MFGH Entities Unsecured Claims and instead agrees to acquire pursuant to this Agreement substantially all remaining MFGI estate assets and to liquidate these assets for the benefit of the MFGH Entities;

B.      the SIPA Trustee retains sufficient cash from the assigned assets to make final distributions to all Other Unsecured Creditors representing a cumulative 95% or 94%

66065567_19

payment on the Other Unsecured Creditors' Allowed Claims, and to maintain reserves to resolve Disputed Claims and wind down the MFGI estate;

C.     the SIPA Trustee assigns to the Plan Administrator (or its designee) all remaining assets except those specifically excluded, including: (a) the SIPA Trustee's claims in the multidistrict litigation, (b) the SIPA Trustee's rights and interests in certain insurance proceeds, (c) the SIPA Trustee's rights to distributions in the MF Global UK Ltd. insolvency proceeding, and (d) all remaining cash in the MFGI estate after distributions are made to the Other Unsecured Creditors, subject to reserve requirements for expenses and disputed claims; and

D.     the Plan Administrator also agrees to assume the SIPA Trustee's discovery and contractual obligations in connection with the assigned rights.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I

## AGREEMENT OF SALE AND ASSUMPTION

Section 1.1     Sale of the Assigned Rights.  Assignor hereby agrees to assign to Holdings or, pursuant to the requirements of Section 7.9, at Holdings' direction, in whole or in part, to the Holdings Designee (whether Holdings and/or the Holdings Designee, the "Assignee") at the Closing, and Assignee hereby agrees to accept and assume from Assignor at the Closing, upon the terms and subject to the conditions of this Agreement, the following (in each case, as in the existence at the Closing) (sections (a)-(k) below (excluding the Excluded Assets, as defined below) being, collectively, the "Assigned Rights"):

(a)     Assignor's rights, remedies, title, and interests in, arising out of, or related to any and all claims asserted in the case captioned *In re MF Global Holdings Ltd. Investment Litigation*, 11 Civ. 7866 (the "MDL") against former officers, directors, and other employees of MFGI or Holdings and other third parties (the "MDL Defendants") arising from the shortfall in customer property available to satisfy allowed commodity customer net equity claims (the "MDL Assigned Claims"),  including, for the avoidance of doubt:

(i)     all of Assignor's rights, remedies, title, and interests set forth in (i) the Assignment Agreement dated October 2, 2013 (MFGI Docket 7207, Ex. 1) (the "NES Assignment Agreement"),[1] (ii) the Trustee's motion to approve the Assignment Agreement and for related relief (MFGI Docket No. 7103) (the "Allocation Motion"),[2]

---

1.   The NES Assignment Agreement is available at http://dm.epiq11.com/MFG/Document/GetDocument/2433959.

2.   The Allocation Motion is available at http://dm.epiq11.com/MFG/Document/GetDocument/2423825.

66065567_19

(iii) the corresponding Order entered on November 6, 2013 by the Bankruptcy Court in the MFGI Proceeding granting the NES Motion (Docket No. 7208) (the "Allocation Order"),[3] and (iv) the order entered on February 20, 2014 by the District Court (S.D.N.Y. Case No. 13-8893, Docket No. 38) (the "District Court Order"),[4] including, but not limited to, Assignor's right as assignee and/or subrogee of the right to recover any and all amounts collected by the Customer Representatives in the MDL;

(ii)     all of Assignor's rights, remedies, title, and interests set forth in the Amended and Restated Continuing Cooperation and Assignment Agreement dated September 10, 2012 and approved by the Bankruptcy Court on October 11, 2012 (MFGI Docket No. 3764) (the "CCAA");[5] and

(iii)     all of Assignor's rights, remedies, title and interests set forth in the Common Interest Agreement dated June 8, 2012 (MFGI Docket No. 2906, Ex. A to Ex. A (the "Common Interest Agreement").[6]

(b)     Assignor's rights, remedies, title, and interests in, arising out of, or related to any and all existing or known claims, losses, or recoveries reported under, related to, arising from, or seeking coverage from the E&O Policies, including but not limited to claims, losses, or recoveries reported under, arising from, or related to (i) the MDL Assigned Claims, (ii) the proof of loss submitted by Assignor on behalf of MFGI on March 28, 2012, and (iii) any other proof of claim filed by the former commodity customers with Assignor against MFGI (the "E&O Assigned Claims");

(c)     Assignor's rights, remedies, title, and interests in, arising out of, or related to any and all existing or known claims, losses, or recoveries reported under, related to, arising from, or seeking coverage from the D&O Policies, including but not limited to any claims or losses arising from the MDL (the "D&O Assigned Claims");

(d)     Assignor's rights, remedies, title, and interests in, arising out of, or related to any and all existing or known claims, losses or recoveries reported under, related to, arising from,  or seeking coverage from the Fidelity Bonds, including but not limited to the original and supplemental proofs of loss submitted by Assignor on behalf of MFGI on July 25, 2012 and May 18, 2015, respectively (the "Fidelity Bond Assigned Claims");

(e)     Assignor's rights, remedies, title, and interests in, arising out of, or related to any and all existing or known claims, losses, or recoveries reported under, related to, or arising from the Fiduciary Policies (the "Fiduciary Policy Assigned Claims");

---

3.   The Allocation Order is available at http://dm.epiq11.com/MFG/Document/GetDocument/2434325.

4.   The District Court Order is available at http://dm.epiq11.com/MFG/Document/GetDocument/2605042.

5.   The CCAA is available at http://dm.epiq11.com/MFG/Document/GetDocument/2155404.

6.   The Common Interest Agreement is available at http://dm.epiq11.com/MFG/Document/GetDocument/1782205.

-3-

66065567_19

(f)     Assignor's rights, remedies, title, and interests under the agreement between MF Global Finance USA Inc. and the Trustee dated May 23, 2014 (MFGI Docket No. 7927) (the "Dooley Assignment Agreement") related to a proof of loss asserted to recover $141,024,494.28 for losses sustained by MFGI as a result of illegal trading activity by Evan Dooley between February 26-27, 2008 (the "Dooley Assigned Claims");

(g)     Assignor's rights, remedies, title, and interests in distributions in the special liquidation proceeding of MF Global UK Ltd. (the "MFGUK Assigned Claim") allowed pursuant to the settlement agreement between the SIPA Trustee and the administrators for MF Global UK Ltd. dated December 21, 2012 (MFGI Docket No. 5168) (the "MFGI-MFGUK Settlement Agreement");

(h)     Assignor's rights, remedies, title, and interests, if any, with respect to any potential recoveries against LCH.Clearnet Limited or LCH.Clearnet S.A. (the "LCH Assigned Claim");

(i)     Assignor's rights, remedies, title, and interests in all cash under the Trustee's control at the Closing ("Assigned Cash"), provided, however, that the following (collectively, the "Excluded Cash") shall not constitute Assigned Cash: (i) the reserve funds described in Section 1.4 (collectively, the "Reserve Funds"), (ii) the Consideration Appeal Closing Reserve, if any, and (iii) the funds necessary to pay in full all allowed priority, administrative, secured claims and to pay the GUC Recovery Percentage (as defined in section 1.3 below) distributions on all the Other Unsecured Claims (and 100% of any additional amounts required to satisfy any Taxes that the Trustee is obligated to pay by applicable Law on such distributions) (as defined below);

(j)     Assignor's rights, remedies, title, and interests in, arising out of, or related to all systems, systems services contracts, hardware, software, and all documents and data related to the Assigned Rights, the Assumed Liabilities and Obligations, and the systems, hardware, documents and data and the systems services contracts listed in Exhibits B and C (the "Assigned Data and Contracts"); and

(k)     Assignor's rights, remedies, title, and interests in, arising out of, or related to any other remaining property of the estate or other rights, remedies, title, and interests that may otherwise benefit creditors of the MFGI estate (other than the Excluded Assets), consisting of known or unknown assets or claims which have not been previously sold, assigned, or transferred, including, without limitation, (1) claims for any tax refunds or other tax benefits, (2) any and all causes of actions, claims, lawsuits, or similar actions, whether or not such causes of action, claims, lawsuits or similar actions have been asserted by the SIPA Trustee or MFGI, and whether or not such causes of action, claims, lawsuits, or similar actions are liquidated, unliquidated, tangible, intangible, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, (3) any cash in the possession of the Trustee that is neither Assigned Cash nor Excluded Cash, and (4) any and all claims or rights arising under any Order (the "Remnant Assigned Assets").

For the avoidance of doubt, anything in this Agreement to the contrary notwithstanding, the Trustee shall not be obligated to sell, transfer or assign any of its rights, title or interest in, to or

-4-

66065567_19

under any of the Excluded Assets, except that the unused portions of the Reserve Funds, if any, shall revert to Assignee as and to the extent expressly provided for in Section 1.4.

Section 1.2    Assumption of Liabilities and Obligations.  Assignee hereby agrees to accept and assume from Assignor at the Closing and, from and after the Closing, timely pay, perform and discharge in accordance with their respective terms the following Liabilities and obligations of Assignor (sections (a)-(f) below being, collectively, the "Assumed Liabilities and Obligations"):

(a)    all obligations and Liabilities of Assignor regarding responding to discovery requests that seek pre-Filing Date documents or other information in any litigation or proceeding related to the Assigned Rights, if any (collectively, the "Assumed Litigation Liabilities and Obligations"). For the avoidance of doubt, the Assumed Litigation Liabilities and Obligations do not include any litigation or proceeding related to the Disputed Claims;

(b)    all obligations and Liabilities of Assignor to preserve any documents, data or systems that are required to be preserved pursuant to the Federal Rules of Civil Procedure or other Laws in order to respond to any party or third party discovery request corresponding to the Assumed Litigation Liabilities and Obligations, including without limitation the systems listed in Exhibit C (the "Assumed Preservation Liabilities and Obligations");

(c)    all obligations and Liabilities of Assignor under the NES Assignment Agreement, Allocation Motion, Allocation Order, District Court Order, the CCAA, and the Common Interest Agreement (the "Assumed Customer Representative Liabilities and Obligations");

(d)    all obligations and Liabilities of Assignor, if any, with respect to Group Taxes (including with respect to the Assigned Rights or otherwise), including Group Taxes that may arise as a result of (i) any claim, audit, investigation, assessment, or adjustment for any amount of Group Tax proposed, asserted, or assessed by any taxing authority, court, or other Governmental Authority against Assignor, or (ii) the sale of the Assigned Rights or the assumption of the Assumed Liabilities and Obligations pursuant to this Agreement (the "Assumed Tax Obligations");

(e)    all other obligations and Liabilities of Assignor under the Assigned Data and Contracts, including without limitation any and all payment obligations under the Assigned Data and Contracts (the "Assumed Assigned Contract Liabilities and Obligations"); and

(f)    any and all of the Liabilities of Assignor based upon, arising under or with respect to the Assigned Rights to the extent arising (x) on or after the Closing, and (y) as a result of any action or omission by Assignee (the "Assumed Closing Liabilities and Obligations").

For the avoidance of doubt, Assignee shall not be deemed to assume any Liabilities or obligations other than (i) those explicitly identified as Assumed Liabilities and Obligations in this Agreement, or (ii) any other Liabilities and obligations imposed by the terms of this Agreement.

66065567_19

Section 1.3    Consideration.

(a)    As consideration for the sale (the "Purchase Price") of the Assigned Rights (in addition to the Assumed Liabilities and Obligations), Holdings, on behalf of the MFGH Entities, hereby irrevocably agrees that, if the Closing occurs, then, from and after the Closing, the MFGH Entities will forebear any and all distributions on the MFGH Entities Unsecured Claims so that:

(i)    Assignor may complete 100% distributions on all allowed priority, administrative, and secured claims; and

(ii)    one of the following (whether 95% as detailed in (i) below or 94% as detailed in (ii) below, such percentage shall be referred to as the "GUC Recovery Percentage"):

(A)    if the Closing takes place on or before September 30, 2015, and the dollar amount of the Assigned Cash is greater than or equal to the 95% Distribution Assigned Cash Prerequisite Amount, the Assignor may complete 95%[7] distributions on all Other Unsecured Claims[8] (and 100% distributions and/or other payments of any additional amounts required to satisfy any Taxes that the Trustee is obligated to pay by applicable Law on such distributions); or

(B)    if the foregoing clause (a)(ii)(A) is not applicable, and the dollar amount of the Assigned Cash is greater than or equal to the 94% Distribution Assigned Cash Prerequisite Amount (unless otherwise waived at the Plan Administrator's sole discretion), the Assignor may complete 94% distributions on all Other Unsecured Claims (and 100% distributions and/or other payments of any additional amounts required to satisfy any Taxes that the Trustee is obligated to pay by applicable Law on such distributions).

(b)    For the avoidance of doubt, the Purchase Price includes the forbearance of distributions by the MFGH Entities in  the amount necessary to complete a 100% distribution on

---

7.    As described in the recitals to this Agreement, the Trustee has already made distributions to general unsecured creditors with allowed claims in the amount of approximately 74%.  All references herein to 95% or 94% distributions to general unsecured creditors shall mean the amounts necessary to provide each such creditor that has an allowed claim with a cumulative 95% or 94% recovery on account of its general unsecured claim.

8.    A certain portion of the allowed claim held by JPMorgan Chase Bank, N.A. ("JPM") (SIPA Claim No. 5630) is a general unsecured claim held for the benefit of Holdings pursuant to a settlement agreement between Holdings and JPM.  See Motion Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure for Entry of an Order Approving the Settlement Agreement Between the Plan Administrator and JPMorgan Chase Bank, N.A. (the "MFGH-JPMC Settlement") (Chapter 11 Docket No. 1562) (providing that Holdings is entitled to recover 75% of JPM's recoveries in the MFGI Proceeding between $30 million and $50 million and 100% of JPM's recoveries above $50 million).  JPM's claim in the MFGI Proceeding has been allowed in the amount of $60 million.  Under the terms of this Agreement, JPM is an Other Unsecured Creditor, and accordingly, JPM will receive distributions such that it receives the GUC Recovery Percentage, a portion of which automatically becomes payable to Holdings under the MFGH-JPMC Settlement.

-6-

any Disputed Administrative Claim that is allowed after the Closing Date or a distribution at the GUC Recovery Percentage on any Disputed Unsecured Claim that is allowed after the Closing Date, which distribution(s) will be funded from the Disputed Administrative Claims Reserve or Disputed Unsecured Claims Reserve, as appropriate, described in sections 1.4(b) and 1.4(c).

Section 1.4    Reserve Funds.  The Trustee shall establish the following reserve funds:

(a)    "Administrative Expense Reserve": On the Execution Date, Assignor shall establish and fund an Administrative Expense Reserve in the amount of $21,750,000 to be used in his sole discretion to satisfy professional fees and other expenses of the MFGI estate as reasonably necessary subject only to the oversight of SIPC under 15 U.S.C. § 78eee(b)(5) and, until the Final Discharge, the Bankruptcy Court.

(i)    Upon the conclusion of the Final Distribution and in any event no later than thirty (30) days after Closing, Assignor shall transfer to Assignee any portion of the Administrative Expense Reserve then remaining net of any accrued unpaid expenses incurred prior to the conclusion of the Final Distribution, in excess of $10,000,000; and

(ii)    Upon the Final Discharge, Assignor shall transfer to Assignee any portion of the Administrative Expense Reserve then remaining in excess of $5,000,000.

(b)    "Disputed Unsecured Claims Reserve": On the Closing Date, the Trustee shall establish and fund a Disputed Unsecured Claims Reserve funded in an amount equal to the GUC Recovery Percentage of the potentially allowable amount of the Disputed Unsecured Claims (and 100% of any additional amounts required to satisfy any Taxes that the Trustee is obligated to pay by applicable Law on such distributions).  Upon the Final Determination of any of the Disputed Unsecured Claims, the Trustee shall transfer to Assignee any portion of the Disputed Unsecured Claims Reserve attributable to the resolved Disputed Unsecured Claim that is not required for the satisfaction of the resolved Disputed Unsecured Claim (or the payment of related Taxes as described above).

(c)    "Disputed Administrative Claims Reserve": On the Closing Date, the Trustee shall be permitted, at his discretion, to establish and fund a Disputed Administrative Claims Reserve equal to 100% of the potentially allowable amount of the Disputed Administrative Claims (and 100% of any additional amounts required to satisfy any Taxes that the Trustee is obligated to pay by applicable Law on any distributions on the Disputed Administrative Claims).Upon the Final Determination of any of the Disputed Administrative Claims, the Trustee shall transfer to Assignee any portion of the Disputed Administrative Claims Reserve attributable to the resolved Disputed Administrative Claim that is not required for the satisfaction of the resolved Disputed Administrative Claim (or the payment of related Taxes as described above).

Section 1.5    Qualifying Alternative Transaction.  Notwithstanding anything contained in this Agreement to the contrary, until the approval and entry of the Sale and Assumption Order by the Bankruptcy Court:

66065567_19

(a)      Assignor and his Representatives shall have the right to initiate a proposal for, solicit, facilitate, discuss or negotiate an Alternative Transaction with any Person (including entry into a confidentiality agreement or similar agreement with such Person); and

(b)      Assignor or Assignee may terminate this Agreement if Assignor notifies Assignee of his decision to proceed with an Alternative Transaction that offers Assignor consideration that Assignor determines in good faith is expected to (i) be at least $2 million more favorable to Assignor than the aggregate consideration expected to be received from Assignee pursuant to this Agreement (taking into account, among other things, the structure, or legal, regulatory or financial aspects of the transactions contemplated by this Agreement, including Assignee's obligation to assume discovery, document preservation and other obligations, Assignee's ability to effectively pursue and recover the Assigned Claims, and (ii) yield a distribution exceeding 95% for all allowed general unsecured claims against the MFGI estate, including all claims held by the MFGH Entities (a "Qualifying Alternative Transaction").

(c)      For the avoidance of doubt, nothing in this Agreement shall limit Assignee's right to oppose any Qualifying Alternative Transaction whether by filing an objection with the Bankruptcy Court or otherwise.

## ARTICLE II

## COURT APPROVAL

Section 2.1    Bankruptcy Court Filings.  Promptly following the execution of this Agreement, Assignor and Holdings shall file a joint motion (the "Motion")  and separate memoranda of law and supporting documentation (along with the Motion, the "Filings") with the Bankruptcy Court seeking the entry of the Sale and Assumption Order authorizing the sale of the Assigned Rights to Assignee and assumption of the Assumed Liabilities, free and clear of all liens, claims, encumbrances and interests, upon the terms and subject to the conditions contained in this Agreement, and the consummation of the Transactions.  Subject to the terms of this Agreement, Assignor and Holdings each agree to use reasonable best efforts to support the Motion and promptly obtain the entry of the Sale and Assumption Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Assignee under this Agreement and demonstrating that Assignee is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  Holdings and Assignor shall consult prior to filing, joining in or otherwise supporting in any manner whatsoever any motion or other pleading relating to the assignment of the Assigned Rights or assumption of the Assumed Liabilities hereunder.  Subject to the terms of this Agreement, in the event the entry of the Sale and Assumption Order is appealed, Assignor and Holdings shall use their respective reasonable best efforts to defend such appeal, to oppose any request for a stay pending any such appeal, and to obtain an expedited resolution of such appeal or stay request; provided that nothing herein shall preclude the parties hereto from consummating the transactions contemplated hereby, if the Sale and Assumption Order shall have been entered and has not been stayed, as detailed in Section 5.1 herein.

66065567_19

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.1    <u>Representations and Warranties of Assignor</u>.  Assignor hereby represents and warrants to Assignee as of the date hereof and as of the Closing Date except insofar as such representations and warranties are made as of the date hereof or any other specified date (in which case as of such date), as follows:

(a)    Assignor has all requisite trustee power and authority to execute and deliver this Agreement and, at the Closing, the Closing Sale and Assumption Agreement, and to perform his obligations hereunder and thereunder and to consummate of the Transactions.

(b)    Subject to the entry of the Sale and Assumption Order, the execution, delivery and performance by Assignor of this Agreement and, at the Closing, the Closing Sale and Assumption Agreement, and the consummation of the Transactions have been duly and validly authorized by all requisite action on the part of Assignor (in his capacity as trustee) and no other proceeding on the part of Assignor (in his capacity as trustee) is necessary to authorize this Agreement and the Closing Sale and Assumption Agreement and the consummation the Transactions.

(c)    This Agreement has been and, when executed and delivered in accordance herewith, the Closing Sale and Assumption Agreement will be duly and validly executed and delivered by Assignor and (assuming the due authorization, execution and delivery by Assignee) constitutes (or will constitute) legal, valid and binding obligations of Assignor enforceable against Assignor in accordance with its terms (subject to the entry of the Final Sale and Assumption Order).

(d)    Assignor has performed a diligent review of his books and records and, based on that review, cannot identify, and does not believe that there exist, any systems required to perform the Assumed System Liabilities and Obligations other than those identified in Exhibits B and C.

Section 3.2    <u>Representations and Warranties of Assignee</u>.  Each of Holdings and if applicable, the Holdings Designee hereby represents and warrants (in the case of (d) below, on its behalf and on behalf of each MFGH Entity) to Assignor as of the date hereof and as of the Closing Date except insofar as such representations and warranties are made as of the date hereof or any other specified date (in which case as of such date) as follows:

(a)    It is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.  It has all requisite corporate power and authority to execute and deliver this Agreement and, at the Closing, the Closing Sale and Assumption Agreement, and to perform its obligations hereunder and thereunder and to consummate the Transactions.  It (in the case of Holdings) has all requisite power and authority to execute and deliver on behalf of the MFGH Entities this Agreement and, at the Closing, the Closing Sale and Assumption Agreement, and to bind the MFGH Entities to the terms hereof and thereof, including but not limited to those obligations contained in Section 1.3.

-9-

(b)    Subject to the entry of the Sale and Assumption Order, the execution, delivery and performance by it of this Agreement and, at the Closing, the Closing Sale and Assumption Agreement, and the consummation of the Transactions have been duly and validly authorized by all requisite corporate action on its part, and no other proceeding on its part is necessary to authorize this Agreement and the Closing Sale and Assumption Agreement and the consummation of the Transactions.

(c)    This Agreement has been and the Closing Sale and Assumption Agreement will be duly and validly executed and delivered by it and (assuming the due authorization, execution and delivery by Assignor) constitutes (or will constitute) legal, valid and binding obligations of it, enforceable against it in accordance with its terms (subject to the entry of the Sale and Assumption Order).

(d)    The MFGH Entities own and have good title to all of the MFGH Entities Unsecured Claims free and clear of any and all participations or encumbrances created or incurred by or against any MFGH Entity and the MFGH Entities have not transferred or assigned to any other person any of the MFGH Entities Unsecured Claims (or any interest therein), in whole or in part.

Section 3.3    Limitations on Representations and Warranties.  Notwithstanding anything contained in this Agreement to the contrary, Assignor and Assignee each acknowledge and agree that the other Party is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by such Party in Section 3.1 or Section 3.2, as applicable. Any claims Assignor or Assignee may have for breach of representation or warranty shall be based solely on the representations and warranties of the other Party set forth in Section 3.1 or Section 3.2, as applicable, subject, in each case, to this Section 3.3.  Assignor and Assignee each acknowledge and agree that he or it has completed his or its own independent investigation, analysis and evaluation of the Assigned Rights, that he or it has made all such reviews and inspections of the Assigned Rights as he or it deems necessary and appropriate, and that in making his or its decision to enter into this Agreement and consummate the Transactions, such Party has solely relied on the results of his or its own independent investigation, analysis, and evaluation with respect to all matters without reliance upon any express or implied representations or warranties except for the representations and warranties of the other Party as expressly set forth in Section 3.1 or Section 3.2, of this Agreement, as applicable.  Assignee further acknowledges and agrees that, except for the representations and warranties contained in Section 3.1. THE ASSIGNED RIGHTS ARE BEING TRANSFERRED ON AN "AS IS," "WHERE IS" AND "WITH ALL FAULTS" BASIS AND WITHOUT REPRESENTATIONS, WARRANTIES OR GUARANTEES, EXPRESS, IMPLIED OR STATUTORY, WRITTEN OR ORAL, OF ANY KIND, NATURE OR DESCRIPTION (INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), BY ASSIGNOR, HIS REPRESENTATIVES OR THE MFGI ESTATE (ALL OF WHICH ARE HEREBY EXPRESSLY DISCLAIMED BY ASSIGNOR). Assignee further acknowledges and agrees that neither Assignor nor the MFGI estate nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Assignor, the Assigned Rights, the Assumed Liabilities and Obligations,  the Final Distribution, the Transactions or any other matter relating to any of the foregoing not expressly set forth in this Agreement, and Assignor is not, and will

-10-

not have or be, nor will the MFGI estate or any other Person have or be subject to any Liability to Assignee or any other Person resulting from the distribution to Assignee or its Representatives or Assignee's use of, any such information, or any other document or information in any form provided to Assignee or its Representatives relating to the Assigned Rights, the Assumed Liabilities and Obligations, the Final Distribution, the Transactions or any other matter relating to any of the foregoing.

Section 3.4    No Survival of Representations and Warranties.  The Parties agree that the representations and warranties of the Parties contained in this Agreement and the covenants and agreements to be performed by any Party between the date of this Agreement and the Closing shall not survive the consummation of the Closing and shall thereafter be of no further force or effect.

## ARTICLE IV

## COVENANTS

Section 4.1    Claims.  Between the date hereof and the Closing Date, except (a) as required by Law (including the Bankruptcy Code and SIPA), an Order of the Bankruptcy Court, or an Order of the District Court, (b) as otherwise expressly contemplated by this Agreement, (c) in connection with a Qualifying Alternative Transaction that is approved by an order of the Bankruptcy Court and upon substantially concurrent termination of this Agreement in accordance with Section 1.5(b), or (d) with the prior written consent of Assignee, Assignor shall (1) not assign the Assigned Rights, (2) not make or respond to any proposal or offer to settle or otherwise compromise the MDL Assigned Claims, E&O Assigned Claims, or Fidelity Bond Assigned Claims, (3) not enter into any settlement agreement with respect to the MDL Assigned Claims, E&O Assigned Claims, or Fidelity Bond Assigned Claims, and (4) prosecute the MDL Assigned Claims, E&O Assigned Claims and Fidelity Bond Assigned Claims in good faith in cooperation and coordination with Assignee, provided, however, that the MDL Assigned Claims, E&O Assigned Claim, and Fidelity Bond Claim shall not be settled or compromised without the consent of Assignee, as provided in clauses (2) and (3) above.

Section 4.2    Preservation of Privilege.  To the extent that any of the data, documents, systems or other information assigned under this Agreement may include material subject to the attorney-client privilege, work product doctrine or any other applicable privilege, the Parties understand and agree that they have a commonality of interest with respect to such matters and it is their desire, intention and mutual understanding that the sharing of such material is not intended to, and shall not, waive or diminish in any way the confidentiality of such material or its continued protection under the attorney-client privilege, work product doctrine or other applicable privilege. All data, documents, systems or other information provided by Assignor that is entitled to protection under the attorney-client privilege, work product doctrine or other applicable privilege shall remain entitled to such protection under these privileges and this Agreement.  Nothing in this Agreement obligates either Party to reveal material subject to the attorney-client privilege, work product doctrine or any other applicable privilege and Assignor is not obligated to transfer (or direct the transfer) of any materials maintained by his retained professionals for their internal use that are subject to the attorney-client privilege, work product doctrine or any other applicable privilege or otherwise the subject of a confidentiality agreement.

-11-

Section 4.3      Required Approvals.  Until the earlier of (i) the Closing and (ii) any termination of this Agreement pursuant to Article VI, and except as otherwise contemplated by this Agreement or the Final Sale and Assumption Order, the Parties shall use reasonable best efforts to take all actions necessary or appropriate to consummate the Closing and the Transactions as promptly as reasonably practicable, including the preparation and filing of all forms, registrations and notices required pursuant to applicable Law to be filed to consummate the Closing and the Transactions.

Section 4.4      Failure to Assign.  To the extent that the Assigned Data and Contracts (or any portion thereof) are by their respective terms (to the extent such terms are valid and enforceable under applicable Law) or applicable Law (and, in each case, notwithstanding the provisions of the Final Sale and Assumption Order ) not capable of being or which have not been, sold, transferred, assigned or conveyed, or assumed, respectively, at the Closing as contemplated hereby (all affected Assigned Data and Contracts, collectively, the "Non-Assignable Assigned Data and Contracts"), from and after the Closing, Assignor shall, at the reasonable request of Assignee and at the expense of, and for the account of, Assignee, (i) reasonably cooperate with Assignee in order to provide to Assignee the benefit of the Non-Assignable Assigned Data and Contracts, and/or (ii) enforce any rights of Assignor arising from or under the Non-Assignable Assigned Data and Contracts; provided, that in any event, all responsibility for the post-Closing performance or non-performance with respect to the Non-Assignable Assigned Data and Contracts and any resulting cost and expense shall be Assignee's responsibility. For the avoidance of doubt, subject to clauses (i) and (ii) and the proviso of the proceeding sentence, any Non-Assignable Assigned Data and Contracts will not be sold, transferred, assigned, or conveyed, or assumed, at the Closing pursuant to the terms of this Agreement, and/or the Closing Sale and Assumption Agreement to the extent that it is not capable of being sold, transferred, assigned, or conveyed, or assumed, respectively, as described in the first sentence of this Section 4.4. (but automatically thereafter shall be deemed to have been sold, transferred, assigned, or conveyed, or assumed, respectively, at such time, if any, after the Closing as it is so capable of being assigned sold, transferred, assigned, or conveyed, or assumed, respectively), and (ii) Assignor will not be in breach of this Agreement or the Closing Sale and Assumption Agreement as a result of the foregoing. After the Closing, (a) Assignee shall have the right to (1) approve or to designate, in its sole discretion, counsel and any other professionals that Assignee and its Affiliates may deem necessary and appropriate (at Assignee's sole cost and expense), in connection with any action or proceeding relating to the Assigned Data and Contracts, and (2) consult with and advise such counsel or professionals in the prosecution or defense of any such action or proceeding, and (b) Assignor shall not, without Assignee's consent, compromise, settle, or offer to compromise or settle such action or proceeding. Assignor's reasonable costs and expenses incurred in connection with this Section 4.4 shall be promptly paid (or, to the extent already paid by Assignor, reimbursed) by Assignee upon demand by Assignor on a monthly basis; provided that Assignor shall not be obligated to incur any costs or expenses in connection with his compliance with this Section 4.4 and may instead require that Assignee pay in advance any such reasonable costs or expenses or make arrangements reasonably satisfactory to Assignor for the direct payment of the same by Assignee.

-12-

66065567_19

Section 4.5    Cooperation.

(a)    From and after the Closing Date,  Assignor shall assist Assignee in good faith, with all reasonable costs associated with such assistance to be paid by Assignee who shall promptly reimburse Assignor upon Assignor's demand, in facilitating the transition of the Assigned Rights and Assumed Liabilities and Obligations from Assignor to Assignee, including, but not limited to, (i) answering general questions about the Assigned Rights and Assumed Liabilities and Obligations, including, but not limited to, answering questions (and providing documents when relevant and available)  regarding any agreements, arrangements or other understandings (to the extent any such agreement, arrangement or other understanding exists) between Assignor, including his Representatives, on the one hand, and third parties, including their Representatives, (ii) providing guidance on the proper use of any equipment, software, or other technology transferred to Assignee, (iii) providing general background information regarding matters with which Assignor is more familiar than Assignee, including, but not limited to, with respect to the Remnant Assigned Assets, (iv) communicating with third parties as reasonably specified from time to time by Assignee to confirm the sale of the Remnant Assigned Assets, and (v)  providing any other assistance that Assignee may deem appropriate and which the Parties agree is not unnecessarily burdensome or costly to Assignor.

(b)    From and after the Closing Date and continuing until the Final Discharge, Assignee shall cooperate with Assignor in good faith in defending and resolving the Disputed Claims, including with respect to responding to requests from Assignor for documents and data deemed by Assignor to be necessary or appropriate to defend and resolve the Disputed Claims (at Assignee's sole cost and expense).

(c)    Assignee agrees to take all action as may be reasonable and appropriate to support (i) the Trustee's application for the Final Discharge, including with respect to tax liabilities, and (ii) any application by the Trustee's professionals for payment of fees and expenses.

(d)    From and after the Final Discharge, Assignor agrees to file a change of address form with the U.S. Postal Service so that mail sent to Assignor's attention will be forwarded by the U.S. Postal Service to Assignee's address.  Assignor will use its reasonable efforts to forward to Assignee any mail that Assignor believes may require the attention of Assignee, but shall have no obligation to do so.

(e)    Prior to the Closing Date, Assignor agrees to provide Assignee a report of the current value of the potential Assigned Cash every thirty (30) days.

Section 4.6    Taxes.  Holdings agrees to defend any claim, audit, investigation, assessment, adjustment, or other Tax proceeding proposed, asserted, assessed, or commenced by any taxing authority, court, or other Governmental Authority against Assignor on behalf of Assignor with respect to Group Taxes.

Section 4.7    Publicity.  Except (i) as required by applicable Law (including any Order by the Bankruptcy Court) or (ii) upon prior reasonable consultation, filings by Assignor or Assignee with, or in any proceeding before, the Bankruptcy Court, each Party shall, to the extent

-13-

reasonably practicable, seek the consent of the other Party before issuing any press release or making any public announcement concerning this Agreement or the Transactions and such consent shall not be unreasonably withheld, conditioned or delayed.  Nothing in this Section 4.7 shall prohibit any Party from making any public statement without prior consultation of the other Party as may be required by applicable Law, including any general statement by Assignor or his Representatives with respect to Distributions.

Section 4.8    Indemnification.

(a)    From and after the Closing Date, Assignee shall indemnify and hold harmless Assignor from and against (i) any and all claims that may be asserted, made, maintained or continued at any time after the Closing Date against Assignor directly or indirectly on account of or arising out of any of the Assigned Rights or any of the Assumed Liabilities and Obligations; and (ii) any and all Liabilities, costs or expenses incurred or suffered by, or imposed on, Assignor in connection with, arising out of or resulting from any claim described in clause (i) of this sentence (including, but not limited to, any amount paid or to be paid in satisfaction of any such claim).  To the extent Assignor seeks indemnification from Assignee under this Section 4.8(a), Assignor: (x)  shall allow Assignee the right to consult with and advise counsel to Assignor in the defense of any claims asserted Assignor; and (y)  shall not, without Assignee's prior written consent (which consent shall not be unreasonably withheld), admit any Liability for, consent or stipulate to any judgment against Assignee or, compromise, settle, or offer to compromise or settle, any claims asserted against it for which it seeks indemnification from Assignee. To the extent Assignor fails to adhere to the foregoing (x) and (y), and Assignee is materially prejudiced thereby, Assignor shall permanently waive the right to indemnification with respect to the claims in question.

(b)    Assignee agrees that it shall be solely responsible for all amounts exceeding the Administrative Expense Reserve that are reasonably incurred by Assignor after the Final Discharge and shall promptly upon demand pay (or to the extent such amounts have already been paid by  Assignor, reimburse Assignor for) any and all such amounts, provided that Assignee's liability pursuant to this Section 4.8(b) shall be limited to the costs and fees incurred in connection with responding to discovery requests and subpoenas (including, but not limited to, requests made pursuant to Rule 30 of the Federal Rules of Civil Procedure) in connection with the MDL Assigned Claims, the Fidelity Bond Assigned Claims, the E&O Assigned Claims, the Dooley Assigned Claims, the LCH Assigned Claim or any other litigation or proceeding (except for any litigation of the Disputed Claims) and (x) Assignor acted with  reasonable diligence and in good faith in responding to any such discovery request to be reimbursed under this section and provided Assignee with a good faith estimate of expected costs and expenses and obtained Assignee's written consent to incur such costs and expenses to be reimbursed under this section, or (y)  the cost to be paid or reimbursed was incurred by Assignor while responding to a discovery request pursuant to a court order in any Legal Proceeding.

(c)    Notwithstanding anything to the contrary in Sections 4.8(a) and (b), Assignee shall not be required to indemnify or hold harmless Assignor with respect to any circumstances in which Assignor has acted with gross negligence or recklessness, and, to the extent Assignee indemnifies Assignor or otherwise incurs any expenses with respect to any action in which Assignor is subsequently determined to have acted with gross negligence or

-14-

recklessness, Assignor shall promptly reimburse Assignee the full amount of such indemnification or expenses, plus interest calculated consistent with 28 U.S.C. 1961.

## ARTICLE V

## CLOSING

Section 5.1     Closing Arrangements.  The consummation of the Transactions (the "Closing") shall take place on the later of the Non-Appeal Closing Date, the Consideration Appeal Closing Date, or the Assigned Rights Appeal Closing Date (the "Closing Date"), at the offices of Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, New York, or at such other time or place as may be mutually agreed to by the Parties.

Section 5.2     Closing Deliveries.  On or before the Closing Date, (i) at Assignee's reasonable request, Assignor shall deliver to Assignee all necessary motions and other pleadings to substitute counsel, parties, or other motions in connection with the MDL Assigned Claims, the Fidelity Bond Assigned Claims, and the E&O Assigned Claims, and/or any other outstanding litigation involving MFGI identified by Assignee requiring such substitution, (ii) Assignor shall deliver or cause to be delivered to Assignee the Closing Sale and Assumption Agreement, duly executed by Assignor and (iii) Assignee shall deliver or cause to be delivered to Assignor the Closing Sale and Assumption Agreement, duly executed by Assignee.

Section 5.3     Closing Cash Prerequisites.  If the GUC Recovery Percentage as defined in Section 1.3 is 94% (instead of 95%), then, at Holdings' discretion, the Closing shall not be consummated unless the dollar amount of the Assigned Cash is greater than or equal to the 94% Distribution Assigned Cash Prerequisite.  For the avoidance of doubt, if, pursuant to the preceding sentence, the Closing is not consummated, then the "Closing Date" shall not be deemed to have occurred.

Section 5.4     Closing Transfer.  Within two (2) business days of the Closing Date, Assignor shall transfer the Assigned Cash in immediately available funds pursuant to the wire instructions to be provided by Assignee at the Closing.  Subsequent to the Closing, to the extent that Assignor (other than pursuant to Section 4.4) obtains or otherwise holds Remnant Assigned Assets that are not required to be held in the Administrative Expense Reserve, the Disputed Unsecured Claims Reserve, or the Disputed Administrative Claims Reserve or otherwise addressed by this Agreement, Assignor shall transfer pursuant to the wire instructions or other delivery instructions to be provided by Assignee such Remnant Assigned Asset to Assignee within fourteen (14) business days of obtaining such Remnant Assigned Assets or otherwise determining that he holds such Remnant Assigned Assets and receiving appropriate instructions from Assignee, provided however,  that after the Final Discharge, Assignor shall have  no obligation to transfer any Remnant Assigned Asset whose value is less than $100.00, and after the date on which a final decree is entered in the Chapter 11 Cases under Federal Rule of Bankruptcy Procedure 3022, Assignor shall have no obligation to transfer any Remnant Assigned Assets whose value is less than $25,000.00.

-15-

## ARTICLE VI

## TERMINATION OF AGREEMENT

Section 6.1    Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of Assignor and Assignee;

(b)    by Assignor or Assignee, if the Closing has not occurred on or prior to the Outside Date; provided, however, that if the Closing has not occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Assignor or Assignee, then such materially breaching party may not terminate this Agreement pursuant to this Section 6.1(b);

(c)    by Assignor or Assignee in accordance with Section 1.5(b);

(d)    by Assignor or Assignee, if the Bankruptcy Court shall have stated unconditionally that it will not enter the Sale and Assumption Order; and

(e)    by Assignor or Assignee, if a Governmental Authority of competent jurisdiction shall have issued a final and non-appealable Order or taken any other non-appealable final action, in each case, having the effect of permanently making the Transactions illegal or otherwise permanently restraining or prohibiting consummation of the Transactions.

(f)    by Assignee, if the reserve established by Assignor pursuant to Section 1.4(c) exceeds the Maximum Disputed Administrative Claims Reserve Amount.

(g)    by Assignee, if the establishment of the Consideration Appeal Closing Reserve causes the dollar amount of the Assigned Cash to be less than the 95% Distribution Assigned Cash Prerequisite Amount or 94% Distribution Assigned Cash Prerequisite Amount, as applicable.

Section 6.2    Effect of Termination.  In the event of any termination of this Agreement pursuant to the terms of this Agreement, (a) this Agreement shall forthwith become null and void and be deemed of no further force and effect except that Article VII (other than Section 7.6) shall survive termination of the Agreement, and (b) there shall be no liability or obligation thereafter on the part of any Party arising out of or related to this Agreement, provided, however, that if (x) this Agreement is terminated pursuant to Section 6.1(b) and (y) the Closing has not occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by the non-terminating Party, the terminating Party shall retain all available remedies against the materially breaching Party, including the right to pursue damages or other relief on account of such breach.

66065567_19

**ARTICLE VII**

**MISCELLANEOUS**

Section 7.1    <u>Relationship of the Parties</u>.  Nothing in this Agreement shall be construed so as to make Assignee a partner of Assignor.

Section 7.2    <u>Amendment of Agreement</u>.  This Agreement may not be supplemented, modified or amended except by a written agreement executed by each Party.

Section 7.3    <u>Notices</u>.  Any Notice shall be in writing and shall be deemed to have been duly given or made when personally delivered, sent by email or when mailed by registered or certified mail, postage prepaid, return receipt requested, addressed or directed as follows, or as may be furnished hereafter by notice, in writing, to the other Party on at least three (3) Business Days' prior notice, to the following Parties:

      (a)    If to Assignee, to:

      MF Global Holdings Ltd.
      Attn: General Counsel
      142 West 57th Street
      New York, NY 10019
      lferber@mfglobalholdings.com

      with copies to:

      Bruce Bennett
      Jones Day
      555 South Flower Street, Fiftieth Floor
      Los Angeles, CA 90071
      bbennett@jonesday.com

      and:

      Jane Rue Wittstein
      Jones Day
      222 East 41st Street
      New York, New York 10017
      jruewittstein@jonesday.com

      (b)    If to Assignor, to:

      James B. Kobak Jr.
      Hughes Hubbard & Reed LLP
      One Battery Park Plaza
      New York, New York 10004
      james.kobak@hugheshubbard.com

-17-

66065567_19

with a copy to:

Dustin P. Smith
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
dustin.smith@hugheshubbard.com

These designated notice parties can be changed by providing notice to the Parties in writing by electronic mail or U.S. Mail.  Notice shall be deemed to have been validly and effectively given and received on the date it is delivered (whether by mail, overnight delivery, courier, or email), unless it is delivered after normal business hours of the recipient or on a day which is not a Business Day, in which case it shall be deemed to have been validly and effectively given and received on the next Business Day following the day it was delivered.

Section 7.4    Fees and Expenses.  The Parties agree that, except as otherwise expressly provided in this Agreement or in the Closing Sale and Assumption Agreement, each Party shall bear and pay all costs, fees and expenses that it incurs, or which may be incurred on its behalf, in connection with this Agreement and the Transactions.

Section 7.5    Governing Law; Jurisdiction; Service of Process; WAIVER OF RIGHT TO TRIAL BY JURY.

(a)    This Agreement, and all claims and disputes arising out of or in connection with this Agreement or the Transactions, shall be governed by and construed in accordance with laws of the State of New York and the Bankruptcy Code and SIPA, without giving effect to any principles of conflicts of law to the extent such principles would apply a law other than that of the State of New York, the Bankruptcy Code or SIPA.

(b)    To the fullest extent permitted by applicable Law, each Party:

(i)    agrees, without limiting any Party's right to appeal any order of the Bankruptcy Court, that this agreement fundamentally deals with property of the MFGI estate and the administration of the MFGI estate and that if any dispute arises out of or in connection with this Agreement or any of the documents executed hereunder or in connection herewith, the Bankruptcy Court shall have exclusive personal and subject matter jurisdiction and shall be the exclusive venue to resolve any and all disputes relating to the Transactions;

(ii)    hereby consents and submits to such jurisdiction;

(iii)    irrevocably waives any objection which he or it may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute;

66065567_19

(iv)      agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law; and

(v)      agrees and consents that service of all writs, process and summonses in any action, suit or proceeding with respect to any dispute relating to the Transactions may be made by delivering copies thereof to the appropriate Party at the address of such Party set forth in (or otherwise specified pursuant to) Section 7.3  (with copies to such other Persons as specified therein); provided, however, that nothing contained in this Section 7.5(b)(v) shall affect the right of a Party to serve writs, process or summonses in any other manner permitted by Law.  .

(c)      ASSIGNOR AND ASSIGNEE HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING BETWEEN ASSIGNOR AND ASSIGNEE DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

Section 7.6      Further Assurances.  Subject to the other provisions of this Agreement, each of the Parties hereto agrees to execute, acknowledge, deliver, file and record such further certificates, amendments, instruments and documents, and to do all such other acts and things, as may be reasonably requested by any other Party in order to carry out the intent and purpose of this Agreement at the expense of the requesting Party; provided that this Section 7.6 shall not require any Party to take any action that is not commercially reasonable or that would result in any Liability of such Party or any of its Affiliates (or in the case of Assignor, the MFGI estate).

Section 7.7      Entire Agreement.  Except as otherwise agreed by the Parties in writing and with express reference to this Agreement, and except as set forth herein, this Agreement, together with the Letter Agreement, constitute the full and entire agreement between the Parties hereto pertaining solely to the Transactions and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, with respect thereto between the Parties pertaining solely to the Transactions.

Section 7.8      Waiver.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision (whether or not similar) nor shall any waiver constitute a continuing waiver unless otherwise expressed or provided.  All waivers hereunder must be in writing to be effective.

Section 7.9      Designation of Assignee.  Prior to the Closing, Holdings shall be permitted to designate an MFGH Entity, or an Affiliate or subsidiary of any MFGH Entity, or a trust created pursuant to the Plan, prospectively to constitute the Assignee in whole or in part under this Agreement, and upon such designation, all references to "Assignee" in this Agreement shall prospectively include such designee (the "Holdings Designee"), provided, however, that Holdings shall be jointly and severally liable with such designee for all Liabilities and obligations under this Agreement, the Closing Sale and Assumption Agreement and the Final Sale and Assumption Order.  Any designation under this Section 7.9 is not, and shall not be, effective unless (i) the Holdings Designee has executed and delivered to Assignor a written

-19-

instrument in form and substance reasonably satisfactory to the Assignor pursuant to which it (x) expressly agrees, for the benefit of Assignor, that it is liable (jointly and severally with Holdings) for all of the obligations of the "Assignee" under this Agreement, and (y) makes the representations and warranties set forth in Section 3.2, and (ii) such designation will not result in any delay in the consummation of the Closing. Any designation not permitted under, or otherwise in violation of, this Section 7.9 shall be null and void ab initio.

Section 7.10    Assignment.

(a)    Assignee shall not directly or indirectly assign, sell, transfer, convey or otherwise dispose of this Agreement or any of its rights, interests or obligations hereunder, in whole or in part (whether by operation of law or otherwise), without the prior written consent of Assignor.  After the Closing, Assignee shall not directly or indirectly assign, sell, transfer, convey or otherwise dispose of the Assigned Rights, in whole or in part (whether by operation of law or otherwise) without the prior written consent of Assignor, which consent shall not be unreasonably withheld, unless, following such transaction, Assignee shall remain jointly and severally liable for Assignee's obligations under this Agreement relating to the Assigned Rights assigned to the assignee, the Closing Sale and Assumption Agreement and the Final Sale and Assumption Order, provided, however, that Assignee shall be permitted, in its sole discretion and without the approval of Assignor, to assign, sell, transfer, convey or otherwise dispose of any of the Assigned Rights to any Holdings Designee so long as Assignee remains jointly and severally liable for Assignee's obligations under this Agreement, the Closing Sale and Assumption Agreement and the Final Sale and Assumption Order.  Any assignment, sale, transfer, conveyance or other disposition not permitted under, or otherwise in violation of, this Section 7.10 shall be null and void ab initio.  For the avoidance of doubt, Assignee's liquidation of the Assigned Rights shall not constitute a "disposition" of the Assigned Rights that requires the consent of Assignor, nor shall Assignee's abandonment of the Assigned Rights if Assignee reasonably determines, in its sole discretion, that the abandoned Assigned Rights no longer have any value.

(b)    Notwithstanding anything in Section 7.10(a), Assignee shall have the right, after the Closing, to assign, in whole or in part, any Assigned Rights other than those identified in Section 1.1(a)-(e), so long as Assignee remains liable for Assignee's obligations under this Agreement, the Closing Sale and Assumption Agreement and the Final Sale and Assumption Order associated with such rights.

(c)    Prior to, at and after the Closing, the MFGH Entities shall not directly or indirectly assign, sell, transfer, convey or otherwise dispose of any of the MFGH Entities Unsecured Claims, except that, after the Closing, such a transfer shall not violate this Section 7.10(b) if, and only if, the transferee of the MFGH Entities Unsecured Claims has executed and delivered to Assignor a written instrument in form and substance satisfactory to Assignor pursuant to which such transferee irrevocably and unconditionally waives any right to a distribution from the MFGI estate on account of the MFGH Entities Unsecured Claims and otherwise consents and agrees to the terms of this Agreement, the Closing Sale and Assumption Agreement and the Final Sale and Assumption Order.  Any sale or purported assignment in violation of this Section 7.10(c) shall be void ab initio and may be disregarded by Assignor. Without limitation of the foregoing, any transferee of the MFGH Entities Unsecured Claims shall

-20-

be bound by, and comply with, this Agreement (including this Section 7.10(c)) as if it was an MFGH Entity.

Section 7.11   Successors and Assigns.  This Agreement shall bind and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, including any duly appointed subsequent trustee.

Section 7.12   No Third Party Beneficiaries.  Nothing in this Agreement is intended to, or shall, confer any third party beneficiary or other rights or remedies upon any Person other than the Parties hereto and their permitted assignees.

Section 7.13   Severability of Provisions.  Any provision of this Agreement which is determined by a court of competent jurisdiction to be invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining provisions of this Agreement or affecting the validity or enforceability of any of the provisions of this Agreement in any other jurisdiction, and if any provision of this Agreement is determined to be so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable, provided in all cases that neither the economic nor legal substance of this Agreement is affected by the operation of this sentence in any manner materially adverse to any Party.  Upon any such determination that any provision of this Agreement is invalid or unenforceable, the Parties shall negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effect the original intent of the Parties.

Section 7.14   Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.  Any delivery of an executed counterpart of this Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of this Agreement.

Section 7.15   Certain Terms.  As used in this Agreement, any reference to any federal, state, local, or foreign law, including any applicable Law, will be deemed also to refer to all rules and regulations promulgated thereunder and all amendments or modifications thereto, unless the context requires otherwise.  The words "include", "includes", and "including" will be deemed to be followed by "without limitation".  Pronouns in masculine, feminine, or neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  References to "this Agreement" shall include all Exhibits and other agreements, instruments or other documents attached hereto.  The words "herein", "hereof", "hereby", "hereunder", and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.  References in this Agreement to Articles, Sections, or Exhibits are to Articles or Sections of, or Exhibits to, this Agreement, except to the extent otherwise specified herein.  References to the consent or approval of any Party shall mean the written consent or approval of such Party, which may be withheld, conditioned or delayed in such Party's sole and absolute discretion, except to the extent otherwise specified herein.  All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.  Any agreement, instrument or statute

-21-

66065567_19

defined or referred to herein shall mean such agreement, instrument or statute as from time to time amended, restated, supplemented or otherwise modified, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way limit or modify the provisions of this Agreement and shall not affect the interpretation hereof. Unless otherwise specified herein, payments that are required to be made under this Agreement shall be paid by wire transfer of immediately available funds to an account designated in advance by the Party entitled to receive such payment. All references to "dollars" or "$" or "US$" in this Agreement shall mean U.S. dollars. Except as otherwise specified herein, references to the use of "reasonable best efforts" by a Party shall mean the reasonable best efforts of such Party, without any expenditure of funds other than for court filing fees and other litigation costs and expenses (including fees of such Party's Representatives but excluding any settlement amounts) but without any obligation to initiate a Legal Proceeding.

Section 7.16    Interpretation. The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof will arise favoring or disfavoring any Party hereto because of the authorship of any provision of this Agreement.

Section 7.17    Time.

(a)    General Provisions. Except as expressly set out in this Agreement, the computation of any period of time referred to in this Agreement shall exclude the first day and include the last day of such period. If the time limited for the performance or completion of any matter under this Agreement expires or falls on a day that is not a Business Day, the time so limited shall extend to the next following Business Day. Whenever action must be taken (including the giving of notice, the delivery of documents or the funding of money) under this Agreement, prior to the expiration of, by no later than or on a particular date, unless otherwise expressly provided in this Agreement, such action must be completed by 5:00 p.m., New York City time, on such date (except for the filing of papers with the Bankruptcy Court or the entry of any Order by the Bankruptcy Court, which must be completed on such date by the deadline set forth in the rules of the Bankruptcy Court or any Order of the Bankruptcy Court)

(b)    Time is of the Essence. The Parties agree that time is of the essence with respect to the consummation of this Agreement, including with respect to, but not limited to, (i) the deadlines set forth in Section 1.1(a)(i); (ii) the determination of the GUC Recovery Percentage under Section 1.3; (iii) the dates and deadlines in Section 1.4; (iv) the occurrence of the closing transfer under Section 5.3; (v) the Parties' rights to terminate the Agreement under Section 6.1; and (vi) the definitions of Assigned Right Appeal Closing Date, Closing Date, Consideration Appeal Closing Date, Non-Appeal Closing Date, and Outside Date. The time limited for performing or completing any matter under this Agreement may be extended or abridged solely by an agreement in writing by the Parties, and each Party shall have the right, in its sole discretion and for any reason whatsoever, to consent to or reject the other Party's request for any extension or abridgement of any time limit or deadline set forth in this Agreement.

-22-

66065567_19

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the day and year first above written.

James W. Giddens, solely in his capacity as trustee for the SIPA liquidation of MF Global, Inc.

By: _____

Name: James B. Kobak, Jr.
Title: Counsel to the SIPA Trustee

MF Global Holdings Ltd. as Plan Administrator under the Second Amended and Restated Plan on behalf of MF Global Holdings Ltd., MF Global Holdings USA Inc., MF Global Finance USA Inc., MF Global Capital LLC, MF Global Market Services LLC, MF Global FX Clear LLC, MF Global FX LLC, and MF Global Special Investor LLC

By: _____

Name: Laurie Ferber
Title: Executive Vice President and
General Counsel

66065567_19

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the day and year first above written.

James W. Giddens, solely in his capacity as trustee for the SIPA liquidation of MF Global, Inc.

By: _____

Name: James B. Kobak, Jr.
Title: Counsel to the SIPA Trustee

MF Global Holdings Ltd. as Plan Administrator under the Second Amended and Restated Plan on behalf of MF Global Holdings Ltd., MF Global Holdings USA Inc., MF Global Finance USA Inc., MF Global Capital LLC, MF Global Market Services LLC, MF Global FX Clear LLC, MF Global FX LLC, and MF Global Special Investor LLC

By: _Laurie R. Ferber_

Name: Laurie Ferber
Title: Executive Vice President and General Counsel

66065567_19

Exhibit A

Definitions

1.      The following capitalized terms have the meanings indicated:

"Abandoned Systems and Records" means the following systems and records: (i) UNICOM, (ii) the Ernst & Young hosted Relativity Database, and (iii) CMTA and its related application, CROWD.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such Person.  For purposes of this definition, "control" (including, with correlative meaning, the terms "controlling" and "controlled") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise. For the avoidance of doubt, MFGI is not deemed to be an Affiliate of Holdings or any of the Chapter 11 Debtors for the purposes of this Agreement.

"Alternative Transaction" means any potential or actual assignment, sale, transfer or other disposition of the Assigned Rights (in whole or in part) by Assignor to a Third Party.

"Assigned Rights Appeal Closing Date" shall mean that if there is an appeal(s) of the Sale and Assumption Order regarding the assignment of any of the Assigned Rights (other than the Assigned Data and Contracts or the Assumed Liabilities and Obligations) (an "Assigned Rights Appeal") and there is no other appeal of the Sale and Assumption Order (except for a Consideration Appeal), then 10:00 a.m. on the second Business Day following the date on which no other timely appeals of the Sale and Assumption Order can be taken.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. § 101 et seq, as amended.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or obligated to close under applicable Laws.

"Chapter 11 Cases" means the chapter 11 bankruptcy cases of the Chapter 11 Debtors captioned *In re MF Global Holdings Ltd.*, No. 11-15059 (Bankr. S.D.N.Y.).

"Closing Sale and Assumption Agreement" means the Closing Sale and Assumption Agreement between Assignee and Assignor, substantially in the form attached hereto as Exhibit F.

"Consent" means any consent, approval or other authorization of any Person.

A-1

"Consideration Appeal Closing Date" shall mean that if there is an appeal(s) of the Sale and Assumption Order regarding the GUC Recovery Percentage or the Purchase Price (a "Consideration Appeal") and there is no other appeal of the Sale and Assumption Order (except for an Assigned Rights Appeal), then 10:00 a.m. on the second Business Day after the later of (x) the establishment by Assignor of a reserve equal to full value of the unsatisfied portion of the appealing party's (or parties) allowed general unsecured claim, or, if the appealing party (parties) holds a Disputed Claim, the allowable amount of the Disputed Claim (the "Consideration Appeal Closing Reserve"), which shall be used by the Trustee to satisfy any claim of the appealing party if their appeal is successful (and shall be transferred to Assignee if the appeal is unsuccessful, the Sale and Assumption Order becomes a final, non-appealable Order and the Closing is consummated), or (y) the time at which no other timely appeals of the Sale and Assumption Order can be made.

"Disputed Claims" means the Disputed Administrative Claims and the Disputed Unsecured Claims.

"Disputed Administrative Claims" means any priority, administrative, and/or secured proof of claims (or portions of proofs of claims) asserted against the MFGI estate that have not been determined by a Final Determination at the time of the Closing.

"Disputed Unsecured Claims" means the general unsecured creditor proofs of claim listed on Exhibit D.

"D&O Policies" means the Directors, Officers and Corporate Liability Insurance Policy No 14-MGU 11-A23947 for the claims-made policy period of May 31, 2011 to May 31, 2012 and any related reinsurance or excess insurance.

"E&O Policies" means the errors and omissions insurance policy No. 1-18001-00-11 for the claims-made policy period of May 31, 2011 to May 31, 2012 and any related reinsurance or excess insurance.

"Excluded Assets" means (i) the Excluded Claims, (ii) the Excluded Cash, (iii) Assignor's rights, remedies, title and interests in to or under this Agreement, the Closing Sale and Assumption Agreement and/or any other agreement or interest executed or delivered pursuant to any of the foregoing or otherwise in connection with the Transactions, (iv) the Abandoned Systems and Records, and (v) the Retained Systems and Records.  For the avoidance of doubt, recoveries by Assignor, if any, on account of Excluded Claims shall not be Excluded Assets and shall constitute Remnant Assigned Assets.

"Excluded Claims" means any and all claims and rights of the Trustee or the MFGI estate of whatever kind or nature (whether direct or indirect, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether due or to become due, whether determined or determinable, whether choate or inchoate, whether secured or unsecured, whether matured or not yet matured) against (i) former public customers of MFGI, as defined in 17 CFR § 190.01(cc), (ii) SIPC, (iii) the Trustee, or (iv) the Trustee's Representatives.

A-2

"Fidelity Bond" means, collectively, the fidelity bond insurance policy No. BO8015176P11 for the claims-made policy period of period May 31, 2011 to May 31, 2012 and any related reinsurance or excess insurance.

"Fiduciary Policies" means, collectively, excess insurance policy No. EPG0009735, excess insurance policy No. 000426402, and fiduciary liability insurance policy No. 14-MGU-11-A23948.

"Final Determination" shall mean the entry of a Final Order determining a Disputed Claim.

"Final Discharge" shall mean the date that the Trustee is fully discharged of all obligations under SIPA, the Bankruptcy Code or other applicable Law by a Final Order.

"Final Distribution" means (i) the final 100% distributions on all allowed priority, administrative, and secured claims, and (ii) distributions on substantially all allowed general unsecured claims against the MFGI estate at the GUC Recovery Percentage, subject to Bankruptcy Court approval and reserving fully for all Disputed Claims.

"Final Order" shall mean an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket of such court, the operation or effect of which has not been stayed, reversed, or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending, provided, however, that no order shall fail to be a final order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rule of Civil Procedure, Bankruptcy Rule 9024, any similar local bankruptcy rule or any similar state statute or rule may be filed with respect to such order.

"Governmental Authority" means any domestic, foreign, federal, state, provincial or local authority, legislative body, court, government, regulatory or administrative agency, self-regulatory organization (including any securities exchange), commission, board, arbitral or other tribunal, or any political or other subdivision, department or branch of any of the foregoing.

"Group" means (i) for U.S. federal income Tax purposes, any affiliated group of corporations within the meaning of section 1504 of the Tax Code, or (ii) for state or local income and franchise Tax purposes, any group of corporations that filed (or was required to file) as a combined, unitary or consolidated group under state or local Tax laws, in each case for a taxable period during which both MFGI and at least one of the Chapter 11 Debtors were members.

"Group Taxes" means any Taxes of a Group for which the members of the Group each have liability for the amount of such Taxes under Treasury Regulation § 1.1502-6 or any comparable provision of state or local law, and shall include any income or franchise Taxes filed on the basis of a Group Tax Return even if applicable taxing authority determines that the filing on such basis was improper.

"Group Tax Return" means any return, declaration, form, election letter, report, statement, estimate, information return, or other information filed or required to be filed with

A-3

66065567_19

respect to any Group Taxes, including any schedule or attachment thereto or amendment thereof, and including any claim for a Group Tax refund.

"Laws" means all statutes, laws (including common law), regulations, rules, ordinances, codes and other requirements of any Governmental Authority, including any Orders.

"Legal Proceeding" means any actual or threatened judicial, administrative or arbitral actions, suits, litigation, proceedings (public or private) or claims or any proceedings or investigations by or before a Governmental Authority.

"Letter Agreement" means that certain letter agreement, dated December 21, 2012, between Assignor and the former Chapter 11 Trustee of MF Global Holdings Ltd., *et al.*, regarding, among other things, the resolution of the MFGH Unsecured Claims.

"Liability" means any liability, indebtedness, guaranty, claim, loss, damage, deficiency, assessment, responsibility, "claim" (as defined in Section 101(5) of the Bankruptcy Code) or obligation of whatever kind or nature (whether direct or indirect, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether due or to become due, whether determined or determinable, whether choate or inchoate, whether secured or unsecured, whether matured or not yet matured) and including all costs, fees and expenses relating thereto.

"Maximum Disputed Administrative Claims Reserve Amount" is $750,000.00 or such other amount as agreed to by the Parties.

"MFGH Entities" means the Chapter 11 Debtors and the following nondebtor affiliates of the Chapter 11 Debtors: MF Global FX LLC and MF Global Special Investor LLC.

"MFGH Entities Unsecured Claims" means the allowed general unsecured claims of the MFGH Entities against the MFGI estate (Claim Nos. 5484, 5487, 5488, 5489, 5490, 5492, 7000429, and 7000430) totaling $1,162,906,044.99.

"MFGI" means MF Global Inc.

"Notice" means any notice, request, consent, acceptance, waiver or other communication required or permitted to be given pursuant to this Agreement.

"Non-Appeal Closing Date" shall mean that if there is no appeal of the Sale and Assumption Order, 10:00 a.m. on the second Business Day following the date on which the Sale and Assumption Order has become a final, non-appealable Order of the Bankruptcy Court (or if there is an appeal, all such appeals have been withdrawn or dismissed).

"Order" means any order, writ, judgment, injunction, decree, stipulation, determination, decision, verdict, ruling, subpoena, or award entered by or with any Governmental Authority (whether temporary, preliminary or permanent).

"Other Unsecured Claims" means allowed, non-subordinated general unsecured claims against the MFGI Estate, other than the MFGH Entities Unsecured Claims.

A-4

"Other Unsecured Creditors" means general unsecured creditors of MFGI with non-subordinated allowed claims, other than the MFGH Entities.

"Outside Date" means the date that is ninety (90) days following the date of this Agreement, provided, however, that the Outside Date shall be extended to November 5, 2015 if the Assigned Cash to be transferred pursuant to Section 5.4 of this Agreement is at least the 94% Distribution Assigned Cash Prerequisite Amount.

"Person" means an individual, partnership, limited liability company, corporation, trust, joint venture, association, joint stock company, unincorporated organization, Governmental Authority or other entity, and the successors and assigns thereof or the heirs, executors, administrators or other legal representatives of an individual.

"Representative" means, with respect to a particular Person, any director, officer, manager, partner, member, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants, and financial advisors.  For the avoidance of doubt, any insurer of MFGI shall not be deemed a Representative.

"Retained Systems and Records" means the following systems and records: (i) the claims administration system in the MFGI Proceeding, (ii) the customer and general claims registers in the MFGI Proceeding, (iii) Intermedia, (iv) Oracle EBS, and (v) account trackers provided by CME Group Inc.

"Sale and Assumption Order" means one or more orders of the Bankruptcy Court authorizing the assignment of the Assigned Rights to Assignee, free and clear of all liens, claims, encumbrances or interests, upon the terms and subject to the conditions contained in this Agreement and the consummation of the Transactions, substantially in the form attached hereto as Exhibit E.

"SIPA" means the Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa-*lll*.

"SIPC" means the Securities Investor Protection Corporation.

"Tax" and, with correlative meaning "Taxes," means with respect to any Person (i) all federal, state, local, county, foreign and other taxes, levies, duties, assessments or other government charges of any kind, including income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, occupation, ad valorem, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), business and occupation, environmental or windfall profit tax, custom duty or other tax, governmental fee or other like assessment, charge, or tax of any kind whatsoever, in each case imposed or required to be withheld by any Governmental Authority having jurisdiction over the assessment, determination, collection, or other imposition of any of the foregoing, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority having jurisdiction over the assessment, determination, collection, or other imposition of any such tax (domestic or foreign) whether such Tax is disputed or not, or (ii) Liability for the

A-5

payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person.

"Tax Code" means the Internal Revenue Code of 1986, as amended from time to time, and any regulations promulgated thereunder.

"Tax Reporting" means any return, declaration, report, estimate, information return or statement required under any federal, state, local or foreign tax law to be filed, electronically filed, mailed or otherwise provided to any Governmental Authority or any other Person, in respect of any Taxes.

"Third Party" means any Person that is not a Party.

"Transactions" means the transactions contemplated herein to be consummated at the Closing, including the sale and assumption of the Assigned Rights as provided for in this Agreement.

"94% Distribution Assigned Cash Prerequisite Amount" means $45,000,000 less the aggregate value of the potentially allowable amount of the Disputed Administrative Claims plus any additional cash that comes into the possession of the Trustee subsequent to the date of this Agreement that would otherwise constitute Assigned Cash on the Closing Date

"95% Distribution Assigned Cash Prerequisite Amount" means $45,000,000 less the aggregate value of the potentially allowable amount of the Disputed Administrative Claims plus any additional cash that comes into the possession of the Trustee subsequent to the date of this Agreement that would otherwise constitute Assigned Cash on the Closing Date.

66065567_19

Exhibit B

Assigned Data and Contracts

| System/Vendor | Description |
|---|---|
| Iron Mountain | Hard copy document storage. |
| VanGuard | Hard copy document storage. |
| RhinoDox (Access) | Hard copy document storage. |
| GRM | EY tape and media storage. |
| IG2 | Absorbed by Iron Mountain. Tape and back-up media storage. |
| Compliance11 | Case management platform used to track documents provided in response to third party (mostly regulatory) requests and subpoenas. |
| Juniper | Support and warranty for hardware used for remote access to MFGI network. |
| Cisco Smartnet | Support and warranty for hardware including routers, switches etc. used at Equinix. |
| Cogent | Internet provider for Equinix data center |
| EMC - VNX/Storage | Support and warranty for storage devices and other hardware used to host GMI, fileshare network, etc. |
| Equinix | Infrastructure storage and hosting facility. |
| SunGard Phase3 | System for the broker-dealer side of the MFGI business providing an interface for viewing trades, settlements, account balances and other related data. |
| SunGard GMI | System for futures commission merchant side of the MFGI business providing commodities futures trading information, account information, transaction history and other related data. |
| Proofpoint Access Agreement | Agreement between MFGUK and the Trustee regarding access to Proofpoint archive. |
| Proofpoint Service Agreement (Fortiva) | Email archive for MFGI legacy accounts. |
| American Registry for Internet Numbers (ARIN) | The Regional Internet Registry for the United States, MFGI network IP addresses are registered through ARIN |

B-1

66065567_19

Exhibit C
Assumed Preservation Liabilities and Obligations

| System/Vendor | Description |
|---|---|
| MFGI Network Files | "Unstructured" electronic files stored on MFGI network drives, which include word processing document files, spreadsheets, presentations, PDFs, and the like. |
| Business Intelligence (BI) | MFGI hosted SQL server database containing reports on monthly profit and loss, daily and monthly reconciliation (no third party application license) |
| NICE Trader Voice Recorders (Chicago / New York) | Contains audio logs of trader phone conversations for Chicago and New York |
| E&Y Forensic disc images | Forensic disc images stored off-site at forensic lab vaults and cold storage facilities maintained by Ernst & Young LLP |
| AVAYA Voicemail Recorders | Contains audio logs of MF Global employee voicemails |
| SpeedScan | Used to store historical data e.g. electronic copies of customer statements and tax forms from GMI |
| SpeedView | Used to retrieve customer account initiation documents and subsequent updates to account agreements |
| Tag50 | Tag50 was an application which was being used to allocate unique id to traders across all trading platforms at MF Global, presently it is a SQL database |
| Rep 92 / Ops 92 | Rep 92 is a SQL Server database that hosts end of day data snapshot auto pushed by SunGard from Phase3 system (last synced on December 18, 2011)<br><br>Ops92 contains data from Rep 92 as well as other tables that allows the MFG operations team to generate customized reports. It is managed and hosted internally via SQL Server Management Studio |
| Trade DW | Database used to Generate reports and sometimes used to research information in order to resolve data issues with regard to transactions |
| Studio | Middle office database that hosts fixed income and equities trade positions, also stores customer average price equities  and 10% equity position run reports |
| Netcrunch | Agentless cross-platform network and server monitoring tool which centralizes fault management to generate alerts |

C-1

66065567_19

Exhibit D

Disputed Unsecured Claims

| CLAIM NUMBER | CLAIMANT NAME |
|---|---|
| 500000143 | ROBERT CHARLES CLASS A |
| 4746 | AMERICAN BULLION EXCHANGE ABEX CORP. |
| 900020605 | RYAN A NASS-BRIDGE AS TRUSTEE OF ABCC TRUST |
| 2443 | CVF LUX MASTER S.A.R.L. |
| 500000200 | SONSON, CHARLES |
| 300000309 | SENTINEL LIQUIDATION TRUST |
| 5441 | GOLDMAN, SACHS & CO. |

D-1

66065567_19

# EXHIBIT B

## CLOSING SALE AND ASSUMPTION AGREEMENT

This Closing Sale and Assumption Agreement (this "Assignment") is entered into as of September 8, 2015, between James W. Giddens, solely in his capacity as trustee for the liquidation of MF Global, Inc. ("Assignor"), and MF Global Assigned Assets LLC ("Assignee"). Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Sale and Assumption Agreement (the "Agreement"), dated as of July 24, 2015, between Assignor and MF Global Holdings Ltd. as Plan Administrator under the Second Amended and Restated Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code for MF Global Holdings Ltd., MF Global Finance USA Inc., MF Global Capital LLC, MF Global FX Clear LLC, MF Global Market Services LLC, and MF Global Holdings USA Inc.

WHEREAS, pursuant to the Agreement, Assignor has agreed, among other things, to assign to Assignee, and Assignee has agreed, among other things, to accept and assume from Assignor, the Assigned Rights and Assumed Liabilities and Obligations, on the terms and subject to the conditions set forth in the Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and in the Agreement, it is hereby agreed between the parties as follows:

1.  Assignment and Assumption. Assignor hereby assigns to Assignee, and Assignee hereby accepts and assumes from Assignor the Assigned Rights. Assignee hereby accepts and assumes from Assignor and covenants to, from and after the date hereof, timely pay, perform and discharge in accordance with their respective terms the Assigned Rights and Assumed Liabilities and Obligations.

2.  Agreement Governs. The terms and provisions of the Agreement shall control the extent of the assignment, delegation, acceptance and assumption made pursuant to this Assignment. This Assignment is intended only to effect the assignment, delegation, acceptance and assumption of the Assigned Rights and Assumed Liabilities and Obligations, which shall be governed by the terms of the Agreement.

3.  General Provisions. The provisions of Article VII of the Agreement are hereby incorporated herein by reference and shall apply to this Assignment, *mutatis mutandis*.

[Signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Closing Sale and Assumption Agreement to be executed as of the date first written above.

James W. Giddens, solely in his capacity as trustee for the SIPA liquidation of MF Global, Inc.

By: _____

Name: James B. Kobak, Jr.
Title: Counsel to the Trustee

MF Global Assigned Assets LLC

By: _____

Name: Laurie Ferber
Title: Executive Vice President and
General Counsel

2

# EXHIBIT C

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br><br>MF GLOBAL INC.,<br><br><br><br>Debtor. | Case No. 11-2790 (MG) SIPA |
| In re:<br><br><br>MF GLOBAL HOLDINGS LTD., *et al.*,<br><br><br><br>Debtors.[1] | Chapter 11 Case No. 11-15059 (MG)<br>(Jointly Administered) |

**ORDER APPROVING (I) THE SALE AND ASSUMPTION
AGREEMENT, (II) THE TRANSFER AND ABANDONMENT OF SPECIFIED
SYSTEMS AND DOCUMENTS AND THE SIPA TRUSTEE'S CORRESPONDING
LIMITATION OF DISCOVERY AND RETENTION OBLIGATIONS, (III) A FINAL
DISTRIBUTION ON ALLOWED GENERAL UNSECURED CLAIMS NOT
HELD BY THE MFGH ENTITIES, AND (IV) RELATED RELIEF**

Upon the joint motions (the "Motions") dated July 24, 2015, by James W.

Giddens (the "SIPA Trustee"), as Trustee for the liquidation of MF Global Inc. ("MFGI")

pursuant to the Securities Investor Protection Act ("SIPA") and MF Global Holdings Ltd.

("Holdings" or the "Plan Administrator"), on behalf of itself and its affiliates, as Plan

Administrator under the *Second Amended and Restated Joint Plan of Liquidation Pursuant to*

*Chapter 11 of the Bankruptcy Code for MF Global Holdings Ltd., MF Global Finance USA Inc.,*

*MF Global Capital LLC, MF Global FX Clear LLC, MF Global Market Services LLC, and MF*

---

1. The debtors in these chapter 11 cases are MF Global Holdings Ltd.; MF Global Finance USA Inc. ("Finance USA"); MF Global Capital LLC; MF Global Market Services LLC; MF Global FX Clear LLC; and MF Global Holdings USA Inc. (collectively, the "Chapter 11 Debtors").

*Global Holdings USA Inc.* (the "Plan"), which was confirmed in the above-captioned chapter 11 cases (the "Chapter 11 Cases") of Holdings and the other Chapter 11 Debtors, for entry of an order approving (i) the Sale and Assumption Agreement by and between the SIPA Trustee and MF Global Holdings Ltd., as Plan Administrator Under the Confirmed Plan for the Chapter 11 Debtors (the "Sale and Assumption Agreement"),[2] (ii) the transfer and abandonment of specified systems and documents and the corresponding limitation of the SIPA Trustee's discovery and retention obligations, (iii) the commencement of a final 94% or 95% distribution to all Other Unsecured Creditors following consummation of the Sale and Assumption Agreement, and (iv) related relief, as more fully described in the Motions, the SIPA Trustee's memoranda of law in support of the Motions, the Plan Administrator's memorandum of law in support of the Motions, and the accompanying Declarations of Vilia B. Hayes, Esq., Marlena C. Frantzides, Esq., Erik M. Graber, and Andrew Shannahan (the "Filings"); and the Court having considered the Filings, and any objections to the Motions filed by parties in interest; and the Court having considered the statements of counsel at a hearing before the Court; and the Court having jurisdiction to consider the Motions and the relief requested therein in accordance with SIPA § 78eee(b)(4) and 28 U.S.C. §§ 157 and 1334; and venue being proper before this Court pursuant to SIPA § 78eee(a)(3), 15 U.S.C. § 78aa, and 28 U.S.C. § 1408; and due and proper notice of the Motions having been provided, including in accordance with the Bankruptcy Code, Bankruptcy Rules, all other applicable rules and procedures, and the case management orders entered in the MFGI Proceeding and the Chapter 11 Cases, to all parties in interest, and it appearing that the notice of the Motions, which was served on, among others, all parties in interest in the Chapter

---

2. Capitalized terms not defined herein shall have the meaning ascribed to them in the Sale and Assumption Agreement.

2

11 Cases and the MFGI Proceeding, all defendants in the MDL, all insurers under the D&O

Policies, E&O Policies, Fidelity Bond, and Fiduciary Policies, all current holders of all pending

general creditor claims in the MFGI proceeding, all vendors and counterparties listed on Exhibits

B and C to the Agreement and on Schedule A hereto, and all individuals and entities who have

previously served a request for documents on the SIPA Trustee is sufficient, adequate, and

timely under the circumstances of these cases and that no other or further notices need be

provided; and a reasonable opportunity to object or be heard regarding the Motions having been

given to all such parties; and a full and fair opportunity having been afforded to litigate all issues

raised in all objections, or which might have been raised, and all objections having been fully

and fairly litigated; and after due deliberation, the Court hereby finds and concludes as follows:

1. The relief sought in the Motions is in the best interests of (a) the MFGI estate, customers, and creditors and (b) the Chapter 11 Debtors' estates and creditors.

2. The legal and factual bases set forth in the Motions and supporting memoranda and declarations establish just cause for the relief granted herein.

3. The Court hereby takes judicial notice of the dockets in the Chapter 11 Cases and the MFGI Proceeding and all pleadings, papers, hearing transcripts, opinions, orders, and other documents filed in these cases, including, but not limited to, the terms of the Plan and the order confirming the Plan in the Chapter 11 Cases.

4. The SIPA Trustee and the Plan Administrator have demonstrated good, sufficient and sound business judgment for the consummation of the Sale and Assumption Agreement, and such sale is reasonable and appropriate to maximize the value of MFGI's and the Chapter 11 Debtors' estates.

5. The SIPA Trustee and Holdings negotiated in good faith and at arm's length, and the transactions contemplated by the Sale and Assumption Agreement are undertaken by the SIPA Trustee and Holdings in good faith. The SIPA Trustee and Holdings, its affiliates, and their respective officers and directors and advisors have proceeded in good faith and without collusion in all respects. Holdings and/or its designated affiliate ("Assignee"), therefore, is a good faith purchaser, as that term is used in section 363(m) of the Bankruptcy Code, and is granted the protections provided to a good faith purchaser under section 363(m). Accordingly, the reversal or modification on appeal of this

3

Order or the authorization provided herein to consummate the assignment shall not affect the validity of the assignment of the Assigned Rights to Assignee.

6. The Plan Administrator has given adequate, fair, reasonable and substantial consideration under the Sale and Assumption Agreement for the benefit of the MFGI estate and its creditors and the Agreement may not be avoided under section 363(n) of the Bankruptcy Code. The consideration provided by the Plan Administrator for the Assigned Rights is within the range of reasonableness necessary had the SIPA Trustee sought approval of a compromise of the Assigned Rights for equivalent value pursuant to Bankruptcy Rule 9019.

7. The Assigned Rights are fully assignable under applicable law notwithstanding, by way of example and not limitation, any anti-assignment provisions contained in the insurance policies. The assignment is not collusive and is not intended to, and does not, alter or in any way impair the enforceability of and full receipt of benefits in connection with the Assigned Rights.

8. The Sale and Assumption Agreement constitutes a legal, valid, binding and effective assignment of the Assigned Rights, and there are no legal or equitable impediments to Assignee's full entitlement to and exercise of the Assigned Rights.

9. The SIPA Trustee's publication of notice of the establishment of the record date of August 7, 2015 (the "Record Date") for the purpose of making the third and final distribution for all holders of claims on the SIPA Trustee's website (www.mfglobaltrustee.com) constitutes good and sufficient notice of the Record Date.

In accordance with the foregoing findings and conclusions, it is hereby

**ORDERED** that the Motions are granted in all respects; and it is further

**ORDERED** that any objections to the entry of this Order or the relief granted herein and requested in the Motions that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled; and it is further

**ORDERED** that, pursuant to sections 105(a) and 363 of the Bankruptcy Code, as made applicable to this proceeding by sections 78fff(b) and 78fff-1(a) of SIPA, and Bankruptcy

4

Rule 6004, the SIPA Trustee and the Plan Administrator are authorized to enter into the Sale and Assumption Agreement in substantially the form and substance as set forth in Exhibit B to the Motions, and the SIPA Trustee, Plan Administrator, and Assignee are authorized to perform their obligations, comply with the terms of, and take all actions to consummate the Sale and Assumption Agreement; and it is further

**ORDERED** that pursuant to section 363(f) of the Bankruptcy Code, the assignment of the Assigned Rights in accordance with the Sale and Assumption Agreement shall be free and clear of any and all liens, claims (as such term is defined in section 101(5) of the Bankruptcy Code, including customer claims), encumbrances and interests, with such liens, claims, encumbrances and interests, if any, to attach to the proceeds of the assignment; and it is further

**ORDERED** that any and all privileges, including the attorney-client and related privileges, held by MFGI with respect to the Assigned Rights and the Assumed Liabilities and Obligations shall be transferred to Assignee, who shall control the assertion of such privileges with respect to such Assigned Rights and Assumed Liabilities and Obligations; and it is further

**ORDERED** that in accordance with Rule 502(d) of the Federal Rules of Evidence, the transfer of any document, data, system or other information to the Plan Administrator or Assignee in accordance with the Sale and Assumption Agreement shall not be deemed to waive whatever attorney-client privilege, work-product protection or other privilege or immunity that would otherwise attach to such document, data, system or other information; and it is further

**ORDERED** that the SIPA Trustee, the Plan Administrator, and Assignee are authorized to (a) provide any consents or waivers in respect of, perform all obligations, and enter into any agreements contemplated by, the Sale and Assumption Agreement, and (b) execute such

other documents and take such other actions as may be necessary or appropriate to effectuate the

Sale and Assumption Agreement and the transactions contemplated thereunder or the provisions

of this Order; and it is further

**ORDERED** that the failure to specifically include any particular provision of the

Sale and Assumption Agreement in this Order shall not diminish or impair the effectiveness of

such provision, it being the intent of the Court that the Sale and Assumption Agreement be

authorized and approved in its entirety; and it is further

**ORDERED** that, except as expressly permitted by the Sale and Assumption

Agreement or by this Order, the SIPA Trustee and MFGI and any party holding liens, Claims,

encumbrances or interests of any kind or nature whatsoever against or in the Assigned Rights, or

MFGI's interests in the Assigned Rights, shall be and hereby are forever barred, estopped and

permanently enjoined from commencing, prosecuting or continuing in any manner any action or

other proceeding of any kind against the Plan Administrator and/or Assignee, their property and

their successors and assigns relating to the Assigned Rights; and it is further

**ORDERED** that Assignee shall become the Assignee of Assignor's rights,

remedies, title, and interests in (a) the NES Assignment Agreement (b) the Allocation Motion,

(c) the Allocation Order, (d) the District Court Order, (e) the CCAA, (f) the Common Interest

Agreement, (g) the E&O Assigned Claims, (h) the D&O Assigned Claims, (i) the MDL

Assigned Claims, (j) the Fidelity Bond Assigned Claims, (k) the Fiduciary Policy Assigned

Claims, (l) the Dooley Assignment Agreement and Dooley Assigned Claims, (m) the MFGUK

Assigned Claim, (n) the MFGUK Settlement Agreement, (o) the LCH Assigned Claim, (p) the

Assigned Data and Contracts, and (q) the Remnant Assigned Assets; and it is further

**ORDERED** that by virtue of the assignment of the NES Assignment Agreement,

Allocation Motion, Allocation Order, and District Court Order, (a) Assignee shall become the

assignee of, among other things, all of the SIPA Trustee's rights, remedies, title, and interests as assignee and/or subrogee of the rights of all customers and the right to pursue claims against third parties based on the deficit in the 4d and 30.7 customer estates to the extent that general estate funds were advanced (by the Allocation Order or otherwise) to satisfy net equity claims, including, without limitation, (i) the right to receive any and all money and other property recovered or collected by the Customer Representatives in the MDL under the NES Assignment Agreement and (ii) the right to receive any and all money and other property recovered or collected on account of all potential claims of customers against third parties to recover for the shortfall in the 4d and 30.7 customer estates in existence as of the moment before any advances of funds from the MFGI general estate pursuant to the Allocation Order, and (b) the Customer Representatives will continue to prosecute the MDL Assigned Claims in the MDL pursuant to the terms of the CCAA, and Assignee shall have and exercise all of the SIPA Trustee's rights, remedies, title, interests, and obligations under the NES Assignment Agreement, Allocation Motion, Allocation Order, District Court Order, CCAA, and Common Interest Agreement; and it is further

**ORDERED** that this Order (a) shall be effective as a determination that, on the Closing Date, all liens, Claims, encumbrances or interests of any kind or nature whatsoever existing as to the Assigned Rights have been unconditionally released, discharged and terminated, and that the conveyances described in the Sale and Assumption Agreement have been effected, and (b) shall be binding upon and shall govern the acts of all entities; and it is further

**ORDERED** that the terms and provisions of the Sale and Assumption Agreement and this Order shall be binding in all respects upon the SIPA Trustee, MFGI, the MFGI estate, all creditors and customers (whether known or unknown) and holders of equity interests in MFGI,

7

the Chapter 11 Debtors, the Customer Representatives, all parties in interest in the Chapter 11

Cases, all insurers under the E&O Policies, D&O Policies, Fidelity Bonds, and Fiduciary

Policies, any affected third parties, including, but not limited to, all persons asserting liens,

Claims, encumbrances or interests in the Assigned Rights, and the respective affiliates,

successors and assigns of each of the foregoing; and it is further

**ORDERED** that Assignee shall administer the Assigned Rights for the benefit of

the MFGH Entities as though the Assigned Rights were distributed among the MFGH Entities in

the amounts that the MFGH Entities would otherwise receive from the MFGI estate on account

of (a) the MFGH Entities' allowed claims in the MFGI Proceeding, (b) the Dooley Assignment

Agreement, and (c) the MFGH-JPMC Settlement. For the avoidance of doubt, the Assigned

Rights shall be allocated among the MFGH Entities as follows:

a) Under the Dooley Assignment Agreement, Finance USA is entitled to recover the first $135 million in proceeds, and any proceeds above $135 million are divided among the Chapter 11 Debtors in accordance with the formula set forth in the Dooley Assignment Agreement and based on the Chapter 11 Debtors' allowed claims in the MFGI Proceeding.

b) With respect to any distributions received by JPM as part of the Final Distribution, 75% of the amount of such distributions it receives between $30 million and $50 million, and 100% of such distributions above $50 million are immediately payable by JPM to Holdings.

c) All remaining Assigned Rights and their proceeds shall be allocated among the Chapter 11 Debtors by the Plan Administrator consistent with the amounts of their allowed claims in the MFGI Proceeding.

**ORDERED** that upon the Closing Date and thereafter, the only systems and

documents required to be retained by the SIPA Trustee are (i) the records of the liquidation,

(ii) records showing daily computations of the funded balances of each account with open

commodities contracts as required pursuant to 17 C.F.R. § 190.04(b)-(c), and (iii) documents

8

relevant to the resolution of the Disputed Claims (collectively, the "Retained Documents"); and it is further

ORDERED that the assignment and transfer by the SIPA Trustee to the Plan Administrator and/or the Assignee of the (i) Assigned Contracts listed on Exhibit B of the Agreement, and (ii) Assumed Preservation Liabilities and Obligations listed on Exhibit C of the Agreement, are hereby authorized and approved; and it is further

ORDERED that upon the Closing Date and thereafter, the SIPA Trustee will no longer have any duties or obligations with respect to the Assigned Contracts or the Assumed Preservation Liabilities and Obligations, except as may be specifically enumerated in Section 4.5 of the Sale and Assumption Agreement, and shall not be responsible for any fees, costs or other expenses arising from or relating to the Assigned Contracts or Assumed Preservation Liabilities and Obligations; and it is further

ORDERED that upon the Closing Date and thereafter, with respect to any party or third party discovery requests that seek pre-Filing Date documents or other information in the MDL or any other proceeding related to the MDL Assigned Claims, the Fidelity Bond Assigned Claim, the E&O Assigned Claim, the Dooley Assigned Claim, the LCH Assigned Claim or any Assigned Rights, the Plan Administrator or Assignee will be the responsible responding party; and it is further

ORDERED that upon the Closing Date and thereafter, the SIPA Trustee shall no longer have title, possession, custody or control of any documents, systems, or data other than Retained Documents and will no longer have any document preservation obligations or obligations to respond to requests for information, including, but not limited to, requests made by governmental entities or parties to litigation involving MFGI, other than with respect to the Retained Documents; and it is further

9

**ORDERED** that pursuant to section 554(a) of the Bankruptcy Code, made applicable to this proceeding by SIPA sections 78fff(b) and 78fff-1(a), the records and systems listed on Schedule A to this Order (the "Discarded Records and Systems") are hereby abandoned; and it is further

**ORDERED** that the SIPA Trustee may (a) terminate the contracts for the Discarded Records and Systems effective immediately, and (b) instruct the vendors to destroy any data or records in their possession; and it is further

**ORDERED** that, the SIPA Trustee shall not be required to make further payments related to the Discarded Records and Systems for any period beyond the date of this Order, including but not limited to, the maintenance, destruction, or purge of the data thereto; and it is further

**ORDERED** that within five (5) business days of the completion of the purge, destruction, and termination of the Discarded Records and Systems, the vendors shall provide the SIPA Trustee a certification of destruction affirming the full and complete termination and purge of the data pursuant to this Order; and it is further

**ORDERED** that the Plan Administrator and Assignee shall not assume any liabilities or obligations of the SIPA Trustee not specifically enumerated in the Sale and Assumption Agreement; and it is further

**ORDERED** that the establishment of the Final Unsecured Claims Reserve in an amount of $48.8 million (if the Final Distribution is 95%) or $46.5 million (if the Final Distribution is 94%) is approved and that the Final Unsecured Claims Reserve shall be used to make a third and final distribution to the holders of the Other Unsecured Claims listed on Schedule B and to establish *pro rata* reserves for the Disputed Claims listed on Schedule C in the amount listed on each Schedule; and it is further

**ORDERED** that the establishment of the Final Administrative Expense Reserve in the allowable amount of any claims asserted for administrative expenses arising after September 1, 2013 is approved and that the Final Administrative Expense Reserve shall be used to make a final distribution to the holders of allowed administrative expense claims, if any; and it is further

**ORDERED** that the SIPA Trustee is authorized to release reserves of $367,653.85 from the Priority Claim Reserve, $2,203,953.52 from the Unsecured Claims Reserve, and $1,977,907.01 from the Second Unsecured Claims Reserve and transfer those released reserves to the Final Unsecured Claims Reserve; and it is further

**ORDERED** that, with respect to the Disputed Claims, the First Interim Distribution Order (ECF No. 8364) and the Second Interim Distribution Order (ECF No. 8745) shall continue to apply as to the *pro rata* reserves maintained and distributions made pursuant to such Order, in addition to the *pro rata* reserves and distributions authorized herein; and it is further

**ORDERED** that the SIPA Trustee is authorized to make a third and final distribution to the holders of the Other Unsecured Claims listed on Schedule B; and it is further

**ORDERED** that the SIPA Trustee shall make the third and final distribution to the holders of the Other Unsecured Claims as soon as practicable after the Closing Date; and it is further

**ORDERED** that after each Other Unsecured Creditor receives its final distribution in accordance with the Sale and Assumption Agreement and this Order, such distribution shall be deemed a final satisfaction of such creditor's Other Unsecured Claim, and such Other Unsecured Creditor shall no longer be entitled to any further distributions from the MFGI estate, the SIPA Trustee, or otherwise; and it is further

11

**ORDERED** that MF Global Finance USA Inc. and MF Global Holdings USA

Inc., which hold allowed subordinated claims in the amounts of $470 million and $130 million

respectively, and the holders of all other subordinated general unsecured claims in the MFGI

Proceeding, which claims are subordinated to the MF Global Finance USA Inc. and MF Global

Holdings USA Inc. claims as well, shall not be entitled to any recovery on account of such

subordinated claims from the MFGI estate, the SIPA Trustee, or otherwise; and it is further

**ORDERED** that the Record Date for the purpose of making the third and final

distribution authorized herein for all holders of claims is August 7, 2015; and it is further

**ORDERED** that if and to the extent that a Disputed Claim becomes an Other

Unsecured Claim pursuant to a Final Order[3] entered by this Court (or another court of competent

jurisdiction) or stipulation between the SIPA Trustee and the holder of such claim that has been

approved by the Court, the SIPA Trustee is authorized to make the requisite *pro rata* distribution

to the holder of each such Other Unsecured Claim as of the Record Date and to release the

amount corresponding with such claim from the Final Unsecured Claims Reserve without further

notice or Order of the Court; and it is further

**ORDERED** that with respect to Disputed Claims the SIPA Trustee determines

should be Other Unsecured Claims other than pursuant to Order of this Court, the SIPA Trustee

shall periodically file with the Court a supplemental schedule of such claim(s) (a "Supplemental

---

3.  For the purposes of this Order, the term "Final Order" shall mean an order or judgment of the Bankruptcy Court as entered on the docket, the operation or effect of which has not been stayed, reversed, or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review, writ of certiorari, or rehearing was filed or, if filed, remains pending, *provided however*, that no order shall fail to become a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure, Bankruptcy Rule 9024, any similar local bankruptcy rule or any similar state statute or rule may be filed with respect to such order.

Distribution Schedule") and serve the same on the holder(s) of such claim(s) and all parties in interest that have filed a notice of appearance and requested notice in the MFGI SIPA proceeding; and it is further

**ORDERED** that unless a written objection to that Supplemental Distribution Schedule is filed and served on the SIPA Trustee's counsel and the holder(s) of such claim(s) within ten (10) days of the date of service of the Supplemental Distribution Schedule, the SIPA Trustee shall be authorized to make the requisite *pro rata* distributions to the holder(s) of the Other Unsecured Claims identified in the Supplemental Distribution Schedule as of the Record Date and to release the amount(s) corresponding with respect to such claim(s) from the Final Unsecured Claims Reserve; and it is further

**ORDERED** that with respect to Disputed Claims that, either in whole or in part, become disallowed, expunged, or reclassified as subordinated claims or equity interests by Final Order entered by this Court (or another court of competent jurisdiction), or that are settled or withdrawn with similar effect, the SIPA Trustee is authorized to release the amount corresponding to the disallowed, expunged, or reclassified portion of such claim(s) from the Final Unsecured Claims Reserve without further Order of the Court; and it is further

**ORDERED** that the Trustee is authorized to pay any amounts due as tax based on any distributions to claim holders from the Final Unsecured Claims Reserve and release such amounts from the Final Unsecured Claims Reserve without further notice or Order of the Court; and it is further

**ORDERED** that nothing in this Order shall affect the administrative expense claims and/or requests for reimbursement of actual and necessary expenses, in accordance with SIPA and/or the Bankruptcy Code, of any person or entity who is a professional advisor (*e.g.*, counsel, financial advisors, accountants, claims agents) retained by the SIPA Trustee, including

13

all counsel retained pursuant to orders of the Bankruptcy Court and the District Court, and all

other professionals retained, with permission from SIPC, pursuant to SIPA section 78fff-1(a)(1),

and SIPC itself; and it is further

**ORDERED** that the SIPA Trustee is authorized and empowered to take such

steps and perform such acts as may be necessary to implement the effectuation of all

distributions authorized by this Order, including without limitation requiring holders of Other

Unsecured Claims to complete all tax forms and other documentation necessary to be received

by the SIPA Trustee prior to effectuation of such distributions; and it is further

**ORDERED** that entry of this Order is without prejudice to the right of the SIPA

Trustee to seek a further order of this Court disallowing, expunging, objecting to or otherwise

resolving any of the Disputed Claims; and it is further

**ORDERED** that ninety days after the final distribution the SIPA Trustee shall

stop payment on any check remaining unpaid (the "Uncashed Checks") and transfer any amounts

related to the Uncashed Checks to Assignee; and it is further

**ORDERED** that if the Closing does not occur, then this Order shall be deemed to

be nullified and void *ab initio* in all respects; and it is further.

**ORDERED** that this Order shall be effective and enforceable immediately upon

entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a).  To the extent

applicable, Bankruptcy Rule 6004(h) is hereby waived; and it is further

**ORDERED** that the SIPA Trustee, the Plan Administrator, and Assignee are

authorized and empowered to take such actions as may be necessary and appropriate to

implement the terms of this Order; and it is further

14

15-01362-mg Doc 123 Filed 06/29/15 Entered 06/29/15 23:22:12 Main Document Pg 146 of 149

**ORDERED** that this Court shall retain jurisdiction with respect to all matters

arising from or related to the interpretation or implementation of this Order.

Dated: August 19, 2015
      New York, New York

                                    **/s/Martin Glenn**
                                     MARTIN GLENN
                        United States Bankruptcy Judge

# EXHIBIT D

**JONES DAY**
Jane Rue Wittstein
222 East 41st Street
New York, NY 10017-6702
Tel: (212) 326-3939
Fax: (212) 755-7306
jruewittstein@jonesday.com

Bruce Bennett
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel: (213) 243-2533
Fax: (213) 243-2539
bbennett@jonesday.com

*Attorneys for MF Global Assigned*
*Assets LLC and MF Global Holdings*
*Ltd., as Plan Administrator.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE MF GLOBAL HOLDINGS LTD.** **INVESTMENT LITIGATION** | : : : x |
| **IN RE MF GLOBAL HOLDINGS LTD.** **SECURITIES LITIGATION** | : : : : : : |
| **JOSEPH DEANGELIS, et al.,** | : : |
| **Plaintiffs,** | : **Case No. 11-civ-7866 (VM)** |
| **-against-** | : : |
| **JOHN CORZINE, et al.,** | : : |
| **Defendants.** | : X |

**APPEARANCE OF COUNSEL**

Jane Rue Wittstein, who is admitted to practice in this Court, and Bruce Bennett, who is admitted *pro hac vice*,[1] hereby appear in the above-captioned cases on behalf of MF Global Assigned Assets LLC and MF Global Holdings Ltd., as Plan Administrator.

Dated: September 11, 2015

/s/ Jane Rue Wittstein
**JONES DAY**
Jane Rue Wittstein
222 East 41st Street
New York, NY 10017-6702
Tel: (212) 326-3939
Fax: (212) 755-7306
jruewittstein@jonesday.com

Bruce Bennett
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel: (213) 243-2533
Fax: (213) 243-2539
bbennett@jonesday.com

*Attorneys for MF Global Assigned Assets LLC and MF Global Holdings Ltd., as Plan Administrator.*

---

[1] Mr. Bennett has previously filed a notice of appearance in the above-captioned cases on behalf of the Plan Administrator. *See* Docket No. 518.

2

NAI-1500524423v1